

MAR 2 8 2008
FILED
J.N MAR 2 8 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **WALTER RUSSELL** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | 08cv1814 |
| **v.** ) | JUDGE BUCKLO |
| ) | MAG. JUDGE NOLAN |
| **DONALD HULICK, Warden of Menard** ) | |
| **Correctional Center** ) | |
| ) | **Case No. of State Court** |
| **Respondent.** ) | **Conviction: 00 CR 19109** |

**PETITION FOR WRIT OF HABEAS CORPUS**
**PURSUANT TO 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY**

## I.    INTRODUCTION

1.    Petitioner Walter Russell is currently an inmate at Menard Correctional Center, 711 Kaskakia Street, P.O. Box 711, Menard, IL 62259 (Inmate No. R28770).

2.    On July 27, 2004, a jury convicted him of murder and three counts of attempted murder in the Circuit Court of Cook County, Illinois. Russell had plead not guilty to all charges.

3.    On March 4, 2004, Russell was sentenced to 30 years for the murder conviction and three 15 year sentences for the attempted murder convictions, which were to be served concurrently.

4.    Russell brings this Writ because the State of Illinois has violated his constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution. Specifically, Russell asserts six separate causes of action that support this Petition:

- *First,* the appellate courts of Illinois have denied Russell a "rational" and "non-arbitrary" review of his conviction by refusing to review the merits of his appeal under a standard consistent and uniform with other cases that have presented substantially similar issues.

- *Second,* Russell was denied due process and a fair trial when the trial court incorrectly instructed the jury on how to analyze witness identification testimony by inserting the conjunction "or" between each of the factors the jury was supposed to weigh.

- *Third,* Russell was denied due process and a fair trial when evidence obtained by an illegal seizure was introduced to the jury.



- *Fourth*, Russell was denied due process and a fair trial when evidence obtained from an overly suggestive lineup was introduced to the jury.

- *Fifth*, Russell was denied due process and a fair trial when the trial court gave a jury instruction on accountability when there was not sufficient evidence to support a theory that Russell acted as an accomplice.

- *Sixth,* the State did not present a sufficient amount of evidence to support Russell's conviction.

## II.    JURISDICTION

5.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2254 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. 1331 (federal question).

## III.    VENUE

6.   Venue is proper in the Northern District of Illinois because Mr. Russell is detained at Menard Correctional Center in Menard, Illinois.

## IV.    EXHAUSTION

7.   Mr. Russell has exhausted all state remedies.

8.   After his conviction, Mr. Russell filed a Notice of Appeal with the Appellate Court of Illinois (First District) on March 23, 2004.  Russell filed his opening appellate brief with the Appellate Court on April 15, 2005.

9.   On November 30, 2006, the Appellate Court of Illinois First Judicial District ("First District") affirmed the trial court's judgment and denied Russell's appeal.  (A true and correct copy of this decision is attached as Exhibit A)

10.   Mr. Russell filed a Petition for Leave to Appeal with the Supreme Court of Illinois on January 11, 2007.  On March 28, 2007, the Supreme Court of Illinois denied Mr. Russell's Petition.  (A true and correct copy of this Petition is attached as Exhibit B)

11.   On May 24, 2007, Mr. Russell filed his Motion for Leave to Reconsider Denial of Leave to Appeal in Light of [the Supreme Court of Illinois's] Decision in *People v. Piatkowski* and a separate Motion to Reconsider.  On July 6, 2007, the Supreme Court of Illinois denied Plaintiff's Motion for Leave.  (A true and correct copy of this Motion is attached as Exhibit C)

12.   Mr. Russell has not previously filed a writ of habeas corpus in this matter.



## V.    FACTS AND PROCEDURAL HISTORY

### Underlying Events

13.    During the early hours of July 19, 2000, Aletra Slack died of a single gunshot wound to her head. Earlier that evening, she was involved in a minor car accident when her friend, Raashawn Langford, backed his SUV into a parked van (hereinafter referred to as the "first accident") on the south side of Chicago.

14.    Russell and his friend, Gregory Craig, were sitting in the van when the SUV backed into it. Raashawn, claiming he saw Craig brandish a pistol, fled the scene of the accident and testified that the van pursued Raashawn's SUV. Shortly thereafter, someone fired at least one bullet into the SUV killing Slack.

15.    After the shooting, Raashawn lost control of the SUV and crashed into a tree (hereinafter referred to as the "second accident"). One witness in the SUV, Shivone Langford, testified that she saw Russell and another man drive the van away from the second accident. Raashawn Langford and Reginald Tracy did not identify Russell during the lineup.

### Police Investigation

16.    The initial police investigation focused on Gregory Craig. The Riverdale police picked up Craig and held him against his will for three days. Craig, who had been drinking alcohol for 14 hours when he witnessed the events of July 19, 2000, was also a convicted felon.

17.    The police held Craig until he gave a statement implicating Russell in Slack's death.

18.    On at least one occasion, Craig asked to leave the police station and was told he could not leave until he cooperated. According to the Riverdale police, Craig was held because they could not rule him out as a suspect. On July 23, 2000, four days after Slack was killed, Craig gave a statement implicating Russell (and absolving himself) to the Assistant State's Attorney and was allowed to leave the police station. (A true and correct copy of the transcript of Craig's trial testimony is attached as Exhibit D)

19.    Based on Craig's statement, the police turned their attention to Russell. Around this time, Russell, accompanied by his attorney, went to the police department. Once Russell and his attorney arrived, the police were told that Russell was exercising his right to remain silent, his right to counsel, and that he demanded his attorney be present for any and all lineups, show-ups, or other similar method of identification. The police agreed to this arrangement and memorialized the agreement in writing. (A true and correct copy of the memorialized agreement between Russell and the Riverdale Police is attached as Exhibit E)

20.    Shortly after reaching this agreement, Russell's attorney left the police station and Russell was arrested. He was then forced to participate in a lineup.

3



21. During the lineup, one occupant from the SUV, Shivone Langford, identified Russell. The two other SUV occupants, Raashawn Langford and Reginald Tracy could not identify Russell.

22. The police never recovered the weapon used to murder Slack, the van that followed the SUV, or any other forensics or physical evidence linking Russell to Slack's death.

Russell's Trial

23. The State of Illinois did not produce a single witness who saw Russell fire a gun at the SUV or saw the shot originate from the van.

24. Russell's conviction was based entirely on circumstantial evidence derived from witness identification testimony.

25. Only one occupant of the SUV, Shivone Langford, identified Russell at the "second accident" where Slack died. At the time she claims to have seen Russell, Shivone was running from a SUV that had just hit a tree. She began to vomit. She was also "shaken" and "dazed".

26. At the conclusion of the trial, the court incorrectly read Illinois Pattern Instruction 3.15. The instruction lists the five factors that the jury should consider when evaluating witness identification testimony. The trial court mistakenly inserted the conjunction "*or*" between each of these factors. Those factors are:

   (1)    the witness's opportunity to view the offender;

   (2)    the witness's degree of attention;

   (3)    the accuracy of the witness's prior description of the offender;

   (4)    the level of certainty demonstrated at the identification confrontation; *and*

   (5)    the length of time between the crime and the identification. (A true and correct copy of the jury instruction given at Russell's trial is attached as Exhibit F)

27. By using the conjunction "*or*" instead of "*and*" the court permitted the jury to consider fewer than all the required factors in evaluating Shivone Langford's testimony. This permitted the jury to focus only on evidence that supported guilt and ignore exculpatory evidence. This is particularly egregious where, as was the case in Russell's trial, the only evidence is witness identification testimony.

28. After his conviction, Mr. Russell filed a Notice of Appeal with the Appellate Court of Illinois First Judicial District on March 23, 2004.

Direct Review

29. Defendant filed his opening appellate brief with the Appellate Court on April 15, 2005. In his appeal, Russell presented the following arguments:



- the identification testimony should have been suppressed because it rested on evidence obtained from an illegal arrest made without probable cause;

- the trial court erroneously instructed the jury on the evaluation of witness testimony by inadvertently inserting the conjunction "or" between the five factors the jury should weigh;

- the court erred in refusing to suppress the pretrial lineup on grounds that it was overly suggestive;

- the Court gave an accountability instruction that confused and mislead the jury;

- the state's evidence was insufficient to prove Russell's guilty beyond reasonable-doubt.

30.    On November 30, 2006, the Appellate Court of Illinois First Judicial District ("First District") affirmed the trial court's judgment and denied Defendant's appeal.

31.    The First District held that the evidence was sufficient to support a conviction beyond a reasonable-doubt. It based this holding on witness identification testimony that placed Russell at both the "first" and "second" accidents.

32.    With regard to the jury instruction error, the First District held that because "there was sufficient evidence presented at trial to find Russell guilty...we cannot say that the evidence was closely balanced or that the outcome of this case would have been different had the instruction not included the 'ors.'" (Exhibit A, at a-32). The First District added "[c]onsequently, reversal is not warranted in this case." *Id.* The First District did not provide any further elaboration on this important issue.

33.    Subsequent to the First District's decision, Mr. Walter filed a timely Petition for Leave to Appeal with the Illinois Supreme Court. The Illinois Supreme Court denied this Petition on March 28, 2007.

34.    On May 24, 2007 – less than two months after denying Russell's Petition for Leave to Appeal – the Supreme Court of Illinois issued its decision in *People v. Piatkowski*, 870 N.E.2d 403 (Ill. 2007). In *Piatkowski*, a case with facts strikingly similar to Russell's, the Supreme Court of Illinois reversed the defendant's conviction and ordered a new trial. Notably, the Supreme Court of Illinois held that "[w]hether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable-doubt challenge." *Id.* at 411. Indeed, the Supreme Court of Illinois held that the evidence presented against the *Piatkowski* defendant was sufficient to sustain a defendant's conviction but *not* closely balanced. Accordingly, it ordered a new trial. (A true and correct copy of *People v. Piatkowski*, 870 N.E.2d 403 (Ill. 2007) is attached as Exhibit G)

35.    In response to this decision, Mr. Russell filed a Motion for Leave to Reconsider Denial of Leave to Appeal in Light of [the Supreme Court of Illinois's] Decision in *People v. Piatkowski* and a separate Motion to Reconsider. On July 6, 2007, the Supreme Court of



Illinois denied Plaintiff's Motion for Leave in its entirety and without explanation. To date, the facts of Russell's appeal have not been considered under the *Piatkowski* framework.

36. On October 4, 2007, Mr. Russell filed a Petition for Writ of Certiorari to the Supreme Court of Illinois ("Certiorari Petition").

37. In his Certiorari Petition, Russell presented two questions to the Supreme Court of the United States. *First*, whether a state supreme court's decision to arbitrarily deny a criminal defendant a state provided right of appellate review violates his due process rights under the Fourteenth Amendment? *Second*, whether an erroneous jury instruction that misstates the law on evaluating witness identification testimony denies a criminal defendants due process under the Fourteenth Amendment when the only evidence that supports a conviction beyond a reasonable-doubt is witness identification testimony?

38. On November 26, 2007, the Supreme Court of the United States declined to accept Mr. Russell's Certiorari Petition.

## VI. CLAIMS FOR RELIEF

### A. First Cause of Action — The Supreme Court of Illinois Denied Walter Russell Due Process Under the Fourteenth Amendment When It "Irrationally" and "Arbitrarily" Denied His Motion to Reconsider.

39. In *Piatkowski*, the Supreme Court of Illinois plainly held that when analyzing whether evidence is closely balanced, the appellate court should not merely look to see if the evidence was sufficient to support a conviction on review against a reasonable-doubt challenge.

40. The First District, however, held that Russell's conviction should not be overturned despite the trial court's "plain error" in reading the witness identification jury instruction incorrectly because there was sufficient evidence to support a conviction against a reasonable-doubt challenge.

41. The Supreme Court of Illinois's decision to refuse to reconsider Russell's appeal, or remand the case to the First District in light of *People v. Piatkowski* is irrational and arbitrary.

42. As a result, Russell has yet to receive a constitutionally valid appellate review of his criminal conviction. This is a direct denial of his constitutional right to due process under the Fourteenth Amendment.

**B.    Second Cause of Action — The Trial Court Denied Russell Due Process by Rendering His Trial Fundamentally Unfair in Violation of the Fourteenth Amendment By Incorrectly Reading the Instruction on Witness Identification Testimony with the Conjunction "Or".**

43.    As noted above, the jury instruction on witness identification testimony, as it was given at the conclusion of his trial, implied to the jury that it could ignore all exculpatory evidence and focus only on evidence that suggested guilt.

44.    Russell's conviction is based entirely on the credibility of a witness, and the jury instruction that relates to the evaluation of that witness's testimony is tainted by the error.

45.    Furthermore, the Supreme Court of Illinois recently reversed a conviction where "the case turned on the credibility of the witnesses' identification testimony and the erroneous instruction involved how the jury would weigh and evaluate such identification testimony." *People v. Piatkowski* 870 N.E.2d 403, 413 (Ill. 2007).

46.    The only evidence connecting Russell to Slack's death was witness identification testimony that placed him at the scene of the crime, and the erroneous instruction permitted the jury to ignore evidence that suggested that the identification was unreliable.

**C.    Third Cause of Action — The Trial Court Denied Walter Russell A Fair Trial By Failing to Suppress Evidence Obtained From An Illegal Seizure of the Defendant.**

47.    The Riverdale Police did not have probable cause to arrest Russell when they forced him into a lineup against his will.

48.    At the time of Russell's arrest, the only basis for probable cause that Russell murdered Slack was Craig's statement implicating Russell in Slack's death.

49.    The information Craig provided was insufficient to give the police a reasonable suspicion that Russell murdered Slack because Craig was unreliable.

50.    Craig is a convicted felon, was a suspect of the crime, was held against his will without arrest for nearly three days, and had been drinking alcohol for nearly fourteen hours when he witnessed the events. Finally, Craig absolved himself of any involvement in the crime when he accused Russell.

51.    The Fourth Amendment prohibited the seizure of Russell without probable cause. Furthermore, any evidence that was "discovered" as a direct result of an illegal seizure, cannot be introduced at trial.

52.    Here, the evidence "discovered" after Russell was illegally seized by the Riverdale police — the pretrial lineup — was obtained as a direct result of the illegal seizure.

53.    The trial court should have suppressed the line-up as "fruit of the poisonous tree." By failing to suppress the line-up, the trial court denied Russell a fair trial.

**D.     Fourth Cause of Action — The Trial Court Denied Russell Due Process by Failing to Suppress the Identifications Because the Lineup Was Unconstitutionally Suggestive.**

54.     The lineup Riverdale Police forced Russell to participate in was unconstitutionally suggestive.

55.     Russell was physically distinct from the other participants. First, Russell was the only participant in the lineup who was bald. Second, Russell weighed nearly 25% more or 25% less than all other participants. Third, a Riverdale police detective directly addressed Russell during the lineup which caused him to move. Finally, the State's most important witness, Shivone Langford, already knew at least one participant in the lineup and could eliminate her acquaintance as a possible suspect.

56.     Taken collectively, the totality of the circumstances denied Russell due process.

57.     As a result, the identifications that resulted from the lineup should have been suppressed at Russell's trial.

**E.     Fifth Cause of Action — The Trial Court Denied Russell Due Process By Giving the Jury an "Accountability" Instruction When There Was Not Sufficient Evidence to Support the State's Theory that Russell May Have Acted as an Accomplice.**

58.     The due process clause of the United States Constitution protects an accused against conviction except upon proof beyond a reasonable-doubt of every element necessary to constitute a crime with which he is charged.

59.     The Illinois statute on accountability states, in relevant part, that a defendant is legally accountable for the actions of another when:

> "(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/2-2(c) (West 1994)

60.     Guilt predicated on an accountability theory is proper only some evidence has been introduced that he specifically intended to facilitate the underlying crime.

61.     The State did not produce any evidence that Russell specifically intended to facilitate the underlying crime.

62.     The physical evidence supported a finding that only one bullet was fired at the SUV. Furthermore, the last person seen with a gun was Craig not Russell.

63.     The evidence elicited at trial merely supports a finding that Russell, after his van was hit by the SUV, then chased it. This alone is not sufficient to support a finding of guilt on based on an accountability theory.

8



64.    In closing argument, however, the State argued that Russell was legally responsible for the actions of an unidentified shooter who was a passenger in the van.

65.    This error was exacerbated when the State misstated the law during Closing arguments by declaring that "if you believe there was somebody else in the van with him, Russell is still guilty." The State compounded the error in rebuttal declaring again "[Russell] is responsible for anything that happens by anyone in the van."

66.    Thus, the trial court erred by giving an accountability instruction that was not supported by the evidence elicited at trial. Doing so denied Russell a fair trial and due process. (A true and correct copy of the jury instruction on accountability given at Russell's trial is attached as Exhibit H)

F.    **Sixth Cause of Action — The State's Evidence Was Insufficient to Prove Russell's Guilt Beyond a Reasonable-Doubt**

67.    The State did not offer any eyewitness testimony or forensic evidence that linked Russell to underlying crimes.

68.    The circumstantial evidence produced to convict Russell was derived entirely from witness identification testimony.

69.    The witness identification testimony in this case was insufficient to support a conviction because it was unreliable, inconsistent and tainted by the actions of the Riverdale police department.

70.    For example, Craig's testimony was elicited only after he was held against his will for three days by the Riverdale police department. Furthermore, when he witnessed the events surrounding Slack's death, he was intoxicated.

71.    Shivone Langford's testimony was also unreliable. At the time she saw Russell, she shaken and dazed from the car accident. She was also vomiting out the side of the vehicle.

72.    Other testimony elicited during the trial is equally unreliable. Numerous witnesses were convicted felons. Furthermore, much of the testimony contradicted the testimony of other witnesses and evidence. For example, one witness, Reginald Tracy, another witness in the SUV, testified that he believed ten to twenty shots were fired at the SUV. The physical evidence, however, demonstrated that only one shot was actually fired at the SUV.

73.    Therefore, taken individually or cumulatively, no rational trier of fact could have found Russell guilty beyond a reasonable-doubt. The evidence is entirely circumstantial and based on testimony that is self-interested, inconsistent, and tainted.



## VII.    PRAYER FOR RELIEF

WHEREFORE, Petitioner, Walter Russell, prays that this honorable Court grant the following relief:

A.    Assume jurisdiction over this matter,

B.    Grant the writ of habeas corpus,

C.    Grant any other relief that his Court deems just and proper.

Date:  March 28, 2008

Respectfully submitted,

Timothy A. Duffy
Andrew P. Young
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Attorneys for Petitioner
Walter Russell*

## VERIFICATION

1.    I, Andrew P. Young, under penalty of perjury state the following:

2.    I am the *pro bono* attorney for Petitioner, Walter Russell to whom the foregoing Petition for Writ of Habeas Corpus relates.

3.    Walter Russell, is detained in the Menard Correctional Facility in Menard Illinois. That facility is currently under "lockdown" due to the recent flooding.

4.    I believe that Mr. Russell has reviewed this Petition but is unable, due to the lockdown, to sign the verification form. Given that these issues and allegations have been asserted in prior filings, including a Certiorari Petition with the United States Supreme Court, I have no reason to believe he would not affirm the truth of factual contents of this Petition.

5.    Therefore, I am signing this Verification on his behalf. *See Warren v. Cardwell*, 621 F.2d 319, 321 (9th Cir., 1980) (noting that it was permissible for an attorney to sign a verification where Petitioner "could not sign and verify the petition because the prison was "locked down")


Dated:  *March 28, 2008*


Andrew P. Young

# EXHIBIT A

**NOTICE**

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

Fourth Division
November 30, 2006

No. 1-04-0853

## IN THE
## APPELLATE COURT OF ILLINOIS
## FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 00 CR 19109 |
| | ) | |
| WALTER RUSSELL, | ) | Honorable |
| | ) | Thomas J. O'Hara, |
| Defendant-Appellant. | ) | Judge Presiding. |

## O R D E R

The defendant-appellant, Walter Russell, was indicted and charged with the murder of Aletra Slack, and the attempted murders of Raashawn Langford, Reginald Tracy, and Shivone Langford. Following a jury trial, Russell was convicted of all charges and he was sentenced to concurrent prison sentences of 30 years for murder and three 15 year terms for the attempted murders. On appeal, Russell presents the following issues for review: (1) whether the trial court erred when it denied the motion to suppress his identification; (2) whether the State proved Russell guilty of murder and attempted murder beyond a reasonable doubt; (3) whether the trial court erred when it gave I.P.I. Criminal 3.15 to the jury and read the bracketed word "or"; and (4) whether sufficient evidence was presented for the trial court to give the jury the accountability instruction.

1-04-0853

## BACKGROUND

During the early morning hours of July 19, 2000, Raashawn Langford was driving an SUV with three passengers, Aletra Slack, Reginald Tracy, and Shivone Langford. Raashawn backed his SUV into and hit Russell's van. Raashawn fled the scene of the accident, and Russell chased the SUV in his van and fired a handgun into that vehicle. During the course of the car chase and shooting, Aletra Slack was shot and killed. The car chase ended when Raashawn crashed his SUV into a tree at 120th and Wentworth Avenue in Chicago. Russell left the scene of the accident. Gregory Craig, a passenger in Russell's van, was arrested and provided a statement to the Riverdale Police Department and he identified Russell as the driver of the van. On July 20, 2000, a detective went to Russell's mother's home, and told her that the police were looking for Russell. Subsequently, Samuel Adam, Jr., Russell's attorney, contacted the Riverdale police, and told the police that he represented Russell and that he would bring Russell in for questioning. On July 21, 2000, Adam and Russell went to the Riverdale Police Department and Russell surrendered. At that time, Russell was arrested and subjected to a police lineup. On August 1, 2000, Russell was indicted for the murder of Aletra Slack and the attempted murders of Raashawn Langford, Reginald Tracy, and Shivone Langford.

### The Motion to Suppress

On January 7, 2002, Russell filed a motion to suppress identification. Russell argued that he was denied his Sixth Amendment right to counsel and that the police lineup was unconstitutionally suggestive. The trial court heard testimony and oral arguments on the motion.

### LaToya Higgenbottom

LaToya Higgenbottom testified that on July 21, 2001, at 1:00 p.m., she viewed a lineup at the

- 2 -

1-04-0853

Riverdale Police Department. Higgenbottom sat in a hallway for fifteen minutes at the police department with three other witnesses prior to viewing the lineup or being interviewed by the police. Higgenbottom testified that nobody in the hallway was talking during that time. Each witness was called from the hallway to individually speak with the police. Higgenbottom testified that she spoke to the police prior to viewing the lineup and told them what she observed and then viewed the lineup. Higgenbottom testified that a detective escorted her to the lineup room, told her to look, to pick out a number, and that the detective then left the room that she was in. Higgenbottom testified that she identified Walter Russell as a person she saw at the 136th Street accident. Higgenbottom testified that all of the men in the lineup were holding the numbers the same way, that she did not pay attention to whether all of the men were the same height or what clothing they were wearing, if they were dark or light skinned, and that all she looked at was their faces. On cross-examination, Higgenbottom testified that none of the police officers told her who to pick out of the lineup, that she never saw any police officers in the lineup room with the men in the lineup, and that it took her five seconds to identify Russell in the lineup.

### Towanda Washington

Towanda Washington also viewed the lineup at the Riverdale Police Station. Washington testified that when she arrived at the police station, she waited in a hallway with other witnesses. Washington testified that a detective took her to a small room, and she looked through a small window and saw five or six black males in the room. Washington did not recall what clothing the men in the lineup were wearing or what their heights were. Washington testified that they were all holding numbers toward the center of their bodies. Washington testified that the detectives did not

1-04-0853

speak to her during the lineup. Washington identified Russell as the person she saw at the 136th Street accident. During cross-examination, Washington testified that no police officer told her who to pick out of the lineup and no one signaled to her about who to pick. She also testified that while she was viewing the lineup, she did not see any police officers go into the lineup room.

### Shivone Langford

Shivone Langford testified that she went with her husband, Raashawn Langford, to the Riverdale Police Station and that after being interviewed by detectives, she viewed a lineup. Shivone testified that when she viewed the lineup, she went alone into a small room and that the officer told her to identify the person, if she could. Shivone testified that she saw men sitting on a bench, holding numbers in front of them. Shivone could not recall if any of the men in the lineup adjusted their numbers at any time. Shivone testified that the officer did not speak to her while she was viewing the lineup. Shivone also testified that she identified Russell as a person she saw at the Wentworth accident, and also that she recognized the person in the number five position in the lineup as someone that she knew from the neighborhood.

### Detective Rolniak

Detective William Rolniak, Jr. testified that he was assigned to investigate the death of Aletra Slack, and that on July 21, 2000, he interviewed some witnesses and provided Sergeant Satriano with photos of Russell that were contained in the department records from previous arrests. Detective Rolniak also testified that at approximately 9:00 a.m. on July 21st, Russell and his attorney, Samuel Adam, Jr., appeared at the Riverdale Police Station and that Russell was immediately arrested, processed, and booked. Detective Rolniak testified that he never spoke with Adam. Detective

- 4 -

1-04-0853

Rolniak stated that he received a written form signed by Russell and Adam indicating that Russell wanted his attorney present for any pre-charging lineups. Detective Rolniak testified that Sergeant Satriano attempted to contact Adam to determine if he wanted to be present for the lineup. Detective Rolniak testified that the lineup was conducted four or five hours after he received the form from Russell's attorney because they waited for all of the witnesses to arrive. The following seven witnesses viewed the lineup: Tiffany Rogers, LaToya Higgenbottom, Towanda Washington, Shivone Langford, Raashawn Langford, Robyn Reynolds, and Reginald Tracy. Detective Rolniak testified that he spoke with all seven witnesses before beginning the lineup. Detective Rolniak testified that he brought each witness into the room to view the lineup and that all of the witnesses who were to view the lineup were separated. Detective Rolniak told each witness the same information about viewing the lineup, and he also testified that Russell never indicated to him that he wanted to have his attorney present for the lineup.

On cross-examination, Detective Rolniak testified that Russell was allowed to select his own number in the lineup, that all of the participants in the lineup were seated, that they were all black, that some were shorter and weighed less and some were taller and weighed more than Russell. Detective Rolniak testified that six people, including Russell, participated in the lineup, and that Russell was five feet, eleven inches tall and 270 pounds. Detective Rolniak testified that of the other participants in the lineup, three were six feet tall, one was five-foot-ten, and another was six-foot-five, and one weighed 205 pounds, two participants weighed 215 pounds, one was 220 pounds, and another participant was 330 pounds. Detective Rolniak also testified that Higgenbottom, Washington, and Shivone were able to identify Russell in the lineup. Detective Rolniak also testified that after a

- 5 -

1-04-0853

witness viewed the lineup, they were brought back to the room or the hallway that they had waited in before the lineup and that officers were present to ensure that nothing was said by the witnesses.

### Sergeant Satriano

Sergeant Peter Satriano testified that he interviewed witness Gregory Craig and that Craig told him that the person who killed Aletra Slack had the nickname "man", was either a police officer or a jail guard, and drove a van. Sergeant Satriano testified that Russell's attorney, Adam, called him on July 20th and told him that he would surrender Russell at the police station. Sergeant Satriano testified that he did not speak to Adam at the police station and he was not present during the lineup.

### Lieutenant Amsden

Lieutenant Dan Amsden of the Riverdale Police Department testified that he photographed the lineup. Lieutenant Amsden testified that he took the photo of the lineup in the police garage after the lineups were conducted. Lieutenant Amsden did not recall if any of the participants in the lineup dropped their number during the lineup. Lieutenant Amdsen testified that police normally talk directly to a suspect while the lineup was being conducted if he dropped his number from under his chin.

### Walter Russell

Russell testified that his attorney, Adam, and he signed a form indicating that he wanted his attorney to be present during any pre-indictment lineups or show-ups. Russell testified that Adam took the agreement into the Riverdale Police Department for a detective to sign and that when he next saw the agreement, Detective Rolniak's signature was on it. The agreement was written on Samuel Adam's attorney-letterhead and it was signed by Russell, Adam, and Detective Rolniak. The

- 6 -

1-04-0853

agreement provided as follows:

> "I, ATTORNEY SAMUEL ADAM, represent WALTER RUSSELL,
> regarding the shooting on July 19, 2000. MR. RUSSELL exercises
> his 5th Amendment right under the United States Constitution to
> remain silent, and does not wish to speak to any law enforcement
> official in any capacity about the events of July 19, 2000 without his
> legal counsel present. This letter serves as notice to all law
> enforcement that MR. RUSSELL is exercising his right to silence and
> his right to an attorney. Furthermore, MR. RUSSELL, demands that
> his attorney, SAMUEL ADAM, be present for any and all
> pre-indictment or pre-charging lineups, show-ups, and/or similar
> methods of identification."

Russell testified that once the form was signed, he was taken in the back, fingerprinted, his photograph was taken, his shoes were taken away, and he was put into a cell. Russell testified that he was in a cell for three or four hours when he was then taken to a lineup. Russell testified that he asked where his attorney was and he asked to make a phone call, but Detective Rolniak told him that he could not make a call at that time and that he could not refuse to participate in the lineup. Russell testified that he was given numbers to choose and that he chose to be number three in the lineup. Russell testified that Detective Rolniak and Lieutenant Amsden were involved in the lineup process and that Sergeant Satriano stood in the doorway of the lineup room. Russell testified that although he could not see through the ten-by-ten inch window, he could see the viewer's shape and a shadow

1-04-0853

when they were looking through the other side. Russell also said that they sat for the lineup and were told to hold the number cards up under their chins with one hand. Russell testified that during the lineup, his number was coming down and Sergeant Satriano told him to hold it up. On cross-examination, Russell testified that at the time of his arrest, he weighed approximately 270 pounds and stood five feet eleven inches tall, and that there were at least two or three other participants that were about his size in the lineup.

### Stipulation

Next, the parties stipulated that if attorney Samuel Adam, Jr. were called to testify, he would have stated that on July 20, 2000, he called the Riverdale police and asked if they were trying to locate Russell. Adam would have also testified that he told the Riverdale police that he would surrender Russell to them the following morning. Adam would have also testified that when he arrived with Russell at the Riverdale Police Department on the morning of July 21st, he told the detectives that he did not wish for any officer or detective to question him about the murder investigation of Aletra Slack, and he also requested to be present for any and all pre-charging lineups. Adam would have also testified that he provided the detectives with a written form indicating those requests and that he also left several telephone numbers where he could be reached. Adam would have testified that he did not receive any phone calls or messages informing him that Russell was going to be put into a lineup.

### Trial Court's Ruling & Motion to Reconsider

On January 10, 2003, the trial court denied Russell's motion to suppress the identification. The trial court found that Russell was not denied a right of counsel because the Sixth Amendment

- 8 -

1-04-0853

does not arise until after the defendant has been indicted or formally charged. With regard to the suggestiveness of the lineup argument, the trial court relied heavily on the photograph taken by the Riverdale Police just prior to the lineup. The court found that the difference in weight was not suggestive. The trial court also found that raising or lowering one's number was not suggestive because the witness viewing the lineup would "clearly think that maybe this person was not well trained and probably is one of the ringers in the lineup." Thus, based on the totality of the circumstances, the trial court denied the motion.

Russell moved for the court to reconsider his motion to suppress. The trial court heard arguments and a stipulation from Samuel Thomas, a participant in the lineup. It was stipulated that if Thomas had been called to testify at the hearing, he would have testified that he stood next to Russell in the lineup and that Detective Rolniak received a message on his radio during the lineup telling him to make Russell sit up and hold his number up. Thomas would have also testified that none of the other participants in the lineup were spoken to or had their numbers moved during the lineup. Thomas would have testified that he saw the shadows and shapes of people looking through the window when Russell was told to hold his number up. On May 23, 2003, the trial court denied Russell's motion to reconsider, finding that there was not enough evidence to establish that the lineup was suggestive.

### The Trial

At trial, the State presented the testimony of the following witnesses: Bruce Fairfield, Aletra Slack's stepfather; Dr. Mitra Kalekar, a Cook County Medical Examiner; Gregory Craig; LaShanda Robinson; Towanda Washington; Reginald Tracy; Shivone Langford; Raashawn Langford; Lynne

1-04-0853

Russell, Walter Russell's mother; Detective Darrell Shaw, of the Chicago Police Department; and Detective Peter Satriano, of the Riverdale Police Department. The Defense called two witnesses: Stella Bailey and Samuel Adam, Jr. Only testimony relevant to this appeal has been included in this order.

## The State's Case

### Gregory Craig

Gregory Craig, Russell's friend of four to six years, testified that he was with Russell on the night of July 19, 2000, and he rode with Russell to Riverdale between 11:00 p.m. and midnight in Russell's 1998 Astro van. Craig testified that he and Russell were drinking and that they were with Craig's girlfriend, Robyn Reynolds, and a woman named LaShanda. While they were in the Pacesetter neighborhood of Riverdale, both girls eventually exited the van. Craig also testified that a silver SUV then backed into the front passenger side door of Russell's van. Craig testified that after the SUV hit the van, the driver of the SUV pulled up to the van as if he was going to stop, but when Russell exited his van, the SUV pulled away. Craig testified that when the SUV pulled off, Russell yelled at Craig to hand him his pistol and then Russell reached into a glovebox on the floor of the van in between the two front seats. Craig testified that he saw Russell pull out a black nine millimeter pistol and point it at the SUV. Craig testified that Russell then drove off after the SUV and gave chase. Craig testified that Russell caught up with the SUV, and as the van was still moving, Craig jumped out of the van.

Craig testified that he reported the hit-and-run, and then Craig heard gunshots that sounded like they were coming from Halsted Street, a block away. Craig testified that he returned to

- 10 -

1-04-0853

Reynold's house where he and Russell left Reynolds and LaShanda. Craig, Reynolds, LaShanda and another woman from across the street walked down the street to see what was happening. After about twenty minutes, Russell pulled up to the group in his brother's gray Monte Carlo car. Craig testified that Russell told them that the SUV he was chasing ran into a tree and asked them if they wanted to see it. The group got into Russell's brother's car and traveled to 128th and Halsted, where Russell stopped and exited the car because he was being followed by a man named Steve Green. Craig testified that after Russell returned to the car, LaShanda and Reynolds, the two women who were riding with them, were dropped off in the Pacesetter neighborhood. Craig testified that he and Russell rode to Russell's grandmother's house at 139th and Dearborn and retrieved Russell's van.

LaShanda Robinson

LaShanda Robinson testified that on July 18, 2000, Russell and Gregory Craig picked her up at her house and she rode with them to her friend, Robyn Reynold's house. When they arrived at Reynold's house, Craig exited the van and Robinson remained in the van talking to Russell. Robinson testified that Russell took a black gun out of the glove compartment and showed it to her. Robinson testified that she told Russell to put the gun away and he placed it into a glove compartment between the passenger's and driver's seats. Robinson testified that she then exited the van and Craig got back into the van. Robinson saw a truck from across the street back out and hit Russell's van. Robinson testified that after the truck hit Russell's van, Russell got out of his van and appeared to be angry as he inspected the damage to the passenger's side of the van. Robinson testified that she believed at that point, Russell asked Craig for his gun. Robinson testified that Russell got back into his van as the SUV was pulling away, and that Russell followed the SUV and then came back past where

- 11 -

1-04-0853

Robinson and Robyn were standing again, behind the truck. Robinson testified that she thought that she heard gunshots after the SUV and Russell's van passed.

Robinson testified that she, Reynolds, and Washington, a neighbor from across the street, began walking and they met Craig. Washington was then picked up by a man named Steve Green and the two drove away. While Craig, Robinson, and Reynolds stood on the street, Russell drove up in a gray car and asked them if they wanted to see the crash. They got into the car. Robinson testified that when she asked Russell if he had shot anyone, he responded no. When they got to 128th and Halsted, Russell got out of the car and had a conversation with Steve Green. When Russell finished the conversation, he drove to his house on Dearborn, where they got out of the gray car and into Russell's van. Robinson testified that Russell dropped her and Reynolds off at a recreation center near Reynolds's home.

### Towanda Washington

Towanda Washington testified that on July 18, 2000, she lived on 136th Street in Riverdale, and that around midnight she was home with her friends, Raashawn, Reginald, Aletra, Latoya, and Tiffany. Washington testified that after staying for a half hour, the group left in Raashawn's SUV. Washington testified that as the SUV backed out of her driveway, it crashed into the side of an Astro van that was parked across the street. Washington identified Russell in court as the person that she saw saying in a "mad voice" that somebody had hit his van and to get his gun. Washington testified that Russell said to get his gun to a male who was across the street and that the male passed the gun to Russell. Washington testified that Raashawn pulled off in his SUV and that Russell followed him in the van. Washington testified that she saw the SUV and the van go north on 136th Street and then

- 12 -

1-04-0853

saw both vehicles coming back in the other direction. Washington testified that she walked across the street to Reynolds' house and that she, Robinson and Reynolds began walking toward 136th Street. As they walked, Gregory Craig approached them. Washington testified that she then got into a car with Steve Green and rode with him until he stopped at about 127th Street and had a conversation with Russell, who was at that time driving a gray car.

Washington testified that when she asked Russell what happened on 120th Street, Russell told her that it was just an accident. Washington got back into Steve Green's vehicle and he drove her to 120th and Halsted, where he dropped her off. Washington testified that as she walked along 120th Street, she saw her friends, Latoya and Tiffany, who told her that Aletra had been shot in the head.

### Reginald Tracy

Reginald Tracy testified that on July 18, 2000, he went out with Raashawn Langford, Aletra Slack, and Shivone Langford to celebrate his birthday. Tracy testified that Raashawn drove the group in his SUV to Washington's house on 138th Street in Riverdale. Tracy testified that they arrived at Washington's house around midnight and stayed for fifteen or twenty minutes. As they left Washington's house, Tracy sat in the back seat with his girlfriend, Aletra Slack. Tracy testified that Raashawn backed into a mini Astro van that was parked directly across the street from the driveway. As Raashawn drove away, the van chased him, ultimately heading towards 138th and Halsted. Tracy testified that as they travelled along Halsted Street, one gunshot hit Aletra in the head. The van continued to chase Raashawn's SUV and Reginald heard approximately twelve more gunshots. Tracy testified that the van continued to chase them and that more gunshots were fired until the SUV crashed into a tree at 120th and Wentworth. Tracy testified that after the SUV crashed, the van

1-04-0853

pulled up and stopped briefly and then drove away. Tracy testified that he, Raashawn, and Shivone

exited the SUV, and that he pulled Aletra out of the vehicle and called for help.

### Shivone Langford

Shivone Langford testified that on July 19, 2000, Shivone went to Washington's house in

Raashawn's SUV with Raashawn, Tracy, and Aletra. Shivone testified that as they left Washington's

house and were backing out of the driveway, Raashawn's SUV hit an Astro van that was parked

across the street. Raashawn opened the door of his SUV, but did not get out after the accident and

pulled away. Shivone testified that the van that Raashawn hit followed them, and that when they got

to the area of 138th and Halsted, she heard a gunshot, followed by about fifteen more gunshots

between 138th and 107th streets. Shivone testified that Raashawn drove to the area of 120th and

Wentworth, where he crashed the SUV into a tree. After the crash, Shivone got out of the vehicle

and saw the van pull up along side of her. It was at that time that Shivone saw the driver of the van,

and identified Russell in court as the person that she saw driving the van.

### Raashawn Langford

Raashawn Langford testified on July 18, 2000, he went to Washington's house with Shivone,

Tracy, and Aletra in his silver SUV. Raashawn testified that as he left the house and was backing

down the driveway, he collided with a van that was parked behind him. Raashawn testified that after

he hit the van, he opened his window and observed the driver of the van get out to look at the

damage. Raashawn testified that the passenger in the van raised his hand with a gun and then put it

on the dashboard. Raashawn testified that he drove off to get away and that the van followed him.

Raashawn testified that as he drove, he saw the passenger in the van get out of the van through the

- 14 -

1-04-0853

sliding door. Raashawn testified that when he got to Halsted Street, a gunshot was fired through the back of his SUV and that after a few seconds, six to eight more shots followed. The van followed Raashawn to 107th and Halsted, and more gunshots were fired. Raashawn testified that he attempted to get to a hospital because Aletra had been shot in the head, but when he got to 120th and Wentworth, he slid on the wet pavement and crashed into a tree. Raashawn testified that he saw two men drive past in the van after he hit the tree, but that he was not able to identify them.

Jury Instructions & Verdict

Prior to closing argument, the State asked the trial court to give the jury an Illinois Pattern Jury Instruction, Criminal (IPI Criminal) 5.03 instruction on accountability. Based upon the evidence presented during trial that another passenger may have been in the van, the trial court allowed the instruction over defendant's objection. The instruction provided:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense.
>
> The word "conduct" includes any criminal act done in furtherance of the planned and intended act." Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 1992).

The trial court also gave the jury IPI Criminal 3.15 instruction on identification testimony. The instruction provided as follows:

- 15 -

1-04-0853

"When you weigh the identification testimony of a witness, you should

consider all the facts and circumstances in evidence, including, but not

limited to, the following:

The opportunity the witness had to view the offender at the

time of the offense, or the witness's degree of attention at the time of

the offense, or the witness's earlier description of the offender, or the

level of certainty shown by the witness when confronting the

defendant, or the length of time between the offense and the

identification confrontation." Illinois Pattern Jury Instructions,

Criminal, No. 3.15 (4th ed. 1992).

On January 27, 2004, after deliberation, the jury found Russell guilty of one count of murder

and three counts of attempted murder. On February 27, 2004, Russell filed a motion to reconsider

or in the alternative a motion for new trial. The motion was denied. On March 8, 2004, Russell was

sentenced to concurrent prison terms of 30 years for the murder conviction and three 15 year

sentences for the attempted murder convictions.

ANALYSIS

I.  Motion to Suppress Identification

Russell raises three arguments concerning the motion to suppress his identification in his

pretrial police lineup. Russell contends that his motion to suppress the identification should have been

granted because (1) his arrest was illegal and the identification was therefore the fruit of the

poisonous tree; (2) he was denied his right to counsel during the police lineup; and (3) the police

- 16 -

1-04-0853

lineup was unduly suggestive because of the weight and height disparities between him and the other participants in the lineup and because he was the only participant in the lineup instructed to hold his number up. We review each argument below.

A.     The Arrest

First, Russell contends that his identification in the police lineup should be suppressed because it was the product of an illegal arrest. Russell argues that he voluntarily went to the police station to answer questions in an ongoing investigation and that when he arrived at the police station he was arrested. The State argues that Russell raised the legality of his arrest for the first time on appeal, therefore, Russell has waived this issue for review by failing to file a motion to quash arrest in the trial court. Alternatively, the State argues that even if a motion to quash arrest had been filed, the officers had probable cause to arrest Russell for murder and attempted murder.

A finding of probable cause to arrest will not be disturbed absent clear error, with due deference given to the trial court and arresting officers. People v. Robinson, 299 Ill. App. 3d 426, 430-31 (1998), citing Ornelas v. United States, 517 U. S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). A de novo review applies where the defendant files a motion to quash arrest and suppress evidence and the facts supporting the judge's ruling on that motion are undisputed. Robinson, 299 Ill. App. 3d at 431, citing Ornelas, 517 U.S. at 696-98, 134 L. Ed. 2d at 919-20,116 S. Ct. at 1661-62. However, we must first determine whether Russell's claim has been waived, barring review by this court. We note that Russell did not file a motion to quash arrest in the trial court. As such, Russell has arguably waived the issue for review; however, a reviewing court may ignore the waiver rule in order to reach a just result. Robinson, 299 Ill. App. 3d at 431, citing People v. Hoskins, 101

1-04-0853

Ill. 2d 209, 219 (1984). Accordingly, we will review this issue.

Section 107-2 of the Code of Criminal Procedure provides that a valid arrest may be made when there are reasonable grounds to believe that the person to be arrested has committed a crime. 725 ILCS 5/107-2 (West 2000). "Reasonable grounds" is synonymous with "probable cause." Robinson, 299 Ill. App. 3d at 431, citing In re D.G., 144 Ill. 2d 404 (1991). In determining whether probable cause existed to effectuate a warrantless arrest, a court must look to the totality of the circumstances and make a practical, commonsense decision whether there was a reasonable probability that an offense was committed and that the defendant committed it. Robinson, 299 Ill. App. 3d at 431, citing People v. Tisler, 103 Ill. 2d 226, 236-37 (1984). Mere suspicion is inadequate to establish probable cause to arrest, but evidence relied upon by arresting officers need not be sufficient to prove guilt beyond a reasonable doubt or even be admissible at trial. Robinson, 299 Ill. App. 3d at 431, citing People v. Wilson, 260 Ill. App. 3d 364 (1994). The determination, which considers only information available to officers before the arrest, must focus on the factual considerations upon which reasonable, prudent people, not legal technicians, act. Robinson, 299 Ill. App. 3d at 431, citing People v. Henderson, 266 Ill. App. 3d 882 (1994). A general description of a suspect coupled with other specific facts and circumstances that would lead a reasonably prudent person to believe that the action taken was appropriate can constitute sufficient cause to arrest. See Robinson, 299 Ill. App. 3d at 431.

In this case, for the first time on appeal, Russell argues that he did not surrender himself to police; that he went to the police station because he knew the police were looking for him. Whether Russell went to the police station to surrender and turn himself in or to merely answer questions is

- 18 -

1-04-0853

of no consequence to the determination of whether he was legally arrested. We must determine whether Russell's arrest, once he was at the police station, was based upon a reasonable probability that he committed the offense. See Tisler, 103 Ill. 2d at 236-37; Robinson, 299 Ill. App. 3d at 431. Our review of the evidence reveals that Gregory Craig, Russell's friend and the passenger in Russell's van, told Sergeant Satriano on July 20, 2000, that Russell was the driver of the van and that Russell shot and killed Aletra Slack. Furthermore, at trial, Craig testified that he was in the van with Russell when Raashawn backed his SUV into the van at which point Russell demanded his gun and chased the SUV. Our review of the record reveals that after the murder, the police interviewed Craig, an eyewitness, who provided the police with information about the events leading up to and after the shooting. We find, based upon the information known to the police at the time of their warrantless arrest of Russell, that they had sufficient information to believe that Russell committed Aletra's murder. Accordingly, the police had probable cause to arrest Russell, therefore, the arrest was legal. See Robinson, 299 Ill. App. 3d at 433.

      B.     Right to Counsel at a Police Lineup

      Now we must determine whether Russell's lineup identification should have been suppressed because the police failed to honor his lawyer's request that counsel be permitted to observe the lineup and the witness' identification. In essence, Russell contends that a person who is represented by counsel and who has agreed to take part in a lineup has a right, as a matter of due process, to have counsel present during the identification process. Russell argues that his attorney should have been present for the lineup because he was already being represented by counsel and because Detective Rolniak had signed an agreement to permit Adam, Russell's counsel, to view the lineup.

- 19 -

1-04-0853

The law in Illinois is clear that prior to the initiation of adversary proceedings, a person does not have a constitutional right to counsel when he takes part in a lineup. People v. Bolden, 197 Ill. 2d 166, 175 (2001). The sixth amendment right to counsel does not attach until the initiation of adversary proceedings against the person, whether by formal charge, preliminary hearing, indictment, information, or arraignment. Bolden, 197 Ill. 2d at 175-76, citing Moran v. Burbine, 475 U.S. 412, 429-30, 89 L. Ed. 2d 410, 426-27, 106 S. Ct. 1135, 1145-46 (1986); Kirby v. Illinois, 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82 (1972); United States v. Wade, 388 U.S. 218, 226-27, 18 L. Ed. 2d 1149, 1156-57, 87 S. Ct. 1926, 1931-32 (1967); People v. Garrett, 179 Ill. 2d 239, 247-48 (1997). Prior to the commencement of adversary proceedings, a person also does not possess a right to counsel under the fifth amendment. Bolden, 197 Ill. 2d at 176. A person's appearance in a lineup is nontestimonial in nature and does not constitute interrogation; for these reasons, identification evidence stemming from a lineup does not implicate any fifth amendment concerns. Bolden, 197 Ill. 2d at 176, citing Kirby, 406 U.S. at 687-88, 32 L. Ed. 2d at 416-17, 92 S. Ct. at 1881; Wade, 388 U.S. at 221-23, 18 L. Ed. 2d at 1154-55, 87 S. Ct. at 1929-30; People v. Nelson, 40 Ill. 2d 146, 152 (1968).

Because Russell does not have a right to counsel at a police lineup prior to the commencement of adversary proceedings, we find that he was not entitled to have his attorney present for the lineup. See Bolden, 197 Ill. 2d at 175. Accordingly, we hold that Russell's right to counsel was not violated.

C.    Suggestive Lineup

Next, Russell argues that the trial court erred in denying his motion to suppress identification because the pretrial police lineup was suggestive. Russell contends that the lineup was suggestive

- 20 -

1-04-0853

because there were significant height and weight disparities between Russell and the other participants in the lineup. Russell also argues that the lineup was suggestive because he was the only participant in the lineup who was instructed to lift his number up when it was sliding down. The State argues that Russell failed to meet his burden by establishing that the lineup was overly suggestive.

When challenging a pretrial identification, the defendant has the burden of proving that the identification procedures were so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification. People v. Simpson, 172 Ill. 2d 117, 140 (1996). An identification should be suppressed when it is so unnecessarily suggestive that there is a substantial likelihood of misidentification. People v. Peterson, 311 Ill. App. 3d 38, 48 (1999); citing People v. Hartzol, 222 Ill. App. 3d 631, 642 (1991). Courts must look to the totality of the circumstances in evaluating this claim. Neil v. Biggers, 409 U.S. 188, 196, 93 S. Ct. 375, 380, 34 L. Ed. 2d 401, 409 (1972); Simpson, 172 Ill. 2d at 140. A trial court's ruling on a motion to suppress will not be set aside unless manifestly erroneous. People v. Stewart, 105 Ill. 2d 22, 41 (1984).

In the instant case, at the time of the lineup, Russell was five feet, eleven inches tall and 270 pounds. Detective Rolniak testified that of the other participants in the lineup, three were six feet tall, one was five-foot-ten, and another was six-foot-five, and one weighed 205 pounds, two participants weighed 215 pounds, one was 220 pounds, and another participant was 330 pounds. Russell testified at the motion to suppress hearing that there were at least two or three other participants in the lineup that were "about" his size. The record also indicates that Russell testified that the participants in the lineup were seated on a bench during the lineup. Furthermore, Shivone, Higgenbottom, and Washington positively identified Russell at the lineup, two days after the car chase and shooting. We

- 21 -

1-04-0853

note that Shivone was able to distinguish the men in the lineup because she specifically identified one participant as someone she knew from the neighborhood, but identified Russell as the person she saw at the scene of the Wentworth crash.  After hearing all the evidence presented at the motion to suppress hearing, the trial court found that the difference in weight was not suggestive.

We note that all members of a lineup need not be physically identical.  Simpson, 172 Ill. 2d at 140; Richardson, 123 Ill. 2d at 350; People v. Kelley, 304 Ill. App. 3d 628, 637-38 (1999); Bragg, 277 Ill. App. 3d at 474.  Any differences in appearance goes to the weight of the identification, not to its admissibility.  Peterson, 311 Ill. App. 3d at 49, citing Kelley, 304 Ill. App. 3d at 638; People v. Johnson, 222 Ill. App. 3d 1, 7-8 (1991); People v. Trass, 136 Ill. App. 3d 455, 463 (1985).  In this case, Russell testified that there were two or three participants in the lineup that were similar in size to him.  And after reviewing the record, we do not find that the differences in height and weight were such as to render the identification procedures unnecessarily suggestive.  People v. Polk, 143 Ill. App. 3d 698, 702-03 (1986) (police lineup not suggestive where three lineup participants were 6'2", 5'10", and 6'2", weighing, respectively, 235, 185, and 215 pounds, and the defendants were 5'9", 185 pounds and 5'11", 185 pounds); People v. Williams, 96 Ill. App. 3d 958, 962-63 (1981) (discrepancies in height and weight did not render the lineup suggestive).  Furthermore, we find that because the participants were seated during the lineup, any disparities in height were mitigated.  See Bolden, 197 Ill. 2d at 170.  Moreover, the witnesses identification of Russell was positive and unwavering.  Polk, 143 Ill. App. 3d at 703; Williams, 96 Ill. App. 3d at 963.  Consequently, we find that the trial court's ruling on the motion to suppress was not manifestly erroneous.  See Stewart, 105 Ill. 2d at 41.

1-04-0853

Russell, however, contends that the lineup was suggestive because Sergeant Satriano instructed him to hold his number up when it was coming down. Our review of the record indicates that Lieutenant Amsden testified that the police would routinely address a suspect in a lineup when his number dropped below his chin. We note that Russell does not argue that his number was not falling when Sergeant Satriano addressed him; rather, Russell argues that Sergeant Satriano drew attention to him when he instructed him to lift his number up. We also note that Detective Rolniak testified that he spoke to each witness before the lineup, that he gave each witness the same information, and that he kept the witnesses who were viewing the lineup separated. Considering the totality of the circumstances, we hold that the lineup simply was not unduly suggestive and that the trial court's ruling on the motion to suppress was not manifestly erroneous. See Stewart, 105 Ill. 2d at 41.

## II. Sufficiency of the Evidence

Russell argues that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Russell maintains that the State's case consisted of circumstantial evidence; that there was no physical evidence which placed him at the crime scene; that only one eyewitness, Shivone Langford, identified Russell at the scene of the Wentworth accident; and that the witnesses' testimony was not credible. The State argues that the evidence introduced at trial, when viewed in the light most favorable to the State, proved Russell's guilt beyond a reasonable doubt. The State also argues that the jury was the finder of fact, they heard the testimony and weighed the evidence, and the jury, not the court, properly weighed the credibility of the witnesses and found that the State's witnesses were credible.

When a defendant challenges the sufficiency of the evidence, the issue presented is whether,

- 23 -

1-04-0853

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); People v. Collins, 106 Ill. 2d 237, 261 (1985); People v. Slayton, 363 Ill. App. 3d 27, 31 (2006). When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. People v. Hall, 194 Ill. 2d 305, 329-30 (2000), citing People v. Digirolamo, 179 Ill. 2d 24, 43 (1997). The determination of the credibility of witnesses and the weight to give their testimony are issues for the fact-finder to decide and the fact-finder's conclusions are entitled to great deference. People v. Cunningham, 212 Ill. 2d 274, 279-80 (2004). Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. Hall, 194 Ill. 2d at 330; People v. Brown, 185 Ill. 2d 229, 247 (1998).

Furthermore, we note that circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence establishes the elements of the offense charged beyond a reasonable doubt. Hall, 194 Ill. 2d at 330; People v. Gilliam, 172 Ill. 2d 484, 515 (1996). The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. Hall, 194 Ill. 2d at 330. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. Hall, 194 Ill. 2d at 330, citing People v. Jones, 105 Ill. 2d 342, 350 (1985).

Our review of the record indicates that evidence presented at trial established that Gregory Craig, a passenger in Russell's van, testified that he was seated in Russell's van when Raashawn's SUV backed into the van. Craig testified that Russell told him to give him his gun. Robinson, who was

- 24 -

1-04-0853

with Russell moments before the accident, testified that Russell showed her his gun earlier that evening and that she saw him place it in his glove compartment. Robinson also testified that after the accident Russell asked Craig for his gun and Craig testified that Russell reached into the glove compartment to get it. Washington also testified that after the accident, she heard Russell tell someone to give him his gun. Craig also testified that he was in Russell's van as Russell chased Raashawn's SUV. Although Craig jumped out of Russell's moving van and did not testify to shots being fired, Tracy testified that he was in Raashawn's SUV and heard approximately twelve gunshots being fired from Russell's van. Tracy testified that one of those gunshots struck Aletra Slack in the head. The record indicates that the car chase continued until Raashawn crashed his SUV into a tree on Wentworth Avenue. Shivone testified that once the SUV crashed she saw the van that was chasing them drive by and she identified Russell as the driver of the van.

Our review of the record indicates that four witnesses — Craig, Robinson, Washington, and Raashawn — heard Russell demand his gun after Russell backed his SUV into his van. Six witnesses testified that the van chased Raashawn's SUV: Craig, Robinson, Washington, Tracy, Shivone, and Raashawn. Tracy, Shivone, and Raashawn testified that as they were being chased in Raashawn's SUV by the van, they were fired upon. Shivone testified that when the SUV crashed into a tree at Wentworth, she saw Russell driving the vehicle. Furthermore, Shivone was able to identify Russell at the police line-up. After reviewing the record and considering all of the evidence, we hold that the evidence presented at trial established that Russell was guilty of the crimes with which he was charged. See Hall, 194 Ill. 2d at 330; Jones, 105 Ill. 2d at 350.

Russell, however, argues that the State's case was based solely on Shivone's identification of

- 25 -

1-04-0853

Russell at the scene of the Wentworth accident. Russell argues that Shivone's identification testimony is unreliable because she was the only witness to from the Wentworth accident to identify him; she did not testify to seeing Russell with a gun; and she testified that she was shaken, dazed, and vomiting after the accident. This case is similar to <u>Slayton</u>, where the court noted that "[t]he identification of defendant by a single witness is sufficient to sustain a conviction despite testimony to the contrary, provided the witness is credible and observed defendant under circumstances that would permit a positive identification to be made." <u>Slayton</u>, 363 Ill. App. 3d at 31. In this case, Shivone testified no less than two times that she was able to see the face of the driver of the van. She identified Russell as the offender at trial, as well as at the police lineup. It was for the jury to determine whether Shivone was a credible witness. See <u>Cunningham</u>, 212 Ill. 2d at 279-80. Accordingly, when viewed in the light most favorable to the State, Shivone's testimony, coupled with the other eyewitnesses' accounts, is sufficient to support a guilty verdict. See <u>Jackson</u>, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; <u>Collins</u>, 106 Ill. 2d at 261; <u>Slayton</u>, 363 Ill. App. 3d at 31.

III. IPI Criminal 3.15

Next, Russell claims the trial judge erred when he gave the jury instruction on eyewitness identification and read the bracketed word "or" in IPI Criminal 3.15. Russell argues that, under <u>People v. Gonzalez</u>, 326 Ill. App. 3d 629 (2001), the trial court improperly modified IPI Criminal 3.15 by placing the word "or" in between each factor the jury could consider when determining the reliability the witnesses' identification. The State argues that Russell did not properly preserve this issue and it is therefore waived. The State further argues that in reviewing this issue under plain error, the error was harmless because the evidence in this case was not closely balanced.

- 26 -

1-04-0853

Our review of the record indicates that Russell did not object to the issue at trial and it was not included in his posttrial motions. Consequently, we find that Russell has waived this issue. People v. Smith, 362 Ill. App. 3d 1062, 1084 (2005) (error in instructing jury as to IPI Criminal 3.15 was waived because the defendant failed to object to this instruction during the jury instructions conference or include the issue in his posttrial motions). However, in finding that this issue has been waived, we also note that the trial court improperly read the instruction. Our review of the record reveals that the instruction as given contained an "internal inconsistency" and was, thus, both "ambiguous and misleading." See People v. Herron, 215 Ill. 2d 167, 191 (2005). The Illinois Supreme Court in Herron determined that "giving IPI Criminal No. 3.15 with the 'ors' is indeed plain error." Herron, 215 Ill. 2d at 191. In addition, the comments to IPI Criminal 3.15 in the 2003 supplement inform the trial court that the "or" (or the "and") between the factors is not to be read to the jury or included in the typed version given to the jury. IPI Criminal 4th ed No. 3.15, Committee Note, at 2 (Supp. 2003).

Although we review this issue under plain error, the seriousness of the risk of an improper conviction due to the erroneous reading of "or" in the instruction "depends upon the quantum of evidence presented by the State against the defendant." Herron, 215 Ill. 2d at 193. The error is harmless where the evidence was not closely balanced and the erroneous instruction was not emphasized to the jury. People v. Sims, 358 Ill. App. 3d 627, 638 (2005); compare People v. Gonzalez, 326 Ill. App. 3d 629, 640 (2001) (reversal was warranted because the evidence was closely balanced and the instruction was unduly stressed by the prosecutor in closing argument).

In this case, although we find that the instruction as given constituted plain error, Russell has

- 27 -

1-04-0853

failed to establish that the error was prejudicial. As we have already discussed, there was sufficient evidence presented at trial to find Russell guilty. Therefore, we can not say that the evidence was closely balanced or that the outcome of this case would have been different had the instruction not included the "ors." See Herron, 215 Ill. 2d at 193 (stating that the "seriousness of the risk" that the error prejudiced the defendant "depends on the quantum of evidence presented by the State against the defendant"); see also People v. James, 348 Ill. App. 3d 498, 511 (2004) (finding instruction was plain error, but did not prejudice defendant); People v. Mercado, 333 Ill. App. 3d 994, 1000 (2002) (finding instruction was plain error, but did not prejudice defendant); People v. Furdge, 332 Ill. App. 3d 1019, 1031-32 (2002) (finding instruction was plain error, but did not prejudice defendant). Consequently, reversal is not warranted in this case.

### IV. IPI Criminal 5.03

Finally, Russell argues the trial court erred in giving an accountability instruction to the jury. Russell argues that there is no evidence to support the submission of an accountability instruction (IPI Criminal 5.03), and he argues that there was nothing to indicate that he was in any way connected with any other individual. Russell emphasizes that there was no testimony that he solicited anyone's aid to commit the crime. The State, however, argues that there was at least some evidence from which the jury could have reasonably concluded that another participant might have been involved in the shooting, and therefore, a jury instruction on accountability was warranted.

In Illinois, a person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of

- 28 -

I-04-0853

the offense." 720 ILCS 5/5-2 (c) (West 2000). Moreover, IPI Criminal 5.03 contemplates this situation and provides:

> "A person is legally responsible for the conduct of another
>
> person when, either before or during the commission of an offense,
>
> and with the intent to promote or facilitate the commission of [( an)
>
> (the)] offense, he knowingly solicits, aids, abets, agrees to aid, or
>
> attempts to aid the other person in the planning or commission of [(
>
> an) (the)] offense.
>
> [The word 'conduct' includes any criminal act done in
>
> furtherance of the planned and intended act.]" Illinois Pattern Jury
>
> Instructions, Criminal, No. 5.03 (4th ed.1992).

Even the slightest evidence in support of a theory of accountability warrants giving the jury an accountability instruction. People v. Reatherford, 345 Ill. App. 3d 327, 343-44 (2003); People v. Testa, 261 Ill. App. 3d 1025, 1030 (1994). Some evidence on accountability, along with evidence that the defendant acted as a principal offender, is adequate to support instructions on both principal action and accountability, regardless of whether both theories were advanced in the State's case in chief. Reatherford, 345 Ill. App. 3d at 344; Testa, 261 Ill. App. 3d at 1030. Furthermore, accountability instructions may be given even though the defendant is on trial alone. Reatherford, 345 Ill. App. 3d at 344; Testa, 261 Ill. App. 3d at 1030.

In this case, the State presented evidence that Craig was the passenger in Russell's van when Raashawn backed his SUV into the van. Craig and Robinson testified that Craig was a passenger in

- 29 -

1-04-0853

Russell's van. Craig testified that Russell took his black gun out of his glovebox. Robinson, however, testified that she heard Russell ask Craig to pass him his gun. Raashawn testified that he saw the passenger, Craig, hold a gun and place it on Russell's dashboard. Thus, the State presented evidence of Russell's direct participation in the charged offense along with circumstantial evidence that he aided another in its commission. Accordingly, based on the evidence, we hold that the trial court did not abuse its discretion in instructing the jury on accountability. Reatherford, 345 Ill. App. 3d at 344, citing Reeves, 314 Ill. App. 3d at 488 (the trial court's giving of accountability instruction will not be disturbed absent an abuse of discretion).

Moreover, a defendant's claim of improper jury instructions is reviewed under a harmless-error analysis. Reatherford, 345 Ill. App. 3d at 344, citing People v. Dennis, 181 Ill. 2d 87, 95 (1998). "[W]hen a jury is improperly instructed regarding the principles of accountability, a new trial is not warranted if the evidence is sufficient to find the defendant guilty beyond a reasonable doubt as a principal." Reatherford, 345 Ill. App. 3d at 344, quoting People v. Amaya, 321 Ill. App. 3d 923, 929 (2001). As discussed earlier, there was sufficient evidence to support a guilty verdict based on Russell acting as a principal. Accordingly, even if there was an error, we hold that any error was harmless and a new trial is not required. See Reatherford, 345 Ill. App. 3d at 344.

For the foregoing reasons, the convictions and sentences of the trial court are affirmed.

Affirmed.

NEVILLE, J., with CAMPBELL, J., and MURPHY, J., concurring.

104042

# In the Supreme Court of Illinois

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal to the Illinois Appellate Court, First District, From the Circuit Court of Cook County County, Illinois |
| Plaintiff-Appellee-Respondent, | ) ) | |
| v. | ) ) | |
| WALTER RUSSELL, | ) ) ) | Trial Judge:  The Honorable Thomas J. O'Hara No. 04-853 |
| Defendant-Appellant-Petitioner. | ) ) | |

## DEFENDANT-APPELLANT WALTER RUSSELL'S PETITION FOR LEAVE TO APPEAL

Timothy Duffy
Andrew P. Young
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000

Attorneys for Defendant-Appellant
Walter Russell

Dated: January 11, 2007

**FILED**

JAN 2 3 2007

SUPREME COURT CLERK

## INTRODUCTION

Walter Russell is currently serving a thirty-year prison term without receiving a fair trial. His conviction is based on one type of circumstantial evidence: identification testimony. This evidence, however, was illegally obtained by the Riverdale Police, improperly weighed by the jury, and is insufficient to support a conviction beyond a reasonable doubt. Furthermore, when evidence arose that at least two people may have been involved in Slack's death, the court improperly gave an accountability instruction even though the State had failed to meet its burden to produce any evidence that Russell specifically intended to aid another in the commission of a crime.

During the early hours of July 19, 2000, Aletra Slack died of a single gunshot wound to her head. Earlier that evening, she was involved in a minor car accident when her friend, Raashawn Langford, backed his SUV into a van across the street from the house they were visiting (hereinafter referred to as the "first accident"). Russell and his friend, Gregory Craig, were sitting in the van when the SUV hit it. Claiming he saw Craig brandish a pistol, Raashawn fled the scene of the accident and the van pursued.[1] Shortly thereafter, someone fired at least one bullet into the SUV killing Slack. After the shooting, Raashawn lost control of the SUV and crashed into a tree (hereinafter referred to as the "second accident").

The police never recovered the weapon used to kill Slack, the van that followed the SUV, or any other forensics or physical evidence linking Russell to Slack's death. Moreover, the State did not produce a single witness who saw Russell fire a gun at the

---

[1] Others claimed, including Craig, that they heard Russell ask for the pistol.

SUV or saw the shot come from the van. Only one witness, Shivone Langford, another passenger in the SUV, testified that she saw two people in the van as it passed the SUV at the second accident. She identified one of the those people as Russell. Russell's conviction was based entirely on circumstantial evidence that arose from Shivone's identification of Russell at the second accident, and testimony from others that identified Russell at the scene of the first accident.

Every procedure that touched the identifications of Russell, however, was conducted improperly. Arresting Russell without probable cause, the Riverdale Police forced Russell into a police lineup after it coerced their first suspect, Craig, to give a statement implicating only Russell. During the lineup, they used improper techniques to highlight Russell and obtain a positive identification. At trial, the court improperly read the jury instruction on witness identification testimony, presumptively causing the jury to improperly weigh the only piece of evidence that supported Russell's conviction.

Thus, the single most important piece of evidence in this case, that Russell was at both the first and second accidents, is tainted. It is tainted because the police illegally obtained it through coercion and suggestiveness. It is tainted because the judge improperly instructed the jury how to weigh it. Taken independently or cumulatively, these errors denied Russell a fair trial. Russell, therefore, respectively asks this court for leave to file his appeal from the First District's Order, and overturn his conviction.

## PRAYER FOR LEAVE TO APPEAL

Walter Russell respectfully petitions this Honorable Court for leave to appeal pursuant to Illinois Supreme Court Rule 315(a), from the Order of the Appellate Court of Illinois, First Judicial District, which affirmed the judgment of conviction entered by the

2

Circuit Court of Cook County, Illinois upon the verdict finding Russell guilty of first degree murder and three counts of attempted murder. (A. 1-30).

## JUDGMENT BELOW

On January 27, 2004, Russell was convicted of murder and three counts of attempted murder after a jury trial. On March 4, 2004, the trial court sentenced Russell to concurrent prison terms of 30 years for the murder conviction and three 15 year sentences for the attempted murder convictions. (A. 31, C. 140). Russell filed a timely appeal on April 15, 2005. On November 31, 2006, the First District Appellate Court affirmed the judgment. A petition for rehearing was not filed.

## POINTS RELIED UPON FOR REVERSAL

This Court should review this case to determine whether Russell was denied a fair trial. Specifically, the First District's decision should be reviewed for the following independent reasons:

1.    This Court recently held in *People v. Herron* that giving IPI Criminal 3.15 "with the 'ors' is indeed plan error" and reversed Herron's conviction because the evidence was closely balanced. Like the court in *Herron*, the court improperly read the same jury instruction in Russell's trial. Russell's conviction was based entirely on circumstantial evidence pulled from witness testimony. Specifically, and more importantly, the key evidence in the State's case was identification testimony that placed Russell around the scenes of the first and second accident. Without this evidence, the State would not have been able to prove guilt beyond a reasonable doubt. Yet in spite of this, the First District held that the evidence was not closely balanced--even though the overwhelming majority of it was tainted by the trial court's error. This Court should consider whether the evidence in this case is closely balanced as well as whether

3

identification evidence should enter the "closely balanced" calculus when IPI Criminal 3.15 is read improperly.

2.      The police lacked probable cause to arrest Russell because they relied entirely on a coerced and intoxicated statement from Craig, an informant, who was both the police's first suspect in Slack's murder and a convicted felon. The First District, following this Court's ruling, held in *People v. Johnson* that where an informant is also a suspect in the investigation, the information provided by that informant "should be buttressed by corroborating evidence or by the officer's knowledge and experience." *People v. Johnson*, 187 Ill.App.3d 756, 771 (1st Dist. 1987); *see also People v. James* 118 Ill.2d 214 (Ill. 1989); *People v. Denham* 41 Ill.2d 1 (1968). The First District also held that a statement from a suspect that does not implicate himself is presumptively unreliable. *People v. Halmon*, 225 Ill.App. 259, 273 (1st Dist. 1992). The information Craig provided was uncorroborated and Craig absolved himself from any responsibility in Slack's death. Russell respectively asks this Court for leave to appeal this error.

3.      The State did not produce evidence that Russell specifically intended to aid another in the commission of a crime. The trial court, therefore, erred in giving an accountability instruction to the jury. In holding that there was sufficient evidence to give the accountability instruction, the First District focused entirely on Craig's action prior to Slack's death as evidence that another person may have been involved in her death. Yet, the State did not offer any evidence that Russell intended to help Craig

murder Slack. Thus, Russell was not legally responsible for Craig actions.[2] Russell asks for leave to appeal this error.

4.      Several witnesses identified Russell at the scene of the crime. This testimony was crucial to the State's case yet the identifications they were unnecessarily suggestive. A trial court should suppress an identification when it is so unnecessarily suggestive that there is a substantial likelihood of misidentification. *People v. Peterson*, 311 Ill. App. 38, 48 (Ill. 1999). The Riverdale Police subjected Russell to a lineup that was unnecessarily suggestive. The lineup was also unnecessarily suggestive because Russell was the only participant who was instructed to lift his number up while a witness was viewing the lineup, and he was physically distinct from the other participants. Russell asks for leave to appeal this error.

5.      Russell's conviction is based on circumstantial evidence that arose from identification testimony and little else. The identification testimony was also riddled with inconsistencies, emotion, trauma, and bias. This evidence, as applied specifically in this case, was insufficient to prove Russell's guilt beyond a reasonable doubt. Russell asks for leave to appeal this error.

### STATEMENT OF FACTS

On August 1, 2000, Walter Russell was indicted for the July 19, 2000 murder of Aletra Slack ("Slack") and the attempted murders of Raashawn Langford ("Raashawn"),

---

[2] The First District used evidence related to Craig as both the sole source of probable cause to arrest Russell as well as justification for giving an accountability instruction. The First District's use of Craig in this way is internally inconsistent and confusing.

Reginald Tracy ("Tracy"), and Shivone Langford ("Shivone"). The indictment was based on allegations that during the early hours of July 19, 2000, the SUV driven by Raashawn backed into Russell's van (this car accident is hereafter referred to as the "first accident"), that Russell then chased the SUV through South Chicago and Riverdale, Illinois, fired a handgun into the SUV during the chase, shot and killed Slack, and that the SUV soon thereafter struck a tree in Riverdale, Illinois (this car accident is hereafter referred to as the "second accident").

To prove its case, the State relied entirely on circumstantial evidence derived from witness testimony that placed Russell around the scene of the first and second accidents. Not a single witness, however, saw Russell pull the trigger. The State did not offer any forensic or physical evidence of Russell's guilt. The State did not produce Russell's van, which it argued he was driving during the commission of the murder, the gun it argued he used to shoot at Slack's vehicle, or any other direct evidence that linked him to Slack's death.

Following a jury trial, the trial court sentenced Russell to a 30 year term for murder, and three 15 year terms for the attempted murders. (A. 31, C. 140). The court ordered that the sentences be served concurrently.

## PRE-TRIAL EVENTS

### I.     Police Investigation

####     A.     The Riverdale Police Initially Focused Its Investigation on Gregory Craig

The Riverdale Police initially focused on Gregory Craig ("Craig"), a friend of Russell and a passenger in his van. According to the Riverdale Police, they considered Craig to be a suspect to Slack's murder. (R. 1757). During the initial hours of the investigation, the police picked up Craig and held him against his will for three days. (A.

6

33-34, 48; R. 1185, 1187-88, 1200) The police forced Craig to remain in the same room for the entire period. (A. 33-34; R. 1187-88). The police forced Craig to remain at the police station until he provided a statement implicating Russell. (A. 33-34; R. 1187-88). On at least one occasion during his detainment, the Riverdale Police told Craig that he would remain in their custody until he cooperated with their investigation and identified Russell. (A. 45, R. 1197). Craig, who had been drinking alcohol for fourteen straight hours was also obviously intoxicated when he gave his statement. (R. 1178).

B.    Upon Learning that the Riverdale Police Were Looking for Him, Walter Russell Voluntarily Went to the Riverdale Police Department With His Attorney

Based on Craig's implication, the police turned their focus onto Russell. (R. 512). The detectives investigating Slack's murder went to Russell's mother's home and told her that there had been "an incident and that [they] were looking for [him]. (R. 1224, 1738). Around the same time, Samuel Adam, Jr., Russell's attorney, contacted the Riverdale police. (R. 1710). Adam told the police that he represented Russell and that he would bring Russell in for questioning. (R. 613).

On July 21, 2000, both Adam and Russell went to the Riverdale police station. Once Adam and Russell entered the police station, Adam informed the investigating detectives that Russell demanded his attorney be present for any and all lineups, show-ups, or other similar method of identification. (A. 32, R. 614-15, 1715, C. 63). The detective agreed and assured Adam he would honor the request.  The parties memorialized the agreement in writing and Russell, Adam, and Detective Rolniak each signed it. (A. 32, R. 614-15, 1715, C. 63). The agreement clearly states that "MR. RUSSELL demands that his attorney SAMUEL ADAM, be present for any and all pre-indictment or pre-charging lineups, show-ups, and/or similar methods of identification."

7

Before Adam left Russell with the Riverdale Police, he gave the police a "plethora" of phone numbers, a pager number, and a fax number. (R. 614, 1716, C. 63). The police never contacted Adam. Instead, once Adam left the station, the police fingerprinted, photographed, and placed Russell in a jail cell without his shoes. (R. 437, 584). At this point, Russell did not know if his attorney was at the station. (R. 585). After three to four hours in the jail cell, Rolniak told Russell that they were placing him in a lineup. Russell specifically asked for his attorney and to make a phone call. (R. 588-89). Rolniak told Russell that he could not make a phone call and could not refuse the lineup. (R. 589). Adam did not know that Russell had been put in a lineup until the bond hearing the following day. (R. 1717).

### C. The Riverdale Police placed Russell in a pre-indictment lineup against his will and without an attorney present

After the police refused to allow Russell to contact his lawyer per their agreement, they moved him from his jail cell to a garage area used by the Riverdale Police as a staging area for lineups. (R. 590). In the garage, Lt. Amdsen took a photograph of all the lineup participants. (A. 51, R. 592, C. 19). After the photograph, the group was brought into a small room with a bench and a window. (R. 593).

Although Russell could not see through the ten-by-ten inch window, he could see the viewer's shape and a shadow when the witness was looking through the other side. (R. 596). During the lineup, Satriano ordered Russell to raise his number and caused Russell to turn his head. (R. 599). Russell could see shadows through the window when this occurred. (R. 599). When Satriano spoke directly to Russell, Russell was the only participant in the lineup that moved. (R. 661).

Six people, including Russell, participated in the lineup. (R. 451). The other participants were physically different from Russell in distinct ways. First, Russell was the only bald participant; all the other participants had hair. (A. 51, C. 19). Moreover, Russell was five foot eleven and weighed approximately 270 pounds at the time of the lineup was conducted. (A. 51, R. 455, C. 19). None of the other participants were within 50 pounds of Russell; three weighed less than 220 pounds and one weighed more than 330 pounds. (A. 51, R. 455, C. 19). Finally, one participant was nearly six foot five, six inches taller than Russell. (A. 51, R. 455, C. 19).

Seven witnesses viewed the lineup: Tiffany Rogers, LaToya Higgenbottom, Towanda Washington, Shivone Langford, Raashawn Langford, Robyn Reynolds, and Reginald Tracy. (R. 442, 446). Only two, Higgenbottom and Washington, identified Russell as a person at the scene of the first accident. Shivone Langford, a passenger in the SUV, was the only witness who identified Russell as a person at the second accident. (R. 414). None of the witnesses identified Russell as the shooter.[3]

## II.    The Trial

### A.    Witness Testimony

The State presented the testimony of eleven witnesses. Russell called two witnesses in his defense.[4] Of the eleven prosecution witnesses, six testified about circumstantial facts the State argued implicated Russell in Slack's death. Three of these

---

[3]       Prior to his trial, Russell filed a motion to suppress the pre-indictment identifications on January 7, 2002 based on an alleged violation of Russell's Sixth Amendment right to counsel and that it was unnecessarily suggestive. (A. 52-53, R. 153, C. 57-58).

[4] Only testimony relevant to this appeal has been included in this Petition.

witnesses, Lashanda Robinson, Towanda Washington, and Craig testified about events that occurred at the first accident. The other three witnesses, Tracy, Shivone, and Raashawn were all passengers in the SUV. (R. 1281). Neither Tracy and Raashawn identified Russell. (R. 1460, 1365-67, 1584-85). Shivone testified that she saw Russell drive by the SUV at the second accident after Slack was shot. (R. 1463, 1468). None of these witnesses testified that they ever saw Russell fire a weapon at the SUV.

During the late evening of July 18, 2000, Russell, Robinson, and Craig were visiting a friend in the Pacesetter neighborhood of Riverdale. (R. 1159). Across the street, Slack and her friends, Raashawn, Shivone, and Tracy had gathered at Towanda Washington's house around midnight and stayed for approximately thirty minutes. (R. 1280-81).

At 12:30 a.m. on July 18, 2000, Slack and her friends left Washington's home in Raashawn's SUV. (R. 1281). Raashawn was driving the vehicle, his fiancé Shivone was in the passenger seat, Tracy was in the back seat on the driver's side, and Slack was seated in the back on the passenger's side. (R. 1358). As Raashawn backed out of the driveway, his SUV slammed into Russell's van parked across the street. (R. 1162, 1283, R. 1580).

Russell and Craig were seated in the van when Raashawn hit it with his SUV (the "first accident"). (R. 1182). After the accident, Russell exited the van and inspected the damage. (R. 1163, 1581). According to Raashawn, as Russell inspected the damage to the van, Raashawn got out of the SUV to pay Russell for the damage with $1500 in cash he had on him. (R. 1638).

At this point, Robinson believed she heard Russell ask for a gun. (R. 1232). Washington also testified that Russell asked for a gun. (R. 1285). Raashawn testified

10



that he saw the passenger, presumably Craig, in the van raise a gun and put it on the dashboard. (R. 1581). He also saw Russell examine the damage and smirk while standing outside the van. (R. 1581, 1689). Instead of paying the Russell as he intended, Langford re-entered his SUV and fled the scene with his companions. (R. 1582, 1638).

At this point in the evening, Russell re-entered his vehicle and followed the SUV. (R. 1286). The two vehicles traveled north on 136th Street and turned onto Wallace Street. The SUV and the van made u-turns when they encountered several fire trucks blocking the road. (R. 1166-67). As the van turned around, one of its passengers, "young, light skinned" and male, jumped out of the van through the sliding door. (R. 1167, 1459, 1583).

Minutes later, Washington and Robinson saw the SUV and a van traveling back down Wallace Street. (R. 1236, 1287, 1289). Neither Washington nor Robinson saw Russell ever shoot a gun. As the SUV passed Washington's house, it took Parnell Street back to 136th Street, to 138th Street, and turned north on Halsted. (R. 1584). As the SUV turned onto Halsted, Raashawn could see vehicle headlights behind him. (R. 1584-85). Both the SUV's rear and side windows were tinted. (R. 1503). It was also raining. (R. 1700). At this exact moment, a gunshot rang out and Slack slumped to the side with gunshot wound to her head. (R. 1365-66, 1459, 1503, 1585). Although Raashawn testified that he was looking at the vehicle's headlights when the bullet hit Slack, he did not testify that he also saw a flash of gunfire or anyone else shooting a gun from the vehicle behind him. (R. 1585-86). After this gunshot, Shivone and Tracy ducked down and could no longer see the vehicle behind the SUV. (R. 1503, 1418).

Soon thereafter, while traveling south on Wentworth, Raashawn lost control of the SUV and crashed into a tree. (R. 1597). Raashawn told Tracy to jump out and flee

11

the scene leaving Shivone and Slack. (R. 1589). Shivone got out of the SUV and ran to a garage of a neighboring house. (R. 1462). After the SUV hit the tree, Raashawn testified that he saw two men in a van but could not identify either of them at the pre-trial lineup or during trial. (R. 1591). Tracy also testified that he saw a van at the scene of the second accident but could not identify either of them. (R. 1372). Shivone testified that she saw two people in the van and identified one of those men as Russell. (R. 1463, 1468). Shivone was the only witness who identified Russell as a person at the scene of the second accident. Shivone did not, however, see Russell hold or shoot a gun at any point during these events.

B.    Forensics Evidence

The State's only forensics evidence established that Slack died of a gunshot wound to the head on July 19, 2000. (R. 1148, C. 2-12). The forensics established that the SUV had damage from a single gunshot. (R. 1549). The State also failed to produce the gun used in Slack's death. The police did not find shell casings along the route taken by the SUV. (R. 1743-44).

C.    Closing Arguments, Jury Instructions & Verdict

The trial court instructed the jury on what factors it should consider when it weighed the credibility of witness identification testimony. (A. 67, C. 86). The court improperly read the jury IPI 3.15 to include the "ors" between each factor. (A.67, C. 85).

Prior to closing argument, the State also asked the trial court to instruct the jury with IPI 5.03 on accountability. (A. 68, R. 1836). The State introduced evidence at trial that supported the claim that a passenger was in the van when Slack was shot. The State did not introduce evidence that Russell specifically intended to aid that person in the commission of a crime. The State also misstated the law on accountability by saying "if

12

you believe there was somebody else in the van with him, Russell is still guilty" (R. 1865). Over objection, the trial court read the accountability instruction to the jury.

### III.    The Appeal

Russell appealed his conviction and sentencing. The First District issued an Order on November 30, 2006 denying his appeal and affirming both his conviction and sentence. Russell now seeks leave to appeal from the First District's decision.

## ARGUMENT

### I.    The Improper Reading of Jury Instruction IPI Criminal 3.15 Denied Russell a Fair Trial

This Court has held that the reading of Criminal 4th No. 3.15 with the "ors" is plain error. *People v. Herron*, 215 Ill.2d 167, 191 830 N.E.2d 467 (Ill. 2005). (A. 67). In this case, the First District noted that the trial court's inclusion of the bracketed "ors" was plain error and reviewed it accordingly. (A. 28).

Where there is plain error, a defendant is entitled to a new trial if he persuades the court that the evidence is "closely balanced." *Id.* at 178 (noting that "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted"). In Russell's case, the evidence was closely balanced because witness identification testimony was the key evidence in the case. Without the identification evidence, the State did not have any case against Russell, and the erroneous jury instruction involved how the jury should weigh that evidence. The instruction, as it was read, permitted the jury to disregard any factor that inculpated Russell and ignore factors that exculpated him in Slack's death. If a proper instruction had been given, the outcome of the case could have been different.

13

This error illustrates the need for this Court to take up Russell's appeal and order a new trial.

This Court noted in *Herron* that the "seriousness of the risk depends upon the quantum of the evidence presented by the State against the defendant." *Herron*, 215 Ill.2d at 193. The Court added that it dealt with "probabilities, not certainties" and "with risks and threats to the defendant's rights. When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person." *Id.* at 193. In *Herron*, this Court reversed the conviction of the defendant because only one witness could identify the defendant as one of the robbers." *Id.* As a result, the case "turned on the credibility of the [witness] identification, and the erroneous jury instruction involved how the jury should weigh such identification testimony." The Court added the "effect of the error was not uncertain. The defendant proved that the trial court's error in reading IPI 3.15 Criminal 4th No. 3.15 with the "ors" was prejudicial. The jury's verdict may have been different with a different instruction." *Id.* 193-94.

Here, the erroneous jury instruction affected the manner in which the jury weighed the most important piece of evidence presented against Russell. Only a single witness, Shivone, identified Russell at the crime scene. Just prior to the moment when she claimed to have seen Russell at the second accident, the SUV swerved and crashed into a tree. (R. 1460). After the accident, Shivone, who was pregnant at the time, began to vomit. (R. 1462). By her own account, she was understandably "shaken" and "dazed." (R. 1508-09). She was running away from the SUV and her perceived attacker across a yard to a nearby house. (R. 1463). A jury who applied the witness identification jury instruction literally, as the trial court gave it, could rightfully have ignored all these facts and convicted Russell because Shivone expressed certainty that Russell was the

14

same person she saw at the second accident. *See Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 329 (1990) ("the proper inquiry ... is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence").

No other evidence suggests, beyond a reasonable doubt, that Russell committed this crime. Unlike those cases where the appellate courts found that the erroneous jury instruction was harmless because the evidence was not closely balanced, in this case, Russell did not confess to the crime, no forensics evidence linked Russell to Slack's death, and there is no other independent evidence that directly points to Russell. *See e.g. People v. Sims,* 358 Ill.App.3d 627 (1st Dist. 2005) (noting that the evidence was not closely balanced because the defendant's confession was presented to the jury); *People v. Gonzalez,* 326 Ill.App.3d 629, 639 (1st Dist. 2001) (noting that where a case is largely built on circumstantial evidence witness identification testimony, without any physical evidence, a jury may believe that "the presence of evidence supporting only one of the five factors" is a sufficient basis to determine that a witness's testimony is reliable…thus, where an "instruction as given may have mistakenly led the jury to rely on but a single factor when deciding that the identification testimony presented was reliable," the error is prejudicial and can overcome even the highest stand of plain error).

Finally, Russell asks this Court to not consider the identifications when determining whether the evidence was closely balanced. The Third District recognized the prudence of the approach in *People v. Strong,* 316 Ill.App. 807, 812 (3rd Dist. 2000). In *Strong,* the defendant argued that his confession was not voluntary and that the trial court should have suppressed it. Reviewing under plain error, the Third District refused to consider the confession as part of the closely balanced calculus because that was the

15

very evidence the defendant was challenging. *Id.* Excluding the evidence at the center of the appeal from the closely balanced calculus is the best way to protect the fundamental right to a fair trial. Given that identification testimony is the only evidence in this case that supports Russell's conviction, and that evidence is the subject of his appeal, the First District improperly considered when it held that that the evidence was closely balanced.

## II.    The Police Did Not Have Probable Cause to Arrest Russell Because They Relied Only On the Statement of a Another Suspect

The Riverdale Police did not have probable cause to arrest Russell when it forced him to participate in the police lineup. As a result, the identification the Riverdale Police obtained is the "fruit of a poisonous tree" and should have been suppressed.

The First District held that the Riverdale Police had probable cause to arrest Russell because of the information Craig provided to them during his detention. (A. 19). As a matter of law, Craig was an unreliable source for probable cause unless there was independent corroborating evidence. There was not.

It is not enough that the police had the information; the information must come from a reliable source. *People v. Armstrong*, 318 Ill.App.3d 607, 612 (1st Dist. 2000). In Illinois, information provided to the police from a third party must be justified by some indicia of reliability in order to establish probable cause. *People v. Morris*, 229 Ill.App.3d 144 (Ill. 1992). Probable cause is defined as facts and circumstances that would prompt a reasonable person to believe that an offense has been committed and that the accused committed the offense. *Morris*, 229 Ill.App. at 158.

Where the third party informant is a suspect in the investigation, the information provided by the suspect should be "buttressed by corroborating evidence or by the officer's knowledge and experience." *People v. Johnson*, 187 Ill.App.3d 756, 771 (1st

16

Dist. 1989). In these types of cases, special attention is given to whether the suspect absolved himself by implicating others. *People v. James*, 118 Ill.2d 214 (Ill. 1987), *People v. Dale and Dukes*, 189 Ill.App.3d 704 (Ill. 1989); *People v. Halmon*, 225 Ill.App.3d 259 , 273 (1st Dist. 1992) (stating that a statement given by a suspect that did not implicate himself in the incident was not presumptively reliable).

The police relied almost entirely on Craig's statement to form a basis to arrest Russell. Yet, according to Detective Satriano, Craig was the initial suspect to Slack's murder. (R. 1757). As a result, the police held him for three days. (R. 1185, 1887-88). The First District went so far as to characterize his detention as an arrest. (A. 2). When Craig gave the statement, he was intoxicated after drinking alcohol for fourteen hours. (R. 1187). Craig was also a convicted felon having served time for battery and burglary charges. (R. 1192). The police, nonetheless, relied on the coerced statement of its first suspect, and an intoxicated felon, who absolved himself of any responsibility, as the sole basis for probable cause. This information was insufficient to give the police a reasonable suspicion that Russell committed the crime. As such, the police lacked probable cause to arrest Russell, and the identifications that resulted from his arrest should have been suppressed at trial.

## III. There Was Insufficient Evidence to Give An Accountability Instruction

The evidence, even viewed in a light most favorable to the prosecution, is insufficient to support a conviction based on accountability. Guilt predicated on an accountability theory must be based on evidence that the defendant specifically intended to facilitate the underlying crime. *People v. Crowder*, 239 Ill.App.3d 1027, 1030 (3rd Dist. 1993). There is no evidence that Russell specifically intended to facilitate the murder of Slack or the attempted murder of her companions. This Court has held that

17

mere presence at the scene of a crime even if the defendant knows the "accomplice" is armed and helps him leave the scene is insufficient evidence to convict a defendant based on a theory of accountability. *People v. Taylor*, 186 Ill.2d 439, 449 (Ill. 1999)

In the opinion below, the First District noted that the evidence showed "Craig was a passenger in Russell's van when Raashawn backed his SUV into the van." (A. 29). Raashawn also testified that he saw Craig holding the gun after the first accident before Slack was shot. *Id.* at 30. The First District held that this evidence demonstrated that there was sufficient evidence to hold Russell accountable for the actions of someone else, presumably Craig.

Indeed, this is the only evidence the court can point to that Russell aided another in the commission of a crime. As a matter of law, it is insufficient because it does not show that Russell specific intended to aid anyone. The overwhelming physical and forensic evidence demonstrates that only one shot was fired. There was only evidence of a single shot penetrating the SUV. The police were unable to recover any shell casing or bullets along the route the SUV traveled. The State argued during its closing argument that the mere fact Russell was allegedly driving the vehicle from which a shot was fired is sufficient evidence to prove specific intent to aid and abet another in the commission of a crime. (R. 1865). *Taylor* stands for the exact opposite proposition. Because the State was not able to produce any evidence that Russell specifically intended to aid Craig in the commission of this crime, there was insufficient evidence to support an accountability instruction and it was error to give it.

## IV.    The Lineup Was Unnecessarily Suggestive

The lineup where Shivone identified Russell as the person she saw at the scene of the second accident should have been suppressed because it was unnecessarily

18

suggestive. Whether a pretrial lineup is unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant is] denied due process ... depends on the totality of the circumstances. *People v. Simpson*, 172 Ill.2d 117 (Ill. 1996), *see also Neil v. Biggers*, 409 U.S. 188, 196 (1972). An identification should be suppressed when it is so unnecessarily suggestive that there is a substantial likelihood of misidentification. *People v. Hartzol*, 222 Ill.App.3d 631, 642 (1st Dist. 1991).

Russell was physically distinct from the other participants in the lineup. Russell was the only bald participant in the lineup. Baldness is impermissibly suggestive unless the witness did not have an opportunity to see that particular characteristic. *People v. Broadnax*, 26 Ill.App.3d 67, 69 (2nd Dist. 1975). Russell also weighed nearly twenty-five percent more or less than any other participant in the lineup. Moreover, the Riverdale Police also brought attention to Russell while a witness was viewing the lineup. These facts, taken together, demonstrate that the lineup was unnecessarily suggestive.

## V.    The Evidence Was Insufficient to Support a Guilty Verdict Beyond Reasonable Doubt

Finally, the evidence presented against Russell at his trial was insufficient as a matter of law to support a guilty verdict beyond reasonable doubt. The State did not offer any direct eyewitness testimony or forensics evidence that linked Russell to the Slack's death. The only evidence offered against Russell was identification testimony that placed him around the scenes of both the first and second accidents and that he may have asked for a handgun.

A witness identification will support a conviction only where he or she had an opportunity to make a positive identification. *People v. Lewis*, 165 Ill.2d. 305, 356 (Ill. 1995). A conviction cannot be sustained based on witness testimony that is vague,



doubtful, or uncertain. *People v. Ash*, 102 Ill2d 485, 494 (Ill. 1984) The standard for a positive identification is whether the witness was close enough to the accused for a sufficient length of time under conditions that provided adequate opportunity for observation. *People v. Armstrong*, 322 Ill.App. 1, 11 (1st Dist. 2001).

All the other witnesses' testimonies are riddled with inconsistencies and bias. Only one victim, Raashawn saw anyone holding a gun and that person was Craig, not Russell. Moreover, only one other witness saw Russell at the scene of the second accident. Thus, taken individually or cumulatively, no rational trier of fact could have found Russell guilty beyond a reasonable doubt for murder or attempted murder. The evidence is circumstantial and based on testimony that is at times self-interested and tainted by untruthfulness and at other times, simply unbelievable.

## CONCLUSION

Witness identification testimony was critical to the State's case against Walter Russell. It was the State's case. Without it, no jury could convict Russell of these crimes beyond a reasonable doubt. Yet, the Riverdale Police obtained it illegally when it arrested Russell without probable cause. The jury weighed it improperly when it was given a clearly erroneous jury instruction. Given these grave errors, and the others discussed above, Russell respectively asks this court to grant it leave to file its full appeal to this Court.

Dated: January 11, 2007

Respectfully submitted,

Timothy Duffy
Andrew P. Young
 KIRKLAND & ELLIS LLP
 200 East Randolph Drive
 Chicago, IL 60601
 (312) 861-2000
*Attorneys for Defendant-Appellant Walter Russell*

20

# EXHIBIT B

# In the Supreme Court of Illinois

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal to the Illinois Appellate Court, First District, From the Circuit Court of Cook County |
| Plaintiff-Appellee-Respondent, | ) ) | County, Illinois |
| v. | ) ) | _____ |
| WALTER RUSSELL, | ) ) ) | Trial Judge:  The Honorable Thomas J. O'Hara No. 04-853 |
| Defendant-Appellant-Petitioner. | ) ) ) | |

---

### DEFENDANT-APPELLANT WALTER RUSSELL'S
### PETITION FOR LEAVE TO APPEAL

Timothy Duffy
Andrew P. Young
 KIRKLAND & ELLIS LLP
 200 East Randolph Drive
 Chicago, IL  60601
 (312) 861-2000

Attorneys for Defendant-Appellant
Walter Russell

Dated: January 11, 2007

## INTRODUCTION

Walter Russell is currently serving a thirty-year prison term without receiving a fair trial. His conviction is based on one type of circumstantial evidence: identification testimony. This evidence, however, was illegally obtained by the Riverdale Police, improperly weighed by the jury, and is insufficient to support a conviction beyond a reasonable doubt. Furthermore, when evidence arose that at least two people may have been involved in Slack's death, the court improperly gave an accountability instruction even though the State had failed to meet its burden to produce any evidence that Russell specifically intended to aid another in the commission of a crime.

During the early hours of July 19, 2000, Aletra Slack died of a single gunshot wound to her head. Earlier that evening, she was involved in a minor car accident when her friend, Raashawn Langford, backed his SUV into a van across the street from the house they were visiting (hereinafter referred to as the "first accident"). Russell and his friend, Gregory Craig, were sitting in the van when the SUV hit it. Claiming he saw Craig brandish a pistol, Raashawn fled the scene of the accident and the van pursued.[1] Shortly thereafter, someone fired at least one bullet into the SUV killing Slack. After the shooting, Raashawn lost control of the SUV and crashed into a tree (hereinafter referred to as the "second accident").

The police never recovered the weapon used to kill Slack, the van that followed the SUV, or any other forensics or physical evidence linking Russell to Slack's death. Moreover, the State did not produce a single witness who saw Russell fire a gun at the

---

[1] Others claimed, including Craig, that they heard Russell ask for the pistol.

SUV or saw the shot come from the van. Only one witness, Shivone Langford, another passenger in the SUV, testified that she saw two people in the van as it passed the SUV at the second accident. She identified one of the those people as Russell. Russell's conviction was based entirely on circumstantial evidence that arose from Shivone's identification of Russell at the second accident, and testimony from others that identified Russell at the scene of the first accident.

Every procedure that touched the identifications of Russell, however, was conducted improperly. Arresting Russell without probable cause, the Riverdale Police forced Russell into a police lineup after it coerced their first suspect, Craig, to give a statement implicating only Russell. During the lineup, they used improper techniques to highlight Russell and obtain a positive identification. At trial, the court improperly read the jury instruction on witness identification testimony, presumptively causing the jury to improperly weigh the only piece of evidence that supported Russell's conviction.

Thus, the single most important piece of evidence in this case, that Russell was at both the first and second accidents, is tainted. It is tainted because the police illegally obtained it through coercion and suggestiveness. It is tainted because the judge improperly instructed the jury how to weigh it. Taken independently or cumulatively, these errors denied Russell a fair trial. Russell, therefore, respectively asks this court for leave to file his appeal from the First District's Order, and overturn his conviction.

## PRAYER FOR LEAVE TO APPEAL

Walter Russell respectfully petitions this Honorable Court for leave to appeal pursuant to Illinois Supreme Court Rule 315(a), from the Order of the Appellate Court of Illinois, First Judicial District, which affirmed the judgment of conviction entered by the

Circuit Court of Cook County, Illinois upon the verdict finding Russell guilty of first degree murder and three counts of attempted murder. (A. 1-30).

## JUDGMENT BELOW

On January 27, 2004, Russell was convicted of murder and three counts of attempted murder after a jury trial. On March 4, 2004, the trial court sentenced Russell to concurrent prison terms of 30 years for the murder conviction and three 15 year sentences for the attempted murder convictions. (A. 31, C. 140). Russell filed a timely appeal on April 15, 2005. On November 31, 2006, the First District Appellate Court affirmed the judgment. A petition for rehearing was not filed.

## POINTS RELIED UPON FOR REVERSAL

This Court should review this case to determine whether Russell was denied a fair trial. Specifically, the First District's decision should be reviewed for the following independent reasons:

1.    This Court recently held in *People v. Herron* that giving IPI Criminal 3.15 "with the 'ors' is indeed plan error" and reversed Herron's conviction because the evidence was closely balanced. Like the court in *Herron*, the court improperly read the same jury instruction in Russell's trial. Russell's conviction was based entirely on circumstantial evidence pulled from witness testimony. Specifically, and more importantly, the key evidence in the State's case was identification testimony that placed Russell around the scenes of the first and second accident. Without this evidence, the State would not have been able to prove guilt beyond a reasonable doubt. Yet in spite of this, the First District held that the evidence was not closely balanced--even though the overwhelming majority of it was tainted by the trial court's error. This Court should consider whether the evidence in this case is closely balanced as well as whether

3

identification evidence should enter the "closely balanced" calculus when IPI Criminal 3.15 is read improperly.

      2.     The police lacked probable cause to arrest Russell because they relied entirely on a coerced and intoxicated statement from Craig, an informant, who was both the police's first suspect in Slack's murder and a convicted felon. The First District, following this Court's ruling, held in *People v. Johnson* that where an informant is also a suspect in the investigation, the information provided by that informant "should be buttressed by corroborating evidence or by the officer's knowledge and experience." *People v. Johnson*, 187 Ill.App.3d 756, 771 (1st Dist. 1987); *see also People v. James* 118 Ill.2d 214 (Ill. 1989); *People v. Denham* 41 Ill.2d 1 (1968). The First District also held that a statement from a suspect that does not implicate himself is presumptively unreliable. *People v. Halmon*, 225 Ill.App. 259, 273 (1st Dist. 1992). The information Craig provided was uncorroborated and Craig absolved himself from any responsibility in Slack's death. Russell respectively asks this Court for leave to appeal this error.

      3.     The State did not produce evidence that Russell specifically intended to aid another in the commission of a crime. The trial court, therefore, erred in giving an accountability instruction to the jury. In holding that there was sufficient evidence to give the accountability instruction, the First District focused entirely on Craig's action prior to Slack's death as evidence that another person may have been involved in her death. Yet, the State did not offer any evidence that Russell intended to help Craig

4

murder Slack. Thus, Russell was not legally responsible for Craig actions.[2]  Russell asks for leave to appeal this error.

4.      Several witnesses identified Russell at the scene of the crime.  This testimony was crucial to the State's case yet the identifications they were unnecessarily suggestive.  A trial court should suppress an identification when it is so unnecessarily suggestive that there is a substantial likelihood of misidentification.  *People v. Peterson*, 311 Ill. App. 38, 48 (Ill. 1999).  The Riverdale Police subjected Russell to a lineup that was unnecessarily suggestive.  The lineup was also unnecessarily suggestive because Russell was the only participant who was instructed to lift his number up while a witness was viewing the lineup, and he was physically distinct from the other participants. Russell asks for leave to appeal this error.

5.      Russell's conviction is based on circumstantial evidence that arose from identification testimony and little else.  The identification testimony was also riddled with inconsistencies, emotion, trauma, and bias.  This evidence, as applied specifically in this case, was insufficient to prove Russell's guilt beyond a reasonable doubt.  Russell asks for leave to appeal this error.

## STATEMENT OF FACTS

On August 1, 2000, Walter Russell was indicted for the July 19, 2000 murder of Aletra Slack ("Slack") and the attempted murders of Raashawn Langford ("Raashawn"),

---

[2] The First District used evidence related to Craig as both the sole source of probable cause to arrest Russell as well as justification for giving an accountability instruction.  The First District's use of Craig in this way is internally inconsistent and confusing.

Reginald Tracy ("Tracy"), and Shivone Langford ("Shivone"). The indictment was based on allegations that during the early hours of July 19, 2000, the SUV driven by Raashawn backed into Russell's van (this car accident is hereafter referred to as the "first accident"), that Russell then chased the SUV through South Chicago and Riverdale, Illinois, fired a handgun into the SUV during the chase, shot and killed Slack, and that the SUV soon thereafter struck a tree in Riverdale, Illinois (this car accident is hereafter referred to as the "second accident").

To prove its case, the State relied entirely on circumstantial evidence derived from witness testimony that placed Russell around the scene of the first and second accidents. Not a single witness, however, saw Russell pull the trigger. The State did not offer any forensic or physical evidence of Russell's guilt. The State did not produce Russell's van, which it argued he was driving during the commission of the murder, the gun it argued he used to shoot at Slack's vehicle, or any other direct evidence that linked him to Slack's death.

Following a jury trial, the trial court sentenced Russell to a 30 year term for murder, and three 15 year terms for the attempted murders. (A. 31, C. 140). The court ordered that the sentences be served concurrently.

## PRE-TRIAL EVENTS

I.    **Police Investigation**

A.    The Riverdale Police Initially Focused Its Investigation on Gregory Craig

The Riverdale Police initially focused on Gregory Craig ("Craig"), a friend of Russell and a passenger in his van. According to the Riverdale Police, they considered Craig to be a suspect to Slack's murder. (R. 1757). During the initial hours of the investigation, the police picked up Craig and held him against his will for three days. (A.

6

33-34, 48; R. 1185, 1187-88, 1200) The police forced Craig to remain in the same room for the entire period. (A. 33-34; R. 1187-88). The police forced Craig to remain at the police station until he provided a statement implicating Russell. (A. 33-34; R. 1187-88). On at least one occasion during his detainment, the Riverdale Police told Craig that he would remain in their custody until he cooperated with their investigation and identified Russell. (A. 45, R. 1197). Craig, who had been drinking alcohol for fourteen straight hours was also obviously intoxicated when he gave his statement. (R. 1178).

> B. Upon Learning that the Riverdale Police Were Looking for Him, Walter Russell Voluntarily Went to the Riverdale Police Department With His Attorney

Based on Craig's implication, the police turned their focus onto Russell. (R. 512). The detectives investigating Slack's murder went to Russell's mother's home and told her that there had been "an incident and that [they] were looking for [him]. (R. 1224, 1738). Around the same time, Samuel Adam, Jr., Russell's attorney, contacted the Riverdale police. (R. 1710). Adam told the police that he represented Russell and that he would bring Russell in for questioning. (R. 613).

On July 21, 2000, both Adam and Russell went to the Riverdale police station. Once Adam and Russell entered the police station, Adam informed the investigating detectives that Russell demanded his attorney be present for any and all lineups, show-ups, or other similar method of identification. (A. 32, R. 614-15, 1715, C. 63). The detective agreed and assured Adam he would honor the request. The parties memorialized the agreement in writing and Russell, Adam, and Detective Rolniak each signed it. (A. 32, R. 614-15, 1715, C. 63). The agreement clearly states that "MR. RUSSELL demands that his attorney SAMUEL ADAM, be present for any and all pre-indictment or pre-charging lineups, show-ups, and/or similar methods of identification."

7



Before Adam left Russell with the Riverdale Police, he gave the police a "plethora" of phone numbers, a pager number, and a fax number. (R. 614, 1716, C. 63). The police never contacted Adam. Instead, once Adam left the station, the police fingerprinted, photographed, and placed Russell in a jail cell without his shoes. (R. 437, 584). At this point, Russell did not know if his attorney was at the station. (R. 585). After three to four hours in the jail cell, Rolniak told Russell that they were placing him in a lineup. Russell specifically asked for his attorney and to make a phone call. (R. 588-89). Rolniak told Russell that he could not make a phone call and could not refuse the lineup. (R. 589). Adam did not know that Russell had been put in a lineup until the bond hearing the following day. (R. 1717).

## C.　The Riverdale Police placed Russell in a pre-indictment lineup against his will and without an attorney present

After the police refused to allow Russell to contact his lawyer per their agreement, they moved him from his jail cell to a garage area used by the Riverdale Police as a staging area for lineups. (R. 590). In the garage, Lt. Amdsen took a photograph of all the lineup participants. (A. 51, R. 592, C. 19). After the photograph, the group was brought into a small room with a bench and a window. (R. 593).

Although Russell could not see through the ten-by-ten inch window, he could see the viewer's shape and a shadow when the witness was looking through the other side. (R. 596). During the lineup, Satriano ordered Russell to raise his number and caused Russell to turn his head. (R. 599). Russell could see shadows through the window when this occurred. (R. 599). When Satriano spoke directly to Russell, Russell was the only participant in the lineup that moved. (R. 661).

8

Six people, including Russell, participated in the lineup. (R. 451). The other participants were physically different from Russell in distinct ways. First, Russell was the only bald participant; all the other participants had hair. (A. 51, C. 19). Moreover, Russell was five foot eleven and weighed approximately 270 pounds at the time of the lineup was conducted. (A. 51, R. 455, C. 19). None of the other participants were within 50 pounds of Russell; three weighed less than 220 pounds and one weighed more than 330 pounds. (A. 51, R. 455, C. 19). Finally, one participant was nearly six foot five, six inches taller than Russell. (A. 51, R. 455, C. 19).

Seven witnesses viewed the lineup: Tiffany Rogers, LaToya Higgenbottom, Towanda Washington, Shivone Langford, Raashawn Langford, Robyn Reynolds, and Reginald Tracy. (R. 442, 446). Only two, Higgenbottom and Washington, identified Russell as a person at the scene of the first accident. Shivone Langford, a passenger in the SUV, was the only witness who identified Russell as a person at the second accident. (R. 414). None of the witnesses identified Russell as the shooter.[3]

## II.     The Trial

### A.     Witness Testimony

The State presented the testimony of eleven witnesses. Russell called two witnesses in his defense.[4] Of the eleven prosecution witnesses, six testified about circumstantial facts the State argued implicated Russell in Slack's death. Three of these

---

[3]     Prior to his trial, Russell filed a motion to suppress the pre-indictment identifications on January 7, 2002 based on an alleged violation of Russell's Sixth Amendment right to counsel and that it was unnecessarily suggestive. (A. 52-53, R. 153, C. 57-58).

[4] Only testimony relevant to this appeal has been included in this Petition.

witnesses, Lashanda Robinson, Towanda Washington, and Craig testified about events that occurred at the first accident. The other three witnesses, Tracy, Shivone, and Raashawn were all passengers in the SUV. (R. 1281). Neither Tracy and Raashawn identified Russell. (R. 1460, 1365-67, 1584-85). Shivone testified that she saw Russell drive by the SUV at the second accident after Slack was shot. (R. 1463, 1468). None of these witnesses testified that they ever saw Russell fire a weapon at the SUV.

During the late evening of July 18, 2000, Russell, Robinson, and Craig were visiting a friend in the Pacesetter neighborhood of Riverdale. (R. 1159). Across the street, Slack and her friends, Raashawn, Shivone, and Tracy had gathered at Towanda Washington's house around midnight and stayed for approximately thirty minutes. (R. 1280-81).

At 12:30 a.m. on July 18, 2000, Slack and her friends left Washington's home in Raashawn's SUV. (R. 1281). Raashawn was driving the vehicle, his fiancé Shivone was in the passenger seat, Tracy was in the back seat on the driver's side, and Slack was seated in the back on the passenger's side. (R. 1358). As Raashawn backed out of the driveway, his SUV slammed into Russell's van parked across the street. (R. 1162, 1283, R. 1580).

Russell and Craig were seated in the van when Raashawn hit it with his SUV (the "first accident"). (R. 1182). After the accident, Russell exited the van and inspected the damage. (R. 1163, 1581). According to Raashawn, as Russell inspected the damage to the van, Raashawn got out of the SUV to pay Russell for the damage with $1500 in cash he had on him. (R. 1638).

At this point, Robinson believed she heard Russell ask for a gun. (R. 1232). Washington also testified that Russell asked for a gun. (R. 1285). Raashawn testified

10

that he saw the passenger, presumably Craig, in the van raise a gun and put it on the dashboard. (R. 1581). He also saw Russell examine the damage and smirk while standing outside the van. (R. 1581, 1689). Instead of paying the Russell as he intended, Langford re-entered his SUV and fled the scene with his companions. (R. 1582, 1638).

At this point in the evening, Russell re-entered his vehicle and followed the SUV. (R. 1286). The two vehicles traveled north on 136th Street and turned onto Wallace Street. The SUV and the van made u-turns when they encountered several fire trucks blocking the road. (R. 1166-67). As the van turned around, one of its passengers, "young, light skinned" and male, jumped out of the van through the sliding door. (R. 1167, 1459, 1583).

Minutes later, Washington and Robinson saw the SUV and a van traveling back down Wallace Street. (R. 1236, 1287, 1289). Neither Washington nor Robinson saw Russell ever shoot a gun. As the SUV passed Washington's house, it took Parnell Street back to 136th Street, to 138th Street, and turned north on Halsted. (R. 1584). As the SUV turned onto Halsted, Raashawn could see vehicle headlights behind him. (R. 1584-85). Both the SUV's rear and side windows were tinted. (R. 1503). It was also raining. (R. 1700). At this exact moment, a gunshot rang out and Slack slumped to the side with gunshot wound to her head. (R. 1365-66, 1459, 1503, 1585). Although Raashawn testified that he was looking at the vehicle's headlights when the bullet hit Slack, he did not testify that he also saw a flash of gunfire or anyone else shooting a gun from the vehicle behind him. (R. 1585-86). After this gunshot, Shivone and Tracy ducked down and could no longer see the vehicle behind the SUV. (R. 1503, 1418).

Soon thereafter, while traveling south on Wentworth, Raashawn lost control of the SUV and crashed into a tree. (R. 1597). Raashawn told Tracy to jump out and flee

11

the scene leaving Shivone and Slack. (R. 1589). Shivone got out of the SUV and ran to a garage of a neighboring house. (R. 1462). After the SUV hit the tree, Raashawn testified that he saw two men in a van but could not identify either of them at the pre-trial lineup or during trial. (R. 1591). Tracy also testified that he saw a van at the scene of the second accident but could not identify either of them. (R. 1372). Shivone testified that she saw two people in the van and identified one of those men as Russell. (R. 1463, 1468). Shivone was the only witness who identified Russell as a person at the scene of the second accident. Shivone did not, however, see Russell hold or shoot a gun at any point during these events.

      B.     <u>Forensics Evidence</u>

The State's only forensics evidence established that Slack died of a gunshot wound to the head on July 19, 2000. (R. 1148, C. 2-12). The forensics established that the SUV had damage from a single gunshot. (R. 1549). The State also failed to produce the gun used in Slack's death. The police did not find shell casings along the route taken by the SUV. (R. 1743-44).

      C.     <u>Closing Arguments, Jury Instructions & Verdict</u>

The trial court instructed the jury on what factors it should consider when it weighed the credibility of witness identification testimony. (A. 67, C. 86). The court improperly read the jury IPI 3.15 to include the "ors" between each factor. (A.67, C. 85).

Prior to closing argument, the State also asked the trial court to instruct the jury with IPI 5.03 on accountability. (A. 68, R. 1836). The State introduced evidence at trial that supported the claim that a passenger was in the van when Slack was shot. The State did not introduce evidence that Russell specifically intended to aid that person in the commission of a crime. The State also misstated the law on accountability by saying "if

12

you believe there was somebody else in the van with him, Russell is still guilty" (R. 1865). Over objection, the trial court read the accountability instruction to the jury.

## III.    The Appeal

Russell appealed his conviction and sentencing. The First District issued an Order on November 30, 2006 denying his appeal and affirming both his conviction and sentence. Russell now seeks leave to appeal from the First District's decision.

## ARGUMENT

### I.    The Improper Reading of Jury Instruction IPI Criminal 3.15 Denied Russell a Fair Trial

This Court has held that the reading of Criminal 4th No. 3.15 with the "ors" is plain error. *People v. Herron*, 215 Ill.2d 167, 191 830 N.E.2d 467 (Ill. 2005). (A. 67). In this case, the First District noted that the trial court's inclusion of the bracketed "ors" was plain error and reviewed it accordingly. (A. 28).

Where there is plain error, a defendant is entitled to a new trial if he persuades the court that the evidence is "closely balanced." *Id.* at 178 (noting that "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted"). In Russell's case, the evidence was closely balanced because witness identification testimony was the key evidence in the case. Without the identification evidence, the State did not have any case against Russell, and the erroneous jury instruction involved how the jury should weigh that evidence. The instruction, as it was read, permitted the jury to disregard any factor that inculpated Russell and ignore factors that exculpated him in Slack's death. If a proper instruction had been given, the outcome of the case could have been different.

13

This error illustrates the need for this Court to take up Russell's appeal and order a new trial.

This Court noted in *Herron* that the "seriousness of the risk depends upon the quantum of the evidence presented by the State against the defendant." *Herron*, 215 Ill.2d at 193. The Court added that it dealt with "probabilities, not certainties" and "with risks and threats to the defendant's rights. When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person." *Id.* at 193. In *Herron*, this Court reversed the conviction of the defendant because only one witness could identify the defendant as one of the robbers." *Id.* As a result, the case "turned on the credibility of the [witness] identification, and the erroneous jury instruction involved how the jury should weigh such identification testimony." The Court added the "effect of the error was not uncertain. The defendant proved that the trial court's error in reading IPI 3.15 Criminal 4th No. 3.15 with the "ors" was prejudicial. The jury's verdict may have been different with a different instruction." *Id.* 193-94.

Here, the erroneous jury instruction affected the manner in which the jury weighed the most important piece of evidence presented against Russell. Only a single witness, Shivone, identified Russell at the crime scene. Just prior to the moment when she claimed to have seen Russell at the second accident, the SUV swerved and crashed into a tree. (R. 1460). After the accident, Shivone, who was pregnant at the time, began to vomit. (R. 1462). By her own account, she was understandably "shaken" and "dazed." (R. 1508-09). She was running away from the SUV and her perceived attacker across a yard to a nearby house. (R. 1463). A jury who applied the witness identification jury instruction literally, as the trial court gave it, could rightfully have ignored all these facts and convicted Russell because Shivone expressed certainty that Russell was the

14

same person she saw at the second accident. *See Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 329 (1990) ("the proper inquiry ... is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence").

No other evidence suggests, beyond a reasonable doubt, that Russell committed this crime. Unlike those cases where the appellate courts found that the erroneous jury instruction was harmless because the evidence was not closely balanced, in this case, Russell did not confess to the crime, no forensics evidence linked Russell to Slack's death, and there is no other independent evidence that directly points to Russell. *See e.g. People v. Sims,* 358 Ill.App.3d 627 (1st Dist. 2005) (noting that the evidence was not closely balanced because the defendant's confession was presented to the jury); *People v. Gonzalez,* 326 Ill.App.3d 629, 639 (1st Dist. 2001) (noting that where a case is largely built on circumstantial evidence witness identification testimony, without any physical evidence, a jury may believe that "the presence of evidence supporting only one of the five factors" is a sufficient basis to determine that a witness's testimony is reliable...thus, where an "instruction as given may have mistakenly led the jury to rely on but a single factor when deciding that the identification testimony presented was reliable," the error is prejudicial and can overcome even the highest stand of plain error).

Finally, Russell asks this Court to not consider the identifications when determining whether the evidence was closely balanced. The Third District recognized the prudence of the approach in *People v. Strong,* 316 Ill.App. 807, 812 (3rd Dist. 2000). In *Strong,* the defendant argued that his confession was not voluntary and that the trial court should have suppressed it. Reviewing under plain error, the Third District refused to consider the confession as part of the closely balanced calculus because that was the

15

very evidence the defendant was challenging. *Id.* Excluding the evidence at the center of the appeal from the closely balanced calculus is the best way to protect the fundamental right to a fair trial. Given that identification testimony is the only evidence in this case that supports Russell's conviction, and that evidence is the subject of his appeal, the First District improperly considered when it held that that the evidence was closely balanced.

## II.   The Police Did Not Have Probable Cause to Arrest Russell Because They Relied Only On the Statement of a Another Suspect

The Riverdale Police did not have probable cause to arrest Russell when it forced him to participate in the police lineup. As a result, the identification the Riverdale Police obtained is the "fruit of a poisonous tree" and should have been suppressed.

The First District held that the Riverdale Police had probable cause to arrest Russell because of the information Craig provided to them during his detention. (A. 19). As a matter of law, Craig was an unreliable source for probable cause unless there was independent corroborating evidence. There was not.

It is not enough that the police had the information; the information must come from a reliable source. *People v. Armstrong*, 318 Ill.App.3d 607, 612 (1st Dist. 2000). In Illinois, information provided to the police from a third party must be justified by some indicia of reliability in order to establish probable cause. *People v. Morris*, 229 Ill.App.3d 144 (Ill. 1992). Probable cause is defined as facts and circumstances that would prompt a reasonable person to believe that an offense has been committed and that the accused committed the offense. *Morris*, 229 Ill.App. at 158.

Where the third party informant is a suspect in the investigation, the information provided by the suspect should be "buttressed by corroborating evidence or by the officer's knowledge and experience." *People v. Johnson*, 187 Ill.App.3d 756, 771 (1st

16

Dist. 1989). In these types of cases, special attention is given to whether the suspect absolved himself by implicating others. *People v. James,* 118 Ill.2d 214 (Ill. 1987), *People v. Dale and Dukes,* 189 Ill.App.3d 704 (Ill. 1989); *People v. Halmon,* 225 Ill.App.3d 259 , 273 (1st Dist. 1992) (stating that a statement given by a suspect that did not implicate himself in the incident was not presumptively reliable).

The police relied almost entirely on Craig's statement to form a basis to arrest Russell. Yet, according to Detective Satriano, Craig was the initial suspect to Slack's murder. (R. 1757). As a result, the police held him for three days. (R. 1185, 1887-88). The First District went so far as to characterize his detention as an arrest. (A. 2). When Craig gave the statement, he was intoxicated after drinking alcohol for fourteen hours. (R. 1187). Craig was also a convicted felon having served time for battery and burglary charges. (R. 1192). The police, nonetheless, relied on the coerced statement of its first suspect, and an intoxicated felon, who absolved himself of any responsibility, as the sole basis for probable cause. This information was insufficient to give the police a reasonable suspicion that Russell committed the crime. As such, the police lacked probable cause to arrest Russell, and the identifications that resulted from his arrest should have been suppressed at trial.

## III.    There Was Insufficient Evidence to Give An Accountability Instruction

The evidence, even viewed in a light most favorable to the prosecution, is insufficient to support a conviction based on accountability. Guilt predicated on an accountability theory must be based on evidence that the defendant specifically intended to facilitate the underlying crime. *People v. Crowder,* 239 Ill.App.3d 1027, 1030 (3rd Dist. 1993). There is no evidence that Russell specifically intended to facilitate the murder of Slack or the attempted murder of her companions. This Court has held that

17

mere presence at the scene of a crime even if the defendant knows the "accomplice" is armed and helps him leave the scene is insufficient evidence to convict a defendant based on a theory of accountability. *People v. Taylor*, 186 Ill.2d 439, 449 (Ill. 1999)

In the opinion below, the First District noted that the evidence showed "Craig was a passenger in Russell's van when Raashawn backed his SUV into the van." (A. 29). Raashawn also testified that he saw Craig holding the gun after the first accident before Slack was shot. *Id.* at 30. The First District held that this evidence demonstrated that there was sufficient evidence to hold Russell accountable for the actions of someone else, presumably Craig.

Indeed, this is the only evidence the court can point to that Russell aided another in the commission of a crime. As a matter of law, it is insufficient because it does not show that Russell specific intended to aid anyone. The overwhelming physical and forensic evidence demonstrates that only one shot was fired. There was only evidence of a single shot penetrating the SUV. The police were unable to recover any shell casing or bullets along the route the SUV traveled. The State argued during its closing argument that the mere fact Russell was allegedly driving the vehicle from which a shot was fired is sufficient evidence to prove specific intent to aid and abet another in the commission of a crime. (R. 1865). *Taylor* stands for the exact opposite proposition. Because the State was not able to produce any evidence that Russell specifically intended to aid Craig in the commission of this crime, there was insufficient evidence to support an accountability instruction and it was error to give it.

## IV.    The Lineup Was Unnecessarily Suggestive

The lineup where Shivone identified Russell as the person she saw at the scene of the second accident should have been suppressed because it was unnecessarily

18



suggestive.    Whether a pretrial lineup is unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant is] denied due process ... depends on the totality of the circumstances. *People v. Simpson*, 172 Ill.2d 117 (Ill. 1996), *see also Neil v. Biggers*, 409 U.S. 188, 196 (1972). An identification should be suppressed when it is so unnecessarily suggestive that there is a substantial likelihood of misidentification. *People v. Hartzol*, 222 Ill.App.3d 631, 642 (1st Dist. 1991).

Russell was physically distinct from the other participants in the lineup. Russell was the only bald participant in the lineup. Baldness is impermissibly suggestive unless the witness did not have an opportunity to see that particular characteristic. *People v. Broadnax*, 26 Ill.App.3d 67, 69 (2nd Dist. 1975). Russell also weighed nearly twenty-five percent more or less than any other participant in the lineup. Moreover, the Riverdale Police also brought attention to Russell while a witness was viewing the lineup. These facts, taken together, demonstrate that the lineup was unnecessarily suggestive.

## V.    The Evidence Was Insufficient to Support a Guilty Verdict Beyond Reasonable Doubt

Finally, the evidence presented against Russell at his trial was insufficient as a matter of law to support a guilty verdict beyond reasonable doubt. The State did not offer any direct eyewitness testimony or forensics evidence that linked Russell to the Slack's death. The only evidence offered against Russell was identification testimony that placed him around the scenes of both the first and second accidents and that he may have asked for a handgun.

A witness identification will support a conviction only where he or she had an opportunity to make a positive identification. *People v. Lewis*, 165 Ill.2d. 305, 356 (Ill. 1995). A conviction cannot be sustained based on witness testimony that is vague,

19

doubtful, or uncertain. *People v. Ash*, 102 Ill2d 485, 494 (Ill. 1984) The standard for a positive identification is whether the witness was close enough to the accused for a sufficient length of time under conditions that provided adequate opportunity for observation. *People v. Armstrong*, 322 Ill.App. 1, 11 (1st Dist. 2001).

All the other witnesses' testimonies are riddled with inconsistencies and bias. Only one victim, Raashawn saw anyone holding a gun and that person was Craig, not Russell. Moreover, only one other witness saw Russell at the scene of the second accident. Thus, taken individually or cumulatively, no rational trier of fact could have found Russell guilty beyond a reasonable doubt for murder or attempted murder. The evidence is circumstantial and based on testimony that is at times self-interested and tainted by untruthfulness and at other times, simply unbelievable.

## CONCLUSION

Witness identification testimony was critical to the State's case against Walter Russell. It was the State's case. Without it, no jury could convict Russell of these crimes beyond a reasonable doubt. Yet, the Riverdale Police obtained it illegally when it arrested Russell without probable cause. The jury weighed it improperly when it was given a clearly erroneous jury instruction. Given these grave errors, and the others discussed above, Russell respectively asks this court to grant it leave to file its full appeal to this Court.

Dated: January 11, 2007

Respectfully submitted,

Timothy Duffy
Andrew P. Young
 KIRKLAND & ELLIS LLP
 200 East Randolph Drive
 Chicago, IL 60601
 (312) 861-2000
*Attorneys for Defendant-Appellant Walter Russell*

20

# EXHIBIT C

No. 104042

# In the Supreme Court of Illinois

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Illinois Appellate Court, First District, Cook County |
| Plaintiff-Appellee-Respondent, | ) ) | |
| v. | ) ) | Original Appeal from the Circuit Court of Cook County, Illinois |
| WALTER RUSSELL, | ) ) ) | Trial Judge:  The Honorable Thomas J. O'Hara No. 04-853 |
| Defendant-Appellant-Petitioner. | ) | |

---

## MOTION TO RECONSIDER DENIAL OF LEAVE TO APPEAL IN LIGHT OF THIS COURT'S DECISION IN *PEOPLE V. PIATKOWSKI*

---

Timothy A. Duffy
Andrew P. Young
 KIRKLAND & ELLIS LLP
 200 East Randolph Drive
 Chicago, IL 60601
 (312) 861-2000

Attorneys for Defendant-Appellant
Walter Russell

Dated: June 22, 2007

1.      Defendant-Appellant-Petitioner Walter Russell respectfully moves, pursuant to Illinois Supreme Court Rule 361, this Court to reconsider its denial of his Petition for Leave to Appeal. Alternatively, Russell asks that this Court remand his case to the appellate court so that it may reconsider its decision in light of *People v. Piatkowski*, No. 102087, 2007 WL 1519895 (May 24, 2007). In support of his motion, Russell states as follows:

2.      Russell brings this Motion for Reconsideration on two discrete points. First, the Court's decision in *Piatkowski* strongly suggests that Russell's conviction should be overturned, and he should be granted a new trial, because the facts in Russell's case are virtually identical to the facts presented in *Piatkowski*. Second, in direct conflict with the Court's holding in *Piatkowski*, the First District reasoned that the evidence in Russell's case was "closely balanced" precisely because there was sufficient evidence to support Russell's conviction beyond a reasonable doubt. As a matter of law, this analysis is insufficient and does not properly assess the merits of Russell's appeal.

**Trial Court**

3.      In 2004, Russell was convicted of the murder of Aletra Slack and the attempted murders of Raashawn Langford, Reginald Tracy, and Shivone Langford. At Russell's trial, the state did not present any direct eyewitness testimony, forensic, physical, or confessional evidence connecting Russell to the shootings. Instead, the State's case relied exclusively on circumstantial witness testimony that placed Russell around the scene of Slack's murder. Furthermore, none of the three witnesses who identified Russell saw him shoot a gun. Only one witness, Shivone Langford, who did not know Russell prior to the shooting, testified that she saw Russell at the scene

2

of Slack's murder.   Ms. Langford's testimony, however, was inconsistent and ambiguous.

4.      At the conclusion of Russell's trial, the trial court committed plain error in its reading of Illinois Pattern Jury Instructions, Criminal No. 3.15 (4th. Ed. 2000) to the jury.   Illinois Pattern Jury Instruction Criminal No. 4th 3.15 lists five factors which the jury should consider in evaluating a witness's identification testimony:   (1) the witness's opportunity to view the offender; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated at the identification confrontation; and (5) the length of time between the crime and the identification confrontation.   *See Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382 (1972).   The jury should weigh the relevant evidence in light of *all* five factors.   *Neil*, 409 U.S. at 199.   However, the court improperly inserted the conjunction "or" between each of the factors.   This Court has held that this reading of the instruction is plain error, requiring reversal and a new trial if the evidence is closely balanced.   *People v. Herron*, 215 Ill.2d 167, 830 N.E.2d 467 (Ill. 2005).   In *Herron*, this Court reversed the defendant's conviction because only one witness could identify the defendant as one of the robbers turning the defendant's fate on the credibility of that witness's identification testimony.   *Id.* at 193.

### Russell's Appeal to the First District Court

5.      In Russell's appeal to the First District, Russell argued that the evidence was closely balanced because the only evidence supporting a conviction was witness   identification   testimony   that   circumstantially   implicated   Russell. Furthermore, Russell argued the evidence was closely balanced because the only



evidence that supported a conviction was the testimony of one witness who placed Russell at the scene of the crime.

6.    On appeal, the First District noted that the trial court committed plain error but held that the evidence in Russell's case was not closely balanced. The First District reached this conclusion despite the fact that the State's case relied exclusively on witness identification testimony (tainted by the erroneous instruction) and did not present any physical, forensics, or confessional evidence.

7.    Affirming Russell's conviction and sentence, the First District further noted that "although we find that the instruction as given constituted plain error, Russell has failed to establish that the error was prejudicial. As we have already discussed, there was sufficient evidence presented at trial to find Russell guilty. Therefore, we can not say that the evidence was closely balanced or that the outcome of this case would have been different had the instruction not included the 'ors.'" *People v. Walter Russell*, No. 00 CR 19109, slip. op. at 28 (Ill. App. Ct. Nov. 30, 2006). A true and correct copy of the First District's decision is attached as Exhibit A.

### The Illinois Supreme Court

8.    On January 23, 2007 Russell filed a Petition for Leave to Appeal seeking review of the Illinois Appellate Court, First District's opinion in *People v. Walter Russell*, No. 1-04-0853 (Ill. App. Ct. Nov. 30, 2006). On March 28, 2007, this Court denied Russell's petition. A true and correct copy of Russell's Petition for Leave to Appeal is attached as Exhibit B.

9.    On May 24, 2007, thirty-six days after denying Russell's petition, this Court issued its decision in *People v. Piatkowski*, No. 102087, 2007 WL 1519895 (May 24, 2007) A true and correct copy of *People v. Piatkowski* is attached as Exhibit

4



C.   In *Piatkowski,* this Court's reversed the defendant's murder conviction and ordered a new trial because the trial court improperly read Illinois Pattern Jury Instruction, Criminal No. 3.15, and the only evidence presented against the defendant was eyewitness identification testimony.

### Basis for Motion for Reconsideration

10.    The facts in *Piatkowski* are virtually identical to those in Russell's case.  In *Piatkowski,,* the State did not present any physical evidence to connect the defendant to the shooting.  *Id.* at \*8.  In particular, both witnesses testifying against Piatkowski only viewed the suspect's face for 15 or 20 seconds and neither witness claimed to have previously known the suspect.  *Id.*  There was no indication that the witnesses were paying a great deal of attention to the suspect and neither witness testified that they had an opportunity to view the suspect after the shooting began.  *Id.* Inconsistencies and ambiguities in the witnesses' testimony further damaged their credibility.  Prior to the identification the witnesses' descriptions of the suspect were not very detailed.  *Id.*  For example, neither witness mentioned to police that defendant had a goatee, yet both testified that the goatee was at least one factor leading them to identify him.  *Id.*  The witnesses' unequivocal identifications of the defendant also did not heavily favor the State. Although both witnesses identified Piatkowski in a photo array, a lineup and at trial, the Court noted that they had a 20 per cent chance of picking him out simply by guessing, and the defendant was the only suspect pictured with a goatee.  *Id.* at \*9.  Based on these facts, the Court found that the evidence on the reliability of eyewitness testimony "did not overwhelmingly favor the State," rendering the case closely balanced. *Id.*

11.    The "quantum and quality of the evidence" against Russell were equally poor, if not more so, than the evidence in *Piatkowski*.  In Russell's case, the

State presented no forensic evidence or direct testimony connecting Russell to the crime. Instead, the State relied exclusively on witness testimony placing Russell at the scene of the shooting. Shivone Langford, the only witness who identified Russell at the crime scene did not know Russell prior to the identification. She was a passenger in an SUV involved in a car chase, admitted she was crouching down in the SUV and unable to look outside. Just prior to the moment when she claimed to have seen Russell at the scene of the shooting, the SUV swerved and crashed into a tree. At the time of this accident, Shivone began to vomit. She admitted she was "shaken" and "dazed" and that she saw Russell only for a brief moment while running away from the SUV across a yard to a nearby house. Further damaging the value of her testimony, Shivone picked the defendant out of a six person line-up made up of physically distinct individuals, one of whom she recognized as someone from her neighborhood. Finally, the two other passengers in the SUV, including the driver, could not identify Russell in the same line-up. Indeed, the driver of the SUV testified that he was looking at the van Russell allegedly occupied when the shot was fired. He did not, however, testify that he saw anyone shooting from the van.

12.     The First District's decision conflict with the Court's reasoning in *Piatkowski*. The Court provides specific guidance as to when the evidence is closely balanced in a case such as Russell's where this particular erroneous instruction is given and the only evidence against the defendant is witness identification testimony. Affirming its holding in *Herron*, the Court recognized that where, as here, the entire case turns on the credibility of the witnesses' identification testimony, erroneously inserting the conjunction "or" between each of the factors listed in the instruction is especially prejudicial, because it affects how the jury would weigh and evaluate such testimony. *Id.* at *9. Ms. Langford's testimony is the only evidence that links Russell

6

to the shooting. Her testimony, however, only circumstantially connects Russell to Slack's death because she did not see him fire a gun or shoot at the SUV. Furthermore, Ms. Langford admitted that when she saw Russell, she was running away from the scene, vomiting and dazed.

13.     The First District's decision affirming Russell's conviction directly conflicts with this Court's recent opinion in *Piatkowski* because it based its conclusion that the evidence was closely balanced on its reasoning that there was sufficient evidence to support a conviction beyond reasonable doubt. In *Piatkowski*, the Court held that "[w]hether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *Piatkowksi*, 2007 WL at *7. Yet, the First District held that the evidence was closely balanced because "there was sufficient evidence presented at trial to find Russell guilty." *People v. Walter Russell*, No. 1-04-0853 (Ill. App. Ct. Nov. 30, 2006). These two holdings are irreconcilable.

14.     In *Piatkowski*, this Court found both that the evidence was sufficient to sustain the defendant's conviction and that it was closely balanced, and ordered a new trial. As the only evidence presented against Russell was witness identification testimony, and the erroneous instruction related to how the jury would assess the reliability of such testimony, the First District should have considered "whether the evidence presented on the reliability of the eyewitness testimony rendered this case one that is closely balanced." *Piatkowski*, at *8. The First District never engaged in this analysis.

## CONCLUSION

This Court should reconsider its denial of Russell's Petition for Leave to Appeal or, in the alternative, remand his case to the First District for reconsideration in light of *Piatkowski*.

Dated: June 22, 2007

Respectfully submitted:

Timothy A. Duffy
Andrew P. Young
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312)861-2000
*Attorneys for Defendant-*
*Appellant-Petitioner Walter*
*Russell*

8

# EXHIBIT D

1      A    Correct.

2      Q    And they took you -- I assume when you say

3  they, you mean personnel from the Riverdale Police

4  Department, is that correct?

5      A    Yes.

6      Q    And they drove you in a police car?

7      A    Correct.

8      Q    And they took you to the police station?

9      A    Correct.

10      Q    And they put you in a room.

11      A    Correct.

12      Q    And who was in the room with you?

13      A    An officer named Vito.

14      Q    And were you handcuffed or not?

15      A    Not at all.

16      Q    And how long did they keep you in the police

17  station?

18      A    Three days.

19      Q    And you volunteered to be there for three days?

20      A    Sure didn't.

21      Q    So, they kept you against your will for three

22  days.

23      A    Sure did.

24      Q    And you also testified at the grand jury about

DD-151

A.00033

1    this incident, right?

2          A    Correct.

3          Q    And one of the last questions you were asked at

4    the grand jury was, Counsel, do you have --

5          This is the grand jury transcript dated July 24,

6    2002.  This is page 15 and it is a line  --  again, at

7    line 15.

8          THE COURT:  Thank you, sir.

9          MR. CLARKE:  Excuse me, counsel.  Can we have a

10   minute?

11         MR. WIMBERLY:  Judge, can tender a copy to the

12   State?

13         THE COURT:  Okay.  Thank you, Mr. Wimberly.  Now,

14   sir, you may proceed.

15         MR. SNOWDEN:  "Q   And have you been treated well

16   today?"

17         A    I guess."

18         Were you asked that question, and did you give that

19   answer?

20         A    Sure did.

21         Q    And were you further asked, yes or no,

22              "Q    have you been treated well?

23              A    Yep."

24         And did you answer yes?

DD-152                              A.00034

1          A      Yeah, anything just to get up out of there from
2    being there three days, pretty much.

3          Q      So, they held you for three dyas and then took
4    you in front of the grand jury?

5          A      Correct.

6          Q      Did they treat you well?

7          A      The grand jury?

8          Q      Overall, your treatment during the three days?

9          A      No, not at all.   Three days of jail ain't fun.

10         THE COURT:   Sir, just answer the question that was
11   given you.

12         MR. SNOWDEN:    Q    Let's talk about the three days
13   of jail.

14         MS. CLARKE:   Objection.

15         THE COURT:   Sustained.

16         MR. SNOWDEN:   Q   Were you in that room for the
17   entire three days?

18         A      Sure was.

19         Q      Did you ask to leave?

20         A      Sure did.

21         Q      Were you under arrest?

22         A      Not at all.

23         Q      But they wouldn't allow you to leave?

24         A      Not at all.

A.00035

1       Q      In fact, they didn't allow you to leave until

2   after you gave them a statement, is that correct?

3       A      Correct.

4       Q      And after that they took you to the grand jury.

5       A      The next day.

6       Q      So, you gave them the statement, and then they

7   held you for another day?

8       A      No, they let me go home then.

9       Q      You gave the statement, and then they held you

10  for another day, and then they took you to the grand

11  jury, is that right?

12      A      That's not right.

13      Q      When did you give the -- the first statement

14  you gave, you were in that room, is that right?

15      A      Correct.

16      Q      And the Assistant State's Attorney came in,

17  right?

18      MS. CLARKE:  Objection, foundation, date and time,

19  please.

20      THE COURT:  Sustained as to foundation.

21      MR. SNOWDEN:  Q  You were in this courtroom for

22  three days, is that right?

23      A      That's correct.

24      Q      What's the first day you were there?

1       A       I don't remember the day.

2       Q       Okay.  During the first day you were there, did

3    the Assistant State's come to see you?

4       A       Not at all.

5       Q       Let's move to the second day.  The second day

6    you were there, did the Assistant's Attorney come to see

7    you?

8       A       Not at all.

9       Q       The Assistant State's Attorney didn't come

10   until the third day.

11      A       Correct.

12      Q       So, then you gave a statement finally on the

13   third day, is that correct?

14      A       That's correct.

15      Q       Then after that they took you out of the police

16   station and then took you to the grand jury?

17      A       No, they took me home then.

18      Q       When was it you went to the grand jury?

19      A       Either a couple of days or a day or two after

20   that.

21      Q       Now -- well, let me ask you about the interior

22   of the van.  You said that there was a gun retrieved from

23   the interior of the van, is that right?

24      A       Correct.

A.00037

1      Q      And now, when Russell retrieved this gun, did

2   he have to jump up?

3      A      It's like a little stoop on the driver's side

4   and the passenger's side.

5      Q      So, he had to step up?

6      A      Correct.

7      Q      And did he have to lean into the van?

8      A      Correct.

9      Q      So, he stepped up and bent over and leaned into

10   the van, correct?

11      A      Correct.

12      Q      Then he was able to open up that console in the

13   middle.

14      A      Yes.

15      Q      And that's when he retrieved the gun.

16      A      Correct.

17      Q      You didn't hand it to him?

18      A      Not at all.

19      Q      Were you convicted of the offense of

20   residential burglary?

21      MS. CLARKE:   Objection.   Side-bar, Judge.

22      THE COURT:   Side-bar, please.

23

24

DDD-156

CED201190

A.00038

1                 (The following proceedings were had

2                out side the presence and hearing

3                of the jury:)

4      THE COURT:  The record reflect we're in chambers

5  with counsel.  There's been an objection made to

6  counsel's reference to a prior conviction.

7      What's the basis of that objection, counsel?

8      MS. CLARKE:  That it appeared to me to be a

9  misdemeanor since he got forty-three days Cook County

10  Jail for it.

11      MR. SNOWDEN:  I'm looking at the notes on the

12  document that is marked with a delta sign, which

13  generally means, in the State's Attorney's office, the

14  defendant.  This is discovery tendered by the State.

15      THE COURT:  Is that commonly known as a rap sheet

16  you have?

17      MR. SNOWDEN:  It is commonly known as a rap sheet.

18  What it says on the front in handwriting that was put on

19  prior to it having been tendered --

20      MS. CLARKE:  I take that back.  It is residential

21  burglary.  I thought it was just theft.  I'm looking at

22  another page, and it does say residential burglary.  It

23  does say probation and time served, which led me believe

24  it is a misdemeanor.

OE  1191

A.00039

1          THE COURT:  The sentence is not relevant, it's just

2     the conviction, itself.  Is the State objecting to it

3     being used for impeachment purposes?

4          MS. CLARKE:  No, because it doesn't say it was a

5     reducer.  On the State's it says guilty of battery and

6     guilty of residential burglary.  And I assume it was a

7     reducer, because of the fact it didn't have probation on

8     there.  I can't prove it, so, I'm going to withdraw my

9     objection.

10          THE COURT:  Counsel will be allowed to inquire about

11     the conviction to show a residential burlary conviction.

12          MR. SNOWDEN:  Can I also, for the record, ask about

13     his theft conviction?

14          MS. CLARKE:  The theft conviction is also from 1996.

15          THE COURT:  Since that's a conviction, that goes to

16     his honesty.  I will allow that, also.  It goes to his

17     veracity as a witness.

18                         (The following proceedings were had

19                          in the presence and hearing of

20                          of the jury:)

21          THE COURT:  You may continue, then, counsel.

22          MR. SNOWDEN:  Q   In the year 1996, were you

23     convicted of the offense of residential burglary?

24          A     Yes.

DD-158

A.00040

1      Q     Also, in the year of 1996, were you convicted

2  of the offense of theft?

3      A     Yes.

4      Q     Now, you indicated that at some point you heard

5  some shots, correct?

6      A     Correct.

7      Q     And could you tell exactly where those shots

8  were coming from?

9      A     Not really.

10     Q     Could you tell who fired those shots?

11     A     Not at all.

12     Q     Do you know whether or not a nine millimeter

13  handgun has any particular sound to it?

14     A     Yes.

15     Q     It does?

16     A     Well, it depends on the speed of how it's being

17  shot if it's an automatic. It can go --

18     Q     Are you a firearms expert?

19     A     Not at all.

20     Q     Do you have a lot of experience shooting

21  weapons?

22     A     Unh-unh.

23     Q     So, you don't know who, if anybody, fired any

24  shots, do you?

CB2501193

A.00041

1      A      Not at all.

2      Q      Now, in point of fact, you never saw any

3  crashed vehicle, did you?

4      MS. CLARKE:  Objection, foundation.

5      THE COURT:  Please clarify it, counsel.

6      MR. SNOWDEN:   Q   On the night of this incident

7  where Walter's van was hit, aside from Walter's vehicle,

8  you never saw any crash vehicle, did you?

9      A      Not at all.

10     Q      Now, Let's talk about Walter's vehicle.

11     MS. CLARKE:  Objection to counsel's comment.

12     MR. SNOWDEN:  Withdraw it.

13     Q      With respect to Walter's vehicle, you had a

14  chance to see it, is that right?

15     A      Yes.

16     Q      And, in fact, you were sititing in the vehicle

17  when it was hit, is that right?

18     A      That's correct.

19     Q      And the collision took place in very close

20  proximity to where you were sitting, is that correct?

21     A      That's correct.

22     Q      The van was hit kind of hard, wasn't it?

23     A      Yes.

24     Q      And it rocked the van, didn't it?

A.00042

```
 1        A    Yes.

 2        Q    And, in point of fact, it crashed the door in

 3   so that you couldn't open it, correct?

 4        A    Correct.

 5        Q    Did you try hard to get it open?

 6        A    Yes.

 7        Q    Did you hit the door to try to open it?

 8        A    No.

 9        Q    You just pushed really hard?

10        A    Yes.

11        Q    And you couldn't get the door open?

12        A    Not at all.

13        Q    You said before you couldn't see anybody inside

14   of that van, is that right?

15        A    That's correct.

16        Q    Not even the driver?

17        A    Correct.

18        Q    Now, you said that on the day of this incident,

19   from about noon on, you had been drinking, is that right?

20        A    That's correct.

21        Q    And you had been drinking a lot, you said, is

22   that right?

23        A    That's correct.

24        Q    Had you sobered up by the time you gave your
```

CEVE61195

A.00043

1    statement?

2         A    I was sober the next day, pretty much.

3         MR. SNOWDEN:  Just a moment, your Honor.

4         THE COURT:  Yes, sir.

5         MR. SNOWDEN:    Q   Gregory, you previously testified

6    about a first statement that you gave in which there was

7    an assistant state's attorney present and a detective, is

8    that right?

9         A    I think it was just the State's Attorney that

10   day.  That's the only statement I made.

11        Q    So, it was just you and the State's Attorney in

12   the room?

13        A    Yeah.

14        Q    Was there a detective by the name of Roniak in

15   the room?

16        A    I don't recall.

17        Q    You don't recall him being there?

18        A    Not at all.

19        Q    At any point during the statement?

20        A    Not at all, because, as I remember, it was just

21   me and the lady.

22        MR. SNOWDEN:  No further questions.

23        THE COURT:   Redirect.

24                        REDIRECT EXAMINATION

A.00044

1              BY

2              MS. CLARKE:

3      Q    You spent three days in the police station

4  because the police weren't sure who had been responsible

5  for the shooting, correct?

6      MR. SNOWDEN:  Objection.  How doe he know?

7      THE COURT:  Sustained as to that.

8      MS. CLARKE:  Q   You were cooperative with the

9  Riverdale Police, isn't that true?

10      MR. SNOWDEN:  Objection, beyond the scope.

11      THE COURT:  Overruled.

12      THE WITNESS:  A   Yes.  I really had no other

13  choice.

14      MS. CLARKE:  Q   When you were at the station, they

15  had not completed their investigation.

16      MR. SNOWDEN:  Objection.  How would he know?

17      THE COURT:  Do you understand the question?

18      THE WITNESS:  A   I don't know.

19      MS. CLARKE:  Q   Did you tell the police Walter

20  pulled a gun from his van and pointed it at the  S.U.V

21  because it was the truth?

22      A   I never told the police that.  I told -- they

23  asked me what was happening, and I told them what was

24  happening.  But I never told the police that at all.

A.00045

1          MS. CLARKE:    Q    So, it was just the Assistant

2     State's Attorney that you talked to and gave that

3     information to?

4          A    Yes.

5          Q    Did you give that information to the Assistant

6     State's Attorney because it was the truth?

7          A    Yes.

8          Q    You didn't give the information to the

9     Assistant State's Attorney because you wanted to get out

10    of Riverdale police station.

11         A    That's it, also.

12         Q    So, is what you're telling the ladies and

13    gentlemen of the jury today the truth?

14         A    Yes, it is.

15         Q    Because Walter is a friend of yours, is that

16    correct?

17         A    Yes, he is.

18         MR. SNOWDEN:   Objection.

19         THE COURT:   Overruled.

20         MS. CLARKE:    Q    And then you were allowed to go

21    home, correct?

22         A    Yes.

23         Q    And then a couple of days later, you were given

24    a ride down to 26th and California to testify in front of

1     the grand jury, correct?

2         A    Correct.

3         Q    And did you tell the grand jury pretty much the

4     same thing you told the Assistant State's Attorney at the

5     Riverdale police station?

6         A    Correct.

7         Q    And you were aware of what Walter Russell did

8     for a living on the day of the shooting, weren't you?

9         MR. SNOWDEN:   Objection.

10        THE COURT:   Basis.

11        MR. SNOWDEN:   Beyond the scope.

12        THE COURT:   Overruled.

13        MS. CLARKE:   Q    Were you aware what he did for a

14    living?

15        A    Correct.

16        Q    What was that?

17        A    Correctional officer for Joliet State

18    Penitentiary.

19        Q    And you gave that information to the police,

20    didn't you?

21        A    Correct, which they also already knew.

22        Q    Would you repeat that?

23        A    They also already knew as far as the Riverdale

24    police.

DDD-165

1       Q     While you were there at the Riverdale police

2  station, you were fed and allowed to sleep, weren't you?

3       A     Yes.

4       Q     You were allowed to use the bathroom, and you

5  weren't handcuffed, is that true?

6       A     I wasn't handcuffed, but I was in a cell with a

7  bathroom in there; so, I was allowed to use the bathroom

8  on my own consent, really.

9       Q     How much time did you spend at the Riverdale

10  police station?

11      A     Three days, three miserable days.

12      Q     Is it true that you jumped out of the van as it

13  was making a U-turn by the fire trucks?

14      A     As it was backing up, yes, that's correct.

15      Q     Is it true that Walter pointed the gun toward

16  the S.U.V.?

17      MR. SNOWDEN:    Objection.

18      THE COURT:    Overruled.

19      THE WITNESS:   Correct.

20      MS. CLARKE:    Q   And is it true once you jumped out

21  of that van, the only person left inside of that van was

22  the defendant Walter Russell?

23      A     Correct.

24      Q     And the State's Attorney's office hasn't

A.00048

1    promised you anything in exchange for your testimony, is

2    that true?

3         A    That's true, not at all.

4         Q    In fact, you are not even a willing

5    participant.  You don't even want to be here, isn't that

6    true?

7         A    That's most definitely true.

8         MS. CLARKE:  Nothing further.

9         THE COURT:  Recross.

10        MR. SNOWDEN:  Yes.

11                    RECROSS EXAMINATION

12                    BY

13                    MR. SNOWDEN:

14        Q    Sir, do you have any pending cases right now?

15        A    Yes, sir.  As a matter of fact, I'm on house

16    arrest right now.

17        Q    What are you on house arrest for?

18        A    Battery.

19        Q    And who's prosecuting you in that case?

20        A    I don't know the judge's name, but it's

21    courtroom 205 in this same court building.

22        Q    In this building?

23        A    Yes.

24        Q    The Cook County State's Attorney is prosecuting

A.00049

1    you, aren't they?

2        A    Correct, I guess.

3        Q    That's the same people that this lady works

4    for, isn't that right?

5        A    I guess.  I don't know.

6        Q    Well, it's the State's Attorneys in the

7    building, right?

8        A    Yes.

9        Q    Do you think it's in your best inerest to

10    cooperate with the State's Attorneys?

11        A    Pretty much.

12        Q    Now, let me just ask you.  Were you given a

13    ride --  were your thumbing out on the corner asking for

14    a ride to the grand jury?

15        A    Not at all.

16        Q    You were given a ride. The police came and took

17    you to the grand jury, is that correct?

18        A    Correct.

19        Q    Not as a volunteer?

20        A    Well, I had to go.  I was subpoenaed to come.

21        Q    Not as a volunteer?

22        A    Correct.

23        Q    Incidently, what am I pointing at?

24        MS. CLARKE:  Objection.

CEEG1202

A.00050

# EXHIBIT E



Samuel E. Adam
*Attorney at Law*

Phone # (312) S.A.M.-A.D.A.M.
726-2326
Phone #: (773) 752-6950
Phone #: (888) 223-9008
Fax #: (773) 752-6960
Pager #: (773) 226-5585

**SAMUEL E. ADAM**
*ATTORNEY AT LAW*

345 East 53rd St.
Suite 200,
Chicago, IL 60615

PHONE: (312) 726-2326
PHONE: (888) 223-9008
FAX: (773) 752-6960

   I, ATTORNEY SAMUEL ADAM, represent WALTER RUSSELL, regarding the shooting on July 19, 2000. MR. RUSSELL exercises his 5th Amendment right under the United States Constitution to remain silent, and does not wish to speak to any law enforcement official in any capacity about the events of July 19, 2000 without his legal counsel present. This letter serves as notice to all law enforcement that MR. RUSSELL is exercising his right to silence and his right to an attorney. Furthermore, MR. RUSSELL, demands that his attorney, SAMUEL ADAM, be present for any and all pre-indictment or pre-charging line-ups, show-ups, and/or similar methods of identification.

*Walter Russell*            July 2
WALTER RUSSELL

*Samuel Adam*            7-21-200
SAMUEL ADAM
Attorney for Walter Russell

*Will Reid Jr* #101    7-21
Detective  Riverdale P.D.

EXHIBIT A

A.00032

C000063

# EXHIBIT F

When you weigh the identification testimony of a witness, you should consider all

the facts and circumstances in evidence, including, but not limited to, the following:

The opportunity the witness had to view the offender at the time of the offense.

or

The witness's degree of attention at the time of the offense.

or

The witness's earlier description of the offender.

or

The level of certainty shown by the witness when confronting the defendant.

or

The length of time between the offense and the identification confrontation.

I.P.I. Criminal No. 3.15

People's Instruction No. _____

A.00067

# EXHIBIT G



2007 WL 1519895
--- N.E.2d ----, 2007 WL 1519895 (Ill.)
**(Cite as: 2007 WL 1519895 (Ill.))**

Page 1

**H**
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Illinois.
The PEOPLE of the State of Illinois, Appellee,
v.
Louis PIATKOWSKI, Appellant.
**No. 102087.**

May 24, 2007.

**Background:** Defendant was convicted in the Circuit Court of first degree murder, attempted first degree murder, and aggravated battery. Defendant appealed. The Appellate Court reversed and remanded for a new trial. On remand a jury in the Circuit Court convicted defendant of first degree murder, attempted first degree murder, and aggravated battery. Defendant appealed. The Appellate Court affirmed. Defendant filed a petition for leave to appeal. The Supreme Court denied the petition and entered a supervisory order directing the Appellate Court to vacate its judgment and reconsider its decision. On reconsideration the Appellate Court affirmed defendant's convictions. Defendant filed a petition for leave to appeal.

**Holdings:** After granting the petition the Supreme Court, <u>Thomas</u>, C.J., held that:

(1) instruction on how to evaluate identification testimony constituted plain error, and

(2) instruction on evaluating eyewitness identification testimony constituted prejudicial error.
Reversed and remanded.

**[1] Criminal Law** 1038.1(1)

110k1038.1(1) Most Cited Cases

**[1] Criminal Law** 1063(6)

110k1063(6) Most Cited Cases
Generally, a defendant forfeits review of any supposed jury instruction error if he does not object to the instruction or offer an alternative at trial and does not raise the issue in a posttrial motion.

**[2] Criminal Law** 1030(1)

110k1030(1) Most Cited Cases
The plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.

**[3] Criminal Law** 782(5.5)

110k782(5.5) Most Cited Cases
Jury instruction on how to evaluate eyewitness identification testimony, which listed several factors for evaluating such testimony but used the word "or" between each listed factor, constituted error, in prosecution for first degree murder and other offenses; the instruction was internally inconsistent since it initially directed jurors to consider all of the facts and circumstances surrounding the identification, but then, using the word "or" directed the jurors to consider one of the factors regarding the reliability of the identification. Sup.Ct.Rules, Rule 615(c); IPI Criminal 4th No. 3.15.

**[4] Criminal Law** 1144.13(3)

110k1144.13(3) Most Cited Cases

**[4] Criminal Law** 1159.2(7)

110k1159.2(7) Most Cited Cases
The relevant inquiry, when deciding whether the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence is sufficient to sustain a conviction, is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**[5] Criminal Law** 🗝 566
110k566 Most Cited Cases
A positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction.

**[6] Criminal Law** 🗝 1038.1(5)
110k1038.1(5) Most Cited Cases
Unobjected-to erroneous instruction on evaluating eyewitness identification testimony, which listed several factors for evaluating such testimony but erroneously used the word "or" between each factor, was prejudicial, and thus constituted plain error in prosecution for first degree murder and other offenses; the State presented no physical evidence to connect defendant to the shooting, defendant made no inculpatory statements, the only evidence linking defendant to the crime was the testimony of two eyewitnesses, the eyewitnesses looked at defendant's face for a few seconds before the shooting, and both witnesses testified in a prior proceeding that part of the reason they identified defendant as the shooter was due to defendant's goatee. IPI Criminal 4th No. 3.15.

**OPINION**

Chief Justice THOMAS delivered the judgment of the court, with opinion.

*1 The issue presented in this case is whether an erroneous jury instruction about eyewitness identification testimony rose to the level of plain error so as to require a new trial. In 1996, defendant was convicted of first degree murder for the shooting death of Pedro Melquiadez and attempted first degree murder and aggravated battery for shooting Jamie Fragoso. On appeal, the appellate court reversed defendant's convictions and remanded the cause for a new trial. *People v. Piatkowski*, No. 1--96--3827 (1999) (unpublished order under Supreme Court Rule 23). Following a jury trial, defendant was again convicted of the same crimes. His convictions were subsequently affirmed by the appellate court. *People v. Piatkowski*, No. 1-- 01--3766 (2003) (unpublished order under Supreme Court Rule 23). Defendant then

filed a petition for leave with this court. We denied leave to appeal, but entered a supervisory order directing the appellate court to vacate its judgment and reconsider its decision in light of *People v. Herron*, 215 Ill.2d 167, 294 Ill.Dec. 55, 830 N.E.2d 467 (2005), which involved the same jury instruction given in the present case. Following reconsideration in light of *Herron*, the appellate court affirmed defendant's convictions. No. 1--01-- 3766 (unpublished order under Supreme Court Rule 23). Defendant then filed another petition for leave to appeal with this court, which we granted (210 Ill.2d R. 315(a)).

**BACKGROUND**

At defendant's retrial in July of 2001, Jamie Fragoso testified that around 2:30 a.m., on July 4, 1994, he was sitting on the doorway stoop of an apartment building located at 1631 West Wallen in Chicago with his friends--Pedro Melquiadez, Erica Ladezma, Juan Morales, and Jose Soto--when he noticed a blue and white Astro conversion van turn onto Wallen. Wallen is a one-way street going west. The van proceeded very slowly, stopped for a few seconds and then drove on to where the group was sitting on the south side of the street. It finally stopped directly in front of them with its driver's side window down and with the driver's side of the van facing the group. The driver then turned in his seat, leaned outside the window and spoke to them for a few seconds. The driver was looking directly at Fragoso, and Fragoso could see the driver's face clearly for those few seconds because the street lights were working and they illuminated the whole area. Despite the fact that the driver's window was down, Fragoso could not make out what the driver was saying, however, so Fragoso turned to Ladezma and Morales to ask them what the driver had said. At that point, Fragoso heard gun shots coming from the van so he ducked down. He felt a bullet hit him in the head and saw flashes coming from the van. He and Melquiadez covered Ladezma with their bodies until there was a momentary pause in the firing. Fragoso and Ladezma then got up and started running east. As they did so, Fragoso was shot in the leg. In all, he heard about 20 shots fired.

Fragoso identified a photograph of the steps where he was sitting prior to the shooting, which showed the letters "L.K." above the door. Over defendant's objection, Fragoso testified that the letters "L.K." stood for the Latin Kings street gang, that he himself was a member of the Latin Kings in 1994, and that the area on Wallen where the shooting occurred was Latin Kings territory.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1519895
--- N.E.2d ----, 2007 WL 1●5 (Ill.)
(Cite as: 2007 WL 1519895 (Ill.))

*2 On January 11, 1995, over six months after the shooting, Fragoso identified defendant as the driver of the van and the shooter from a photo array of a total of five pictures shown to him by police. At a lineup conducted at the police station on February 3, 1995, Fragoso again identified defendant as the driver and shooter. Defendant was the only person depicted in the photo array and the lineup with a goatee. Fragoso also positively identified defendant at trial as the driver and shooter.

On cross-examination, Fragoso testified that he had seen two persons in the van on the night in question, but he did not get a good look at the passenger because Fragoso focused on the driver when he spoke. Fragoso noted that while he was undergoing treatment at the hospital for his wounds immediately after the shooting, he told a police detective that the driver was a "male white Hispanic" who had a goatee and that the passenger was Puerto Rican. Fragoso stated that he also noticed that the driver had protruding eyebrows and eyes that were "sucked in." He acknowledged, however, that he did not tell police anything about the driver's eyes. He also admitted that he did not notice on the night of the shooting whether or not the driver had dark eyes. When Fragoso was asked by defense counsel if he was able to identify defendant from the photo array and at the lineup because the person depicted in the photo and lineup had short hair, a mustache, a goatee and dark eyes, Fragoso responded in the negative and stated that he identified defendant because he recognized him as the driver.

On redirect examination, the prosecutor asked Fragoso what he had told the detective who interviewed him at the hospital about who might have done the shooting. Fragoso responded that he told the detective that his gang was having some problems with other gangs, such as the Black Gangster Disciples, Ashland Vikings and Simon City Royals. The area where the shooting took place was just a few blocks from the Simon City Royals area. Defendant's objection to this testimony was overruled.

After Fragoso's testimony was completed, defendant renewed his objection to the gang testimony and moved for a mistrial. Prior to trial, the court had granted defendant's motion *in limine* to bar evidence of gang activity with the following exceptions: (1) a photograph of the doorway where the shooting took place that showed the letters "L.K." above the door; (2) testimony that "L.K." stood for Latin Kings; and

(3) testimony from Fragoso himself that he was a member of the Latin Kings at the time of the shooting. The trial court denied defendant's motion for a mistrial.

Erica Ladezma testified that on July 4, 1995, at 2:30 a. m., she was sitting in front of a building at 1631 West Wallen talking with her friends--Fragoso, Melquiadez, Morales and Soto. They were discussing their plans for a Fourth of July picnic, when she saw a dark Astro van with white stripes turn onto Wallen. Mini blinds covered the rear windows of the van. After stopping briefly at two alleys, the van stopped in front of where Ladezma was sitting. The van had two occupants, and the driver's side of the van was facing her with the driver's side window down. The driver looked at her for 15 to 20 seconds, while she and her friends waited for him to say something. She also noticed that the passenger climbed out of his open window area and sat on the ledge of the window opening. In the meantime, the driver kept looking at her with his hands on the wheel. He then stretched out his arm with a gun in hand and pointed it at her and her friends. She heard gunshots and then felt Frago so and Melquiadez pile over her, like they were trying to cover her.

*3 During a momentary break in the shooting, she and Fragoso started to run. When they reached an alley, Fragoso told her that he had been shot, and she could see that he was bleeding from his head. Ladezma then went back to check on Melquiadez and found him unconscious on the ground. She held him until the paramedics came. When the police arrived at the scene, she told them that the driver of the van was a "male white Hispanic," with "really short" hair, who was wearing a tank top and a gold chain around his neck.

Ladezma further testified that in January 1995, she viewed two separate photo arrays. From the first photo array, she identified defendant as the driver of the van and the shooter. From the second photo array, she identified Shondell Gray as the passenger in the van. She later identified defendant at a lineup and at trial as the driver of the van and the shooter. Defendant was the only person in the lineup with a goatee.

On cross-examination, Ladezma testified she did not know if the van had white wall tires and she did not remember whether she told a detective that the van had checkered-style hubcaps. She told the police detective at the scene that the driver was young. When defense counsel asked Ladezma, who was 25

years old at the time of the shooting, if she thought the driver was approximately Ladezma's age, she responded, "About, yes, twenties, somewhere around there." She also testified that the detective at the scene did not ask her if the driver had facial hair, and she did not remember telling the detective that defendant had a goatee. When asked if she had ever mentioned to any police officer that defendant had a goatee, Ladezma's response was ambiguous. She first noted that she thought she did mention it to police, but then added that she did not recall. After defense counsel rephrased the same basic question, she responded, "Yes, I think so. I did. I don't know." She denied stating in a prior proceeding that she picked defendant out of the lineup because he had a goatee. On redirect, she stated that the only reason she picked defendant out of the photo array and lineup was because he was the person she saw drive the van and then shoot and kill Melquiadez.

Chicago police detective Steven Stratton testified that he interviewed Ladezma on July 4, 1994, at the scene of the shooting. She told him that the vehicle involved was a dark Astro van with white stripes, and there were at least two persons in it. She described the driver as "a male white or white Hispanic," in his early twenties, who wore a black tank top and gold chain. In his police report dated July 4, 1994, Stratton noted that Ladezma described the suspect as "male/WH"; this is his own shorthand notation, which to him means "white or white Hispanic."

On cross-examination, Stratton stated that Ladezma never mentioned that the driver had a goatee. She said that the van had checkered hubcaps and white-walled tires. Ladezma did not describe any windows behind the driver's window of the van and did not mention mini blinds.

*4 Chicago police detective Lawrence Thezan testified that he prepared two photo arrays in January 1995. From the first group of photos, Ladezma identified defendant as the driver of the van and the shooter. From the second group of photos, she identified Shondell Gray as the passenger of the van. Fragoso viewed the first group of photos and identified defendant as the driver and the shooter. Thezan further testified that he conducted a lineup on February 3, 1995, at which both Ladezma and Fragoso identified defendant as the driver and shooter. Ladezma and Fragoso were kept apart from each other for their respective identifications.

On cross-examination, Thezan testified that none of the persons depicted in the first group of pictures

shown to the witnesses had a goatee. When defense counsel asked Thezan if the photo of defendant showed that he had hair on his chin, Thezan responded that there "appears to be something on his chin." With respect to the photograph of the lineup, which occurred three weeks after the witnesses were shown the photo array of the first group, Thezan acknowledged that defendant was the only person with a goatee. Thezan also acknowledged that the police report of defendant's arrest listed defendant's eye color as blue.

The medical evidence presented at trial showed that Melquiadez died of multiple gunshot wounds, including a shot that penetrated his lungs and heart. He had no drugs or alcohol in his system.

The forensic evidence presented revealed that 19 spent cartridges were recovered from the scene of the shooting--14 were fired from a nine-millimeter handgun and the other 5 were fired from a .45-caliber handgun. The cartridges were tested for fingerprints, but no usable images were obtained. The State's expert explained that this was not unusual because the intense heat of the burning gunpowder "fries" any prints off the cartridge cases. In his 20 years as a forensic investigator, he had never recovered a fingerprint from a fired cartridge.

The State rested, and defendant moved for a directed verdict. The motion was denied.

Defendant called one witness to testify on his behalf. Chicago police detective Andrew Sobolewski testified that he interviewed Fragoso at the hospital on July 4, 1994, following the shooting. Fragoso described one of the suspects as "a male white or Hispanic" and the other suspect as "possibly Puerto Rican, with curly hair, short, combed back." Fragoso did not specify which description applied to the driver, and the detective was not able to ascertain at that time which description fit which suspect. The detective further testified that he did not recall Fragoso telling him that either of the suspects had a goatee or unusual eyebrows.

On cross-examination, Sobolewski testified that at the time of the interview, Fragoso was being prepared for transfer to another hospital for additional treatment. Thus, their discussion only lasted a few minutes. He explained that he did not want to interfere with Fragoso's treatment, so he did not ask him anything in depth at the time, like whether the suspects had any facial hair.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01814    Document 1    Filed 03/28/2008    Page 123 of 130
2007 WL 1519895
--- N.E.2d ----, 2007 WL 1●●●●● (Ill.)
(Cite as: 2007 WL 1519895 (Ill.))

Page 5

*5 The parties stipulated that defendant was a few weeks short of his sixteenth birthday at the time of the shooting, as he was born on July 31, 1978. The parties further stipulated to the following additional matters. If called to testify, a court reporter would state that at a previous hearing in this case, Fragoso testified that the reason he identified defendant in the photo array and lineup was because of defendant's "short hair, his mustache and the goatee and his eyes, dark eyes he had." Additionally, another court reporter would testify that at a previous hearing in this case, Ladezma testified that she picked defendant out of the lineup because he had a goatee. Ladezma also testified at that same hearing that she picked defendant out of the photo array and lineup because she remembered his face.

The jury was given Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed.2000) (hereinafter IPI Criminal 4th No. 3.15), which lists the five factors to consider in weighing identification testimony. Without any objection from the defense, the instruction separated the five factors listed with a disjunctive "or" between them. [FN1] The instruction given read as follows:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
The opportunity the witness had to view the offender at the time of the offense.

[or]
The witness's degree of attention at the time of the offense.

[or]
The witness's earlier description of the offender.

[or]
The level of certainty shown by the witness when confronting the defendant.

[or]
The length of time between the offense and the identification confrontation."

During deliberations, the jurors sent several written notes to the trial judge. One asked for a definition of reasonable doubt and another requested a law dictionary. Two other notes requested transcripts of the testimony of Fragoso and Ladezma. The trial judge answered the jurors' request with written notes telling it that it had already had all the instruction needed to decide the case and that the transcripts

were not available and that they should use their own recollection of the testimony to decide the case. The jury returned verdicts finding defendant guilty of first degree murder, attempted first degree murder and aggravated battery with a firearm. Defendant was sentenced to 45 years in prison for first degree murder to run concurrently with a 30-year sentence for attempted first degree murder. The aggravated battery with a firearm conviction merged into the attempted murder conviction.

The appellate court, with one justice dissenting, affirmed defendant's convictions after we remanded the cause for reconsideration in light of our decision in _People v. Herron_, 215 Ill.2d 167, 294 Ill.Dec. 55, 830 N.E.2d 467 (2005). The appellate court majority noted that this court in _Herron_ ruled that giving IPI Criminal No. 3.15 with the "ors" is error. No. 1--01--3766 (unpublished order under Supreme Court Rule 23), citing _Herron_, 215 Ill.2d at 191, 294 Ill.Dec. 55, 830 N.E.2d 467. _Herron_ found that an unpreserved, jury-instruction error is reviewed under the plain-error analysis. See No. 1--01--3766 (unpublished order under Supreme Court Rule 23), citing _Herron_, 215 Ill.2d at 191, 294 Ill.Dec. 55, 830 N.E.2d 467. Under that test, a new trial is required for this particular jury-instruction error of inserting the "ors" only if a defendant shows that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him.' " See No. 1--01--3766 (unpublished order under Supreme Court Rule 23), quoting _Herron_, 215 Ill.2d at 187, 192-93, 294 Ill.Dec. 55, 830 N.E.2d 467. In _Herron_, the evidence was closely balanced, so the defendant was awarded a new trial. In the present case, however, the appellate court majority found that the evidence was not closely balanced, noting that "two eyewitness, on six different occasions, positively identified defendant as the shooter and driver." The appellate court dissent in the present case argued that the evidence was closely balanced because the witnesses did not know the suspect, had viewed him for only a short time on the date of the offense and defendant was the only person depicted in the photo array and lineup with a goatee. The dissent also noted that there was "no corroborating evidence, no confession and no physical evidence linking defendant to the crime." No. 1--01--3766 (unpublished order under Supreme Court Rule 23) (Theis, J., dissenting). We allowed defendant's petition for leave to appeal. 210 Ill.2d R. 315(a).

ANALYSIS

*6 Defendant argues before this court that he is entitled to a new trial because the jury was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

.07 WL 15...... (Ill.)
... 1519895 (Ill.))

...ted about how to evaluate
...mony. Defendant acknowledges
... the jury instruction issue in the
...gues that the cause should
...manded for a new trial because he
...on to show that the plain-error test
...

...defendant forfeits review of any
...ction error if he does not object
...offer an alternative at trial and
...sue in a posttrial motion. *Herron,*
...294 Ill.Dec. 55, 830 N.E.2d 467,
...ourages a defendant to raise issues
...on, thereby allowing the court to
...efore the instructions are given,
...precluding a defendant from
...through inaction. *Herron,* 215
...*Dec. 55,* 830 N.E.2d 467.

...451(c), however, provides that
... in criminal jury instructions
...to make timely objections
... of justice require.' " *Herron,*
...Ill.Dec. 55, 830 N.E.2d 467,
...451(c). Rule 451(c) fashions a
...the general rule to correct "
... in cases 'so factually close
...requires that the jury be
...*Herron,* 215 Ill.2d at 175, 294
...*g* 467, quoting *People v. Hopp,*
...Dec. 177, 805 N.E.2d 1190
...tensive with the plain-
...ring Court Rule 615(c), and the
...construed identically. *Herron,* 215
...Ill.Dec. 55, 830 N.E.2d 467. Rule
...following: "Any error, defect,
...ance which does not affect
...all be disregarded. Plain errors or
...substantial rights may be noticed
...were not brought to the attention of the
...Ill.2d R. 615(a).

...this court recently conducted an
...of the plain-error doctrine and
...wing:

...error doctrine bypasses normal
...ciples and allows a reviewing court
...unpreserved error when either (1) the
...close, regardless of the seriousness of
...(2) the error is serious, regardless of
...of the evidence. In the first instance,
...must prove 'prejudicial error.' That
...dant must show both that there was
...j error and that the evidence was so

closely balanced that the error alone severely
threatened to tip the scales of justice against him.
The State, of course, can respond by arguing that
the evidence was not closely balanced, but rather
strongly weighted against the defendant. In the
second instance, the defendant must prove there
was plain [ [FN3]] error and that the error was so
serious that it affected the fairness of the
defendant's trial and challenged the integrity of the
judicial process. [Citation.] Prejudice to the
defendant is presumed because of the importance
of the right involved, *regardless* of the strength of
the evidence.' (Emphasis in original.) [Citation.] In
both instances, the burden of persuasion remains
with the defendant." *Herron,* 215 Ill.2d at 186-87,
294 Ill.Dec. 55, 830 N.E.2d 467.

*7 We now reiterate that the plain-error doctrine
allows a reviewing court to consider unpreserved
error when (1) a clear or obvious error occurs and the
evidence is so closely balanced that the error alone
threatened to tip the scales of justice against the
defendant, regardless of the seriousness of the error,
or (2) a clear or obvious error occurs and that error is
so serious that it affected the fairness of the
defendant's trial and challenged the integrity of the
judicial process, regardless of the closeness of the
evidence. See *Herron,* 215 Ill.2d at 186-87, 294
Ill.Dec. 55, 830 N.E.2d 467.

[3] Turning to the above-mentioned test, we note
that the first step is to determine whether error
occurred in the giving of the instruction. This court
has already determined that giving IPI Criminal 4th
No. 3.15 with the "ors" is indeed clear and obvious
error. See *Herron,* 215 Ill.2d at 191, 294 Ill.Dec. 55,
830 N.E.2d 467. The reason that it is error is because,
"[i]f the instruction initially directs jurors to consider
all the facts and circumstances surrounding the
identification, but then, through the use of the
conjunction 'or,' directs jurors to consider one of five
factors regarding the reliability of the identification,
then the instruction contains an internal
inconsistency." *Herron,* 215 Ill.2d at 191, 294
Ill.Dec. 55, 830 N.E.2d 467. Moreover, it is
ambiguous and misleading, regardless of any further
comment on it by the prosecutor during closing
argument. *Herron,* 215 Ill.2d at 191, 294 Ill.Dec. 55,
830 N.E.2d 467.

Determining that the instruction was clear and
obvious error, however, does not end our inquiry
because *Herron* implicitly found that giving IPI
Criminal 4th No. 3.15 with the "ors" was not an error
so serious that reversal was required regardless of the
closeness of the evidence. Thus, defendant must meet

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his burden to show that the error was prejudicial--in other words, he must show that the quantum of evidence presented by the State against the defendant rendered the evidence "closely balanced." *Herron, 215 Ill.2d at 193, 294 Ill.Dec. 55, 830 N.E.2d 467.* When error occurs in a close case, we will opt to "err on the side of fairness, so as not to convict an innocent person." *Herron, 215 Ill.2d at 193, 294 Ill.Dec. 55, 830 N.E.2d 467.*

[4][5] Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge. The relevant inquiry for reasonable doubt purposes is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Pollock, 202 Ill.2d 189, 217, 269 Ill.Dec. 197, 780 N.E.2d 669 (2002).* A positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction. *People v. Vriner, 74 Ill.2d 329, 343, 24 Ill.Dec. 530, 385 N.E.2d 671 (1978).* In the present case, the appellate court determined that the evidence was sufficient to convict defendant beyond a reasonable doubt. Defendant has abandoned any reasonable doubt challenge on review to this court, and we find that the evidence was sufficient to convict for reasonable doubt purposes, thereby precluding any double jeopardy claim on remand should we determine that a new trial is warranted. See *People v. Taylor, 76 Ill.2d 289, 309, 29 Ill.Dec. 103, 391 N.E.2d 366 (1979).*

*8 [6] As to whether the evidence is nevertheless closely balanced, we begin by noting that defendant presented no alibi and no evidence whatsoever other than the testimony of Detective Sobolewski. But this is not fatal to his argument. Although defendant has the burden before this court to show that the evidence is closely balanced, he had no burden to present any evidence or to testify himself at trial. The State, on the other hand, presented no physical evidence to connect defendant to the shooting, and no inculpatory statements by defendant were admitted. The only evidence linking defendant to the crime was the testimony of the two eyewitnesses. The erroneous instruction in this case related to how the jury would assess the reliability of that eyewitness testimony.

Thus, we must consider whether the evidence presented on the reliability of the eyewitness testimony rendered this case one that is closely balanced. The five factors listed in the instruction are the same factors noted by the United States Supreme Court in *Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972),* for assessing the reliability of identification testimony. Those factors include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil, 409 U.S. at 199-200, 93 S.Ct. at 382, 34 L.Ed.2d at 411.*

After carefully examining defendant's argument in relation to the facts in the record, we find that the evidence presented on these five factors did not overwhelming favor the State, and we believe that defendant has met his burden to show that the evidence was sufficiently closely balanced so as to require a remand for a new trial.

With respect to the first *Neil* factor, we note that Fragoso only viewed the suspect's face for a few seconds prior to the shooting. Similarly, Ladezma simply testified that the suspect looked at her for 15 to 20 seconds. Neither witness claimed to have previously known the suspect. We do not find that this first factor greatly favors the State.

Regarding the second factor, there is no indication that the witnesses were paying a great deal of attention to the driver's appearance, as they did not know that they would be fired upon and were not attempting to assess his appearance for a later identification. Moreover, neither witness testified that they had any opportunity to view the suspects after the shooting began.

Turning to the third factor, we note that the prior descriptions of the suspect given by the witnesses were fairly consistent with respect to defendant's actual appearance, yet there were arguably some discrepancies and questions raised. Neither of the witnesses' descriptions was very detailed. Ladezma described the suspect as having short hair, which matched the photograph shown to the witnesses six months later. However, the actual date the photograph was taken was not established at trial. Both witnesses described the driver as a "male, white Hispanic," but neither witness elaborated on what this meant to them. It was undisputed that defendant is actually a male Caucasian. Fragoso testified that he told the police at the hospital that the suspect had a goatee, whereas Ladezma gave an ambiguous response about whether she ever told police prior to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any identification that defendant had a goatee. The police testimony at trial, however, established that neither witness mentioned the goatee prior to their first identification. All of this ambiguity about the goatee could arguably be explained by the fact that defendant's goatee as shown in the photo array and lineup is a very weak one and does not greatly impact his appearance. Yet, it nevertheless does leave room for an argument as to the witnesses' credibility. There is also the matter of the parties' stipulation that both witnesses testified at a prior proceeding that the goatee was at least one factor in leading them to identify defendant. There was also a minor discrepancy between the actual age of the defendant at the time of the crime--15 years--and the approximate age of the driver that Ladezma gave to police--early twenties--though it could be fairly argued that this description was at least close to defendant's actual age and appearance.

*9 Defendant emphasizes that Fragoso testified at the first trial in this case that the driver had dark eyes and dark eyebrows, but at the second trial, he testified that he did not notice whether the driver had dark eyes. Although photographs in the record show that defendant does in fact have dark eyebrows and eyelashes, Fragoso was impeached on the matter of whether he even noticed the driver's eyes on the night in question. Moreover, it was undisputed that defendant's eye color is blue. Under the circumstances, we are unable to say that the third *Neil* factor greatly favors the State.

The fourth and fifth factors--the level of certainty demonstrated at the confrontation and the lapse of time between the crime and the identification-- also do not heavily favor the State. Even though neither witness testified as to his or her level of certainty, both made unequivocal identifications of defendant, identifying him in a photo array, a lineup and again at trial. Additionally, neither witness ever wavered from those identifications. But the first time that the witnesses were asked to make an identification of the suspect, some six months after the offense, they were shown just five photographs, and so they had a 20% chance of picking defendant out even if they had simply guessed. Defendant was also the only suspect pictured with a goatee, albeit a barely discernible one, and both witnesses were impeached with their testimony from the first trial where they stated that they had identified defendant, at least in part, because of his goatee. More importantly, the lapse of six months between the crime and the photo identification is "a seriously negative factor in most cases." See *Neil,* 409 U.S. at 201, 93 S.Ct. at 383, 34

L.Ed.2d at 412. Although such a long delay between the crime and the identification is not enough to overturn a conviction on reasonable doubt grounds, it can be considered "significant" and goes to the weight of the evidence to be considered by the jury. *People v. Holmes,* 141 Ill.2d 204, 242, 152 Ill.Dec. 268, 565 N.E.2d 950 (1990).

This case turned on the credibility of the witnesses' identification testimony and the erroneous instruction involved how the jury would weigh and evaluate such identification testimony. While we do not mean to imply that a new trial is required in every case where this particular erroneous-identification instruction is given and the only evidence against defendant is identification testimony, we believe that a new trial is required in this case under the totality of the circumstances, particularly where the witnesses were only able to view the suspect for as little as a few seconds, did not previously know the suspect, some discrepancies existed in their prior descriptions and a lapse of more than six months occurred from the crime to the identification.

A number of cases have found that the error of using the "ors" in IPI Criminal 4th No. 3.15 was not prejudicial because the evidence was not closely balanced. See *Herron,* 215 Ill.2d at 192, 294 Ill.Dec. 55, 830 N.E.2d 467 (collecting cases). But these cases are all easily distinguishable based on the quantum and quality of evidence presented by the State against the defendants in those cases. For example, in *People v. James,* 348 Ill.App.3d 498, 284 Ill.Dec. 443, 810 N.E.2d 96 (2004), three eyewitness identified the defendant, and each of those witnesses had known the defendant from the neighborhood. In *People v. Sims,* 358 Ill.App.3d 627, 295 Ill.Dec. 86, 832 N.E.2d 237 (2005), the witness did not identify the defendant until 14 months after the shooting, but she explained that she had known the defendant for seven years and was afraid to come forward sooner. The State also presented inculpatory statements from the defendant establishing that he had done the shooting. In *People v. Carrero,* 345 Ill.App.3d 1, 280 Ill.Dec. 139, 801 N.E.2d 1084 (2003), the victim, who was robbed at gunpoint, gave the license plate number of the getaway vehicle to police and identified the defendant just 15 minutes after he was apprehended in the vehicle matching the plate number given by the witness. In *People v. Mercado,* 333 Ill.App.3d 994, 267 Ill.Dec. 838, 777 N.E.2d 641 (2002), the witness' identification was corroborated by the defendant's confession and the physical evidence. In *People v. Furdge,* 332 Ill.App.3d 1019, 266 Ill.Dec. 309, 774 N.E.2d 415 (2002), the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

identifying witness had known the defendant from the neighborhood for many years and identified the defendant from a photo lineup within one day of the shooting.

**\*10** We find that this case is closer factually to *Herron* and *People v. Gonzalez*, 326 Ill.App.3d 629, 260 Ill.Dec. 354, 761 N.E.2d 198 (2001), two cases where the error was found to be prejudicial because of the closely balanced evidence. In *Gonzalez*, there were two eyewitness, but no other physical or corroborating evidence. One eyewitness was unable to tell police shortly after the shooting "**whether the gunman was African-American or Hispanic.**" *Gonzalez*, 326 Ill.App.3d at 633, 260 Ill.Dec. 354, 761 N.E.2d 198. The other eyewitness described the suspect as having a mark on his neck and a gold tooth. Neither witness had previously known the defendant. The defendant presented alibi testimony at trial, as well as the testimony of his dentist stating that none of the defendant's teeth had ever been reduced for a crown. The appellate court found that the evidence was close, and the defendant was therefore prejudiced by the error. *Gonzalez*, 326 Ill.App.3d at 641, 260 Ill.Dec. 354, 761 N.E.2d 198.

In *Herron*, an armed robbery at a hotel was committed by two men with hoods that covered their foreheads. Several hotel employees witnessed the robbery, but only one them could identify the defendant as one of the robbers. The identification was made 15 months after the robbery at a lineup. One other witness who viewed the lineup could not identify the defendant. There was no physical evidence linking the defendant to the robbery. The defendant made a statement to police that placed him at the hotel, but the statement did not specifically implicate him as one of the armed gunmen. This court found that the evidence was close and that the jury's verdict may have been different with a different instruction. *Herron*, 215 Ill.2d at 193-94, 294 Ill.Dec. 55, 830 N.E.2d 467. We find *Herron* and *Gonzalez* to be ample support for our conclusion that a new trial is required in this case due to the jury-instruction error.

## CONCLUSION

For the foregoing reasons, we conclude that defendant has satisfied his burden to show that the evidence was closely balanced and that plain error occurred. For the foregoing reasons, we reverse the judgments of the circuit and appellate courts and remand the cause to the trial court for further proceedings consistent with this opinion.

*Judgments reversed; cause remanded.*

Justices FREEMAN, FITZGERALD, KILBRIDE, GARMAN, and KARMEIER concurred in the judgment and opinion.

Justice BURKE took no part in the consideration or decision of this case.

> FN1. IPI Criminal 4th No. 3.15 was changed in 2003 to remove the "ors" between the factors. See IPI Criminal 4th No. 3.15 (Supp.2003).

> FN2. The word "plain" here is synonymous with "clear" and is the equivalent of "obvious." See *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508, 519 (1993). It is not used as a term of art, and we do not mean to imply that a defendant must somehow satisfy the plain-error test before determining whether the evidence in the case is closely balanced.

> FN3. See footnote 2, *supra*. Again, the word "plain" here is synonymous with "clear" and is the equivalent of "obvious." See *Olano*, 507 U.S. at 734, 113 S.Ct. at 1777, 123 L.Ed.2d at 519.

--- N.E.2d ----, 2007 WL 1519895 (Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## PROOF OF SERVICE

I, the undersigned, attorney for Defendant-Appellant-Petitioner Walter Russell, certify that we caused true and correct copies of the foregoing Motion to Reconsider Denial of Leave to Appeal to be served on June 22, 2007, via U.S. mail, with postage prepaid, and mailed at 200 East Randolph Drive, Chicago, Illinois before 5:00 p.m., upon the following:

Honorable Robert R. Thomas, Chief Justice
Supreme Court of Illinois
1776 South Naperville Road
Building A, Suite 207
Wheaton, IL 60187

Honorable Thomas L. Kilbride, Justice
Supreme Court of Illinois
1819 4th Avenue
Rock Island, IL 61201

Honorable Rita B. Garman, Justice
Supreme Court of Illinois
3607 North Vermilion Street, Suite 1
Danville, IL 61832

Honorable Lloyd A. Karmeier, Justice
Supreme Court of Illinois
1100 South Mill Street
P.O. Box 266
Nashville, IL 62263

Richard Devine
State's Attorney
County of Cook
Room 309 - Richard J. Daley Center
Chicago, IL 60602

Lisa Madigan
Illinois Attorney General
Illinois Attorney General's Office
Chicago Main Office
100 West Randolph Street
Chicago, IL 60601

Andrew P. Young
*Attorney for Defendant-*
*Appellant-Petitioner Walter*
*Russell*

# EXHIBIT H

A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense.

The word "conduct" includes any criminal act done in furtherance of the planned and intended act.

I.P.I. Criminal No. 5.03

People's Instruction No. _____13_____

A.00068

C000066