IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex rel.    )
Walter Russell,                     )
                                    )
            Petitioner,             )
                                    )    No. 08 C 1814
      v.                            )
                                    )
DONALD GAETZ, Warden, Menard        )
Correctional Center,                )
                                    )
            Respondent.             )

## MEMORANDUM OPINION AND ORDER

On March 28, 2008, Walter Russell filed a petition for a writ of habeas corpus seeking to vacate his 2004 conviction for first degree murder and attempted murder. Russell is presently incarcerated at Menard Correctional Center, where Donald Gaetz is the warden.[1] He raises six claims for relief: 1) that the state appellate courts denied him a "rational" and "non-arbitrary" review of his conviction by refusing to review the merits of his appeal under a standard consistent and uniform with similar cases; 2) that he was denied due process and a fair trial when the trial court incorrectly instructed the jury on how to analyze witness identification by inserting the conjunction "or" between each of the factors the jury was supposed to weigh; 3) that he was denied

_____
[1]Donald Hulick, Menard's warden at the time Russell filed his petition, was originally named as the defendant in this action. Hulick is automatically replaced by the current warden pursuant to Fed. R. Civ. P. 25(d)(1).

due process and a fair trial when evidence obtained through an illegal seizure was introduced to the jury; 4) that he was denied due process and a fair trial when evidence obtained form an overly suggestive lineup was introduced to the jury; 5) that he was denied due process and a fair trial when the trial court gave a jury instruction on accountability when there was insufficient evidence to support a theory that he acted as an accomplice; and 6) that the evidence was insufficient to support his conviction. For the reasons explained below, I deny Mr. Russell's petition.

I.

## A. Summary of the Events

Because factual determinations made by state courts are presumed to be correct for the purpose of federal habeas petitions, *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003), I base my account of the material facts on *People v. Russell*, No. 1-04-0853 (Ill.App.Ct., Nov. 30, 2006) ("*Russell*"), Exh. D to Respondent's Answer, in which the Illinois Appellate Court--the highest state court to decide Mr. Russell's claims on the merits--upheld his conviction and sentence. Where helpful, I also include undisputed facts gleaned from my review of the record. Because Mr. Russell asserts, among other grounds for relief, that the trial court violated his rights under the Constitution by failing to suppress certain evidence during pre-trial proceedings, and that the evidence presented at his trial was insufficient to support his

conviction, a summary of each of these proceedings is in order. First, however, an overview of the underlying events:

In the early morning of July 19, 2000, in Riverdale, Illinois, petitioner's parked van was struck by an SUV (this accident is sometimes referred to as the "first accident"), which was driven by Raashawn Langford ("Raashawn"). Also in the SUV at the time were passengers Shivone Langford ("Shivone"), who was seated in the front passenger seat, Aletra Slack, seated behind Shivone, and Reginald Tracy, seated behind Raashawn. The four were leaving the home of their friend, Towanda Washington. The SUV fled the scene after hitting the van, and the van gave chase, shooting at the SUV. During the chase, Slack was shot in the head. She later died from the gunshot wound. The chase ended when the SUV crashed into a tree. Following this crash (sometimes, the "second accident,") the van drove up alongside the SUV, then drove off.

Gregory Craig, a friend of Russell's and a passenger in his van at the time of the first accident, was detained and held for three days by the Riverdale Police Department. During this time, he provided a statement identifying Russell as the driver of the van. On July 20, a detective went to Russell's mother's home and told her the police were looking for Russell. Subsequently, Samuel Adam, Jr., contacted the Riverdale police and told them he was Mr. Russell's attorney and that he would bring Russell to the station for questioning. The following day, Adam and Russell went to the

Riverdale Police Department, where Russell was arrested, processed, and booked upon his arrival. Several hours later, Russell was subjected to a police lineup and was identified by several eyewitnesses to the events surrounding the two car accidents of July 19. On August 1, 2000, Russell was indicted for the murder of Slack and the attempted murders of Raashawn, Shivone, and Tracy.

B. Motion to Suppress Identification

Prior to his trial, Mr. Russell moved to suppress his identification on the grounds that he was denied his right to counsel and that the lineup was unconstitutionally suggestive.[2] Russell argued that the lineup was unduly suggestive because he was physically distinct from the other participants. Russell asserted that at five feet, eleven inches tall and weighing 270 pounds, he was physically different from the other lineup participants. Russell further claimed the lineup was suggestive based on the fact that one of the police officers told him, while the lineup was being observed by a witness, to raise the number he was holding closer to his chin. Russell argued that this singled him out among the lineup participants.

At the suppression hearing, the court heard testimony from seven witnesses, including three witnesses who identified Russell in the lineup, three police officers who conducted the lineup, and

_____

[2]Because Russell does not renew his right to counsel claim here, I discuss only on the evidence and argument relating to the suggestiveness issue.

4

Russell himself.  None of the witnesses who identified Russell testified that they recalled seeing any of the lineup participants move his number.  One of the witnesses said that all of the men were holding their numbers in the same way, another said they were all holding their numbers toward the center of their bodies, and the third said she could not recall whether any of the participants had moved. Russell testified that at least two or three other participants were "about" his size.

The court also considered a group photograph of the lineup participants that was taken by the Riverdale police either just before or just after the lineup.  The record reflects that three of the other participants were six feet tall, one was five-foot-ten, and another was six-foot-five, and that one participant weighed 205 pounds, two weighed 215 pounds, one weighed 220 pounds, and one weighed 330 pounds.  The record also reveals that the participants were seated on a bench during the lineup.

After considering the parties' evidence and arguments, the court denied the motion to suppress.  The court found that the lineup was not unduly suggestive, relying heavily on the photograph of the participants and on the testimony of the witnesses.  Observing the photograph, the court stated, "I see six male blacks. I would say except for one that might be a smaller build, I would say five of those six are substantial height and weight."  Exh. A to Respondent's Answer at OO-63.  The court also noted that the

testimony of various witnesses was consistent, and concluded that defendant had not met his burden of demonstrating that the lineup was "suggestive, unfair, illegal, or unconstitutional." *Id*. at OO-65.

Russell moved to reconsider the court's denial of his motion based on the newly obtained, stipulated testimony of Samuel Thomas, another participant in the lineup. According to the stipulation, Thomas would have testified that he heard a police officer tell Mr. Russell during the lineup to hold his number up. The court considered this additional testimony but declined to reconsider its earlier ruling. The court noted that there was conflicting testimony as to whether Russell was, in fact, told to move his number while witnesses were the lineup, but reasoned that "[e]ven if I believe that happened...the Put your number up conversation, I think it's an unobvious inference or leap of logic to say that that clearly would be a suggestive fact of this –- of the totality of this lineup." Exh. A to Resp.'s Ans. at TT-23.

C. The Trial

At trial, the state presented the testimony of eleven witnesses: Bruce Fairfield, Aletra Slack's stepfather; Mitra Kalekar, a Cook County Medical Examiner; Gregory Craig; LaShanda Robinson; Towanda Washington; Reginald Tracy; Shivone Langford; Raashawn Langford; Lynne Russell, Walter Russell's mother; Detective Darrell Shaw, of the Chicago Police Department; and

Detective Peter Satriano, of the Riverdale Police Department.  The defense called two witnesses, Stella Bailey and Samuel Adam, Jr. Because the Illinois Appellate Court found only the testimony of the state's eyewitnesses--Craig, Robinson, Washington, Tracy, Shivone and Raashawn--relevant to Russell's appeal, I focus on that testimony below.

Gregory Craig testified that he and Russell had been friends for a number of years, and that the two had been drinking together on the night of Slack's death.  They were joined at some point by Craig's girlfriend, Robyn Reynolds, and a woman named LaShanda. While Russell's van was parked outside Reynolds's house, with Russell in the driver's seat and Craig in the passenger's seat, a silver SUV backed into the front passenger side door of the van. Russell got out to inspect the damage, and when the SUV drove off, Russell yelled at Craig to hand him his pistol.  Craig testified that Russell then reached into a glovebox on the floor of the van between the two front seats and pulled out a black, nine millimeter pistol.  Russell pointed the pistol at the SUV, then drove off after it, with Craig still in the passenger's seat.  At some point, the SUV turned back in the opposite direction because fire trucks were blocking the street, and the van followed.  As the vehicles were changing course, Craig told Russell he wanted to get out to get the SUV's license plate number, then jumped out the side door.

The van drove off, and Craig later heard shots fired from what sounded like a nearby area.

Craig then returned to Reynolds's house, where he met up with Reynolds, Robinson, and another woman from across the street. About twenty minutes later, Russell pulled up in his brother's gray Monte Carlo, told Craig, Reynolds, and LaShanda that the SUV he was chasing had hit a tree, and asked whether they wanted to see it. The group then drove towards 128th and Halsted in the Monte Carlo. At some point, Russell got out of the car to speak to a man named Steve Green, who was in another car. Russell returned to the car he was driving, then dropped off LaShanda and Reynolds. Russell and Craig then retrieved Russell's van from Russell's grandmother's house.

LaShanda Robinson testified that Russell and Craig picked her up at her house on July 18, 2000 and went to Robyn Reynolds's house. When they arrived, Craig exited the van and Robinson remained inside, talking to Russell. At that point, Russell took a black gun out of the glove compartment and showed it to her, then returned the gun to the glovebox. Robinson then got out of the van, and Craig got back in. Robinson saw a truck from across the street back into the van. Russell then got out of his van to inspect the damage. Robinson testified that she believed Russell asked Craig for his gun at that point. Russell got back into the van and followed the SUV as it drove off. The two vehicles then

drove back past where Robinson and Reynolds were standing, and Robinson later heard gunshots.

Robinson began walking down the street with Reynolds and Towanda Washington, a neighbor from across the street. They met up with Craig, and Washington later left the group with a man named Steve Green. While Craig, Robinson, and Reynolds stood on the street, Russell drove up in a gray car and asked if they wanted to see the crash. Craig, Robinson, and Reynolds all got into the grey car. Robinson testified that she asked Russell whether he had shot anyone, and he said no. At some point, Russell got out of the car and had a conversation with Steve Green. He then returned to the car, and the group proceeded to Russell's house on Dearborn to pick up Russell's van. Russell then dropped Robinson and Reynolds off at a recreation center near Robinson's home.

Towanda Washington testified that on July 18, 2000 she was home with friends including Slack, Tracy, Shivone and Raashawn. As Raashawn's SUV backed out of her driveway carrying these friends, it hit an Astro van parked across the street. Washington identified Russell in court as the person she heard say in a "mad voice" that somebody had hit his van and to get his gun. Washington said she saw a male pass Russell a gun. Both vehicles drove off, then came back in the other direction. Washington began walking down the street with Robinson and Reynolds, where they met up with Craig. Washington later got into a car with Steve Green

and rode with him until Green stopped the car to have a conversation with Russell. Washington asked Russell what had happened "on 120th street," and Russell told her it was "just an accident." Green dropped Washington off at 120th and Halsted, where she saw friends who told her that Slack had been shot in the head.

Reginald Tracy testified that he was in the back seat of Raashawn's SUV with his girlfriend, Aletra Slack, when the SUV backed into an Astro van parked across the street. As Raashawn drove away, the van chased them, ultimately towards 138th and Halsted Street. As they drove along Halsted, one gunshot hit Aletra in the head. The van continued to chase the SUV, and Tracy heard about twelve more gunshots. The SUV crashed into a tree at 120th Street and Wentworth. After the crash, the van briefly drove up, then drove away. Tracy pulled Slack out of the SUV and on to the sidewalk, then called for help.

Shivone Langford testified that as Raashawn, Tracy, Slack and she were pulling out of Washington's driveway in Raashawn's SUV, Raashawn hit an Astro van that was parked across the street. Raashawn opened the door of the SUV but did not get out, then he pulled away. The van they hit followed them, and when they got to around 138th and Halsted, she heard one gunshot followed by about fifteen more. At 120th and Wentworth, the SUV crashed into a tree. After the crash, Shivone got out of the SUV and saw the van pull up

along side of her, where she was able to see the driver.  In court, Shivone identified Russell as the driver of the van.

Raashawn testified that as he was backing out of Washington's driveway in his SUV, he collided with a van parked behind him. Raashawn saw the driver of the van get out to look at the damage, then saw the passenger in the van raise his hand with a gun and put it on the dashboard.  Raashawn then drove off to get away, and the van followed him.  Raashawn later saw the passenger of the van get out through the sliding door.  When the SUV got to Halsted Street, a shot was fired through the back of the SUV, and that more shots followed.  Raashawn testified that he attempted to drive to a hospital, since Slack had been shot in the head, but at 120th and Wentworth, he slid on wet pavement and crashed into a tree. Raashawn testified that he saw two men drive past in the van after he hit the tree, but that he was not able to identify them.

Although the Illinois Appellate Court did not include the testimony of the defense witnesses in its summary of the evidence presented, I briefly note the thrust of their testimony.  Samuel Adam testified about bringing Russell to the Riverdale Police station on July 21, 2002, and about the circumstances of Russell's arrest and participation in the police lineup. Stella Bailey testified that she lived in a house at the corner of 120th Street and Wentworth, and that at about 1:00 am on July 19, 2000, she was awakened by the sound of a loud crash.  She looked out her front

11

window and saw that an SUV had crashed into a tree.  Bailey said that she saw the occupants of the SUV pull someone out of the vehicle and onto the sidewalk.  The SUV's occupants then got back into the SUV and sped away, hitting Bailey's parked car on the way. Bailey stated that she did not see any other vehicles drive past before the SUV sped away.

## II.

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a state prisoner habeas relief unless the decision of the highest state court to adjudicate the petitioner's claims on the merits, "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Smiley v. Thurmer*, 542 F.3d 574, at 580 (7th Cir. 2008) (citing 28 U.S.C. § 2254(d)).  Only errors of federal law may support a writ of habeas corpus under § 2254; errors of state law are not grounds for federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Moreover, the state court's application of federal law "'must be shown to be not only erroneous, but objectively unreasonable.'" *Waddington v. Sarausad*, 129 S.Ct. 823,

831 (2009) (quoting *Middleton v. McNeil*, 541 U.S. 433, 436, (2004) (per curiam) (internal quotations omitted)).

In addition, before a state prisoner may have his or her claims adjudicated in a federal habeas petition, the prisoner must exhaust his or her state court remedies. 28 U.S.C. § 2254(b). This means, among other things, that the prisoner must have presented his or her federal claims consistently throughout "one complete round of the State's established appellate review process," before a federal court may review the merits of the claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "[F]or a constitutional claim to be fairly presented to a state court, both the operative facts and the 'controlling legal principles' must be submitted to that court." *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (quoting *Picard v. Connor*, 404 U.S. 270, 277 (1971).

Even if a state prisoner fairly presented a constitutional claim throughout his or her state proceedings, if the state courts resolved the claim under state law, a federal habeas court is without authority to overturn the state court judgment. "When the last state court to issue an opinion on a petitioner's federal claim has resolved that claim on an adequate and independent state ground, federal habeas review of the claim is foreclosed." *Miranda v. Leibach*, 394 F.3d 984 (citing *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997)(collecting cases)). In short, a federal claim is procedurally defaulted under § 2254 unless it was both fairly

presented throughout the state proceedings and resolved on the basis of federal law.

III.

## A. Claim One

Russell's first claim--that the Illinois Supreme Court arbitrarily declined to review the Illinois Appellate Court's decision denying his appeal--does not entitle him to habeas relief under AEDPA. The underlying substantive claim that Russell argues was arbitrarily denied review is his claim--also asserted separately as an independent basis for habeas relief--that he was denied due process when the trial court incorrectly instructed the jury on how it should weigh witness testimony. As I discuss in the next section, the Illinois Appellate Court resolved this claim on the merits.

The Illinois Supreme Court is a court with a discretionary power of review, ILCS S. Ct. Rule 315. Where it declines to exercise its discretionary power to review a lower court decision, its reasons for doing so have no bearing on a habeas petitioner's right to relief, since federal courts simply look through the denial of review to the decision of the highest state court to have adjudicated the petitioner's claims on the merits. *Stevens v. McBride* 489 F.3d 883, 902 n. 2 (7th Cir. 2007) ("For purposes of our review under AEDPA, the operative state-court decision 'is that of the last state court to address the claim on the merits.'" (quoting

14

*Garth v. Davis*, 470 F.3d 702, 710 (7ᵗʰ Cir. 2006); *McFowler v. Jaimet*, 349 F.3d 436, 446 (7ᵗʰ Cir. 2003) ("The relevant decision, for purposes of [review under AEDPA], is the decision of the last state court to rule on the merits of the petitioner's claim."); *see also Cone v. Bell*,---S.Ct.---, 2009 WL 1118709 at *16 n. 1 (Alito, J., concurring in part and dissenting in part) (citing *Baldwin v. Reese*, 541 U.S. 27, 30-32 (2004) and *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-43 (1999). Because the Illinois Appellate Court was the last state court to address Russell's claims on the merits, that court's decision is the object of review under § 2254. The violation Russell asserts in his first claim simply does not give rise to an independent entitlement to habeas relief.[3]

---

[3]Neither of the cases Russell cites, *Evitts v. Lucey*, 469 U.S. 387 (1985) and *Hicks v. Oklahoma*, 447 U.S. 343 (1980), supports an independent entitlement to relief under AEDPA where a state supreme court with discretionary power declines to review a claim that was decided on the merits by a state appellate court. In *Evitts*, the petitioner's claims had not been addressed on the merits by *any* state reviewing court: The petitioner's direct appeal was denied due to his appellate counsel's failure to follow state procedural rules, and his petition for discretionary review in the state supreme court was summarily denied. The central issue in that case was not whether the state supreme court's decision to decline review created a right to relief under AEDPA, but, in the Court's own words, "whether the appellate-level right to counsel also comprehends the right to effective assistance of counsel." 469 U.S. at 392. *Hicks* is likewise inapposite, as the issue in that case was whether the state appellate court's decision denying petitioner's claim *on the merits* arbitrarily violated his constitutional right to liberty, 447 U.S. at 346, not whether a later reviewing court's discretionary denial of review supported habeas relief under AEDPA.

<u>B. Claim Two</u>

Russell's second claim is that the trial court's incorrect reading of Illinois Pattern Jury Instruction ("IPI") 3.15, which inserted the conjunction "or" between each of the factors the jury was to weigh in analyzing witness testimony, violated his due process rights under the Fourteenth Amendment. At the time of Russell's trial, IPI 3.15 read:

> When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to the following:
>
> [1] The opportunity the witness had to view the offender at the time of the offense.
>                          [or]
> [2] The witness's degree of attention at the time of the offense.
>                          [or]
> [3] The witness's earlier description of the offender.
>                          [or]
> [4] The level of certainty shown by the witness when confronting the defendant.
>                          [or]
> [5] The length of time between the offense and the identification confrontation.

IPI, Criminal, No. 3.15 (4th ed. 2000)).[4]

Before the Illinois Appellate Court, Russell argued that including the "ors" when instructing the jury on determining

---

[4]In 2003, the recommended instruction was changed to omit the word "or," between the various factors. *People v. Herron*, 215 Ill.2d 167, 830 N.E.2d 467, 482 (Ill. 2005)(citing IPI Criminal 4th No. 3.15 (Supp.2003)). In fact, the "ors" were never intended to be read to the jury, and were included merely to indicate that only the particular factors supported by the evidence should be given. *People v. Gonzalez*, 326 Ill.App.3d 629, 639, 761 N.E.2d 198 (Ill.App.Ct. 2001) (quoting *People v. Lewis*, 165 Ill.2d 305, 354, 651 N.E.2d 72 (1995)).

witness credibility was erroneous and "rendered the judicial process unreliable and denied Russell a fair trial." Appellant's Br. at 21 (citing, *inter alia*, U.S. Const., amend. XIV), Exh. A to Resp.'s Ans. Russell noted that the factors recited in IPI 3.15 mirror those set forth in *Neil v. Biggers*, 409 U.S. 188, 199 (1972), and argued that the weight of Illinois authority holds that including the "ors" in IPI 3.15 constitutes reversible error.

The Illinois Appellate Court rejected Russell's claim. It first held that the claim was waived[5] because Russell had failed to object to the jury instruction at trial or to challenge it in a post-trial motion. Nevertheless, the court reviewed the issue under plain error, citing *People v. Herron*, 215 Ill.2d 167, 193, 830 N.E.2d 467 (Ill. 2005), in which the Illinois Supreme Court explained that forfeiture may be excused where plain error is present, and held that reading IPI 3.15 with the "ors" constitutes plain error where the evidence is "closely balanced." *Id*. at 482. The *Herron* court reasoned that where the evidence is "closely balanced," the erroneous instruction "'creates a serious risk that

---

[5]Respondent points out that "forfeited" is the more appropriate legal concept, since "waiver" implies the intentional relinquishment of a known right, which does not seem to have been the case here. As the Seventh Circuit has noted, however, the term "waiver" may be used broadly to encompasses both the intentional relinquishment of a known right and the mere "failure to comply with a procedural requirement." *Miranda v. Leibach*, 394 F.3d 984 at 992 n. 3. Because the Illinois Appellate Court used the term waiver, that is the term I use here, on the assumption that it was intended in the broad sense.

the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.'" Id. at 483 (quoting *People v. Hopp*, 209 Ill.2d 1, 12, 805 N.E.2d 1190 (Ill. 2004). In this connection, the *Herron* court also cited the standard articulated in *Boyde v. California*, 494 U.S. 370, 380 (1990): "the proper inquiry...is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence"). *Herron*, 215 Ill.2d at 193.

Respondent argues that Russell's claim is procedurally barred in this court because 1) it was not fairly presented in the state court proceedings, and 2) the appellate court resolved the claim on the independent and adequate state law ground of waiver.

As noted above, fair presentment requires that "both the operative facts and the 'controlling legal principles'" be submitted to the state courts. *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)(quoting *Picard v. Connor*, 404 U.S. 270, 277 (1971)). In *Verdin*, the Seventh Circuit articulated the factors it considers relevant to whether a federal claim was fairly presented. The court held that to present a federal claim fairly, a petitioner must: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so

particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation.  972 F.2d at 1473-74.

While it is true that the bulk of Russell's argument in the state courts focused on an analysis of Illinois cases, he explicitly asserted a Fourteenth Amendment violation based on the same operative facts he asserts in his habeas petition.  And although Russell's passing reference to *Neil v. Biggers*, standing alone, likely falls short of a "constitutional analysis" of his claim, the primary state case on which Russell relied, *People v. Gonzalez*, 326 Ill.App.3d 629, 761 N.E.2d 198 (Ill.App.Ct. 2001), places some emphasis on the constitutional underpinnings of its conclusion that including the "ors" in IPI 3.15 is erroneous.  *Id*. at 639.  I conclude that taken together, Russell's assertion that the jury instructions violated the Fourteenth Amendment, his citation to *Neil v. Biggers*, and his discussion of *People v. Gonzalez* are minimally sufficient to present a federal claim fairly under the *Verdin* standard.

Respondent's second argument for procedural default--that the Illinois Appellate Court resolved the claim on independent and adequate state law grounds--requires a more nuanced analysis.  A state ground for decision is deemed "independent" for this purpose "'only if the state court actually relied on a state rule sufficient to justify its decision.'" *Miranda v. Leibach*, 394 F.3d

984, 992 (7th Cir. 2005) (quoting *Prihoda v. McCaughtry*, 910 F.2d 1379, 1382 (7th Cir. 1990). The the state ground "is considered 'adequate' only if the state court applies the rule 'in a consistent and principled way,'" *Miranda*, 394 F.3d at 992 (quoting *Prihoda*, 910 F.2d at 1383).

As noted above, the Illinois Appellate Court explicitly held that Russell's claim based on IPI 3.15 was waived, but went on to review the claim under plain error, citing *People v. Herron*, 215 Ill.2d 167, 830 N.E. 2d 467 (Ill. 2005). *Russell* at 27. The Seventh Circuit has repeatedly held that "an Illinois court does not reach the merits of a claim simply by reviewing it for plain error." *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) (citing *Neal v. Gramley*, 99 F.3d 841, 844 (7th Cir. 1996) and *Rodriguez v. McAdory*, 318 F.3d 733, 735 (7th Cir. 2003) (collecting cases)). Accordingly, the fact that the Illinois Appellate Court engaged in a plain-error analysis does not "cure" Russell's waiver. *See Miranda*, 394 F.3d 984 at 992. Nevertheless, upon close consideration of the appellate court's discussion, I cannot say with confidence that it "actually relied" on state law waiver in denying Russell's claim.

The Illinois Appellate Court's analysis of this claim is a bit perplexing. The court seemingly rejects the claim on the ground that although plain error was present ("we find that the instruction as given constituted plain error"), the error was

nevertheless harmless ("Russell has failed to establish that the evidence was prejudicial"). The court explained that the error was harmless because "we can not say that the evidence was closely balanced or that the outcome of this case would have been any different had the instruction not included the 'ors'". *Russell* at 28. This holding appears to resolve Russell's claim on the merits, since prejudice (i.e., non-harmlessness) is a component of the substantive analysis of whether an erroneous jury instruction warrants reversal of conviction.[6] Indeed, the standard set forth *Boyde v. California*, which the Illinois Appellate Court relied upon indirectly through *Herron* (and which is often cited in cases discussing the constitutional significance of jury instruction errors) incorporates a prejudice element into its holding: The *Boyde* Court held that an ambiguous jury instruction amounts to a constitutional violation only where "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." 494 U.S. 370, 380. Accordingly, to the extent the

---

[6]On direct appeal, the applicable harmless error standard is the one set forth in *Chapman v. California*, 386 U.S. 18,24 (1967)(whether the error was "harmless beyond a reasonable doubt"), while on habeas review, federal courts must apply the standard of *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (whether the error had a "substantial and injurious effect or influence in determining the jury's verdict.") *Smiley v. Thurmer*, 542 F.3d 574 at 584 n.6. Regardless of the standard that applies, however, trial errors in general, and instruction errors in particular, require reversal only where the error is found to be prejudicial.

Illinois Appellate Court resolved Russell's claim on its conclusion of harmlessness, it arguably overlooked the waiver and resolved the merits of Russell's claim.

At the same time, the very basis on which the court determined that the jury instruction error was harmless--that the evidence was not closely balanced--would appear to preclude substantive review of the claim under Illinois law. Indeed, *Herron* held that reading IPI 3.15 with the "ors" amounts to plain error *only* where the evidence is closely balanced. It seems, then, that once the court concluded that the evidence was *not* closely balanced, it should have concluded under *Herron* that there was no plain error (hence no basis for overlooking the waiver) and ended its analysis there.[7]

---

[7]Although the Russell court quoted *Herron* as holding that "giving IPI Criminal No. 3.15 with the 'ors' is indeed plain error," the quoted sentence reads in its entirety, "We agree with the appellate court in this case and in [*People v.*] *Gonzalez* [326 Ill.App.3d 629, 761 N.E.2d 198 (Ill.App.Ct. 2001)] that giving IPI Criminal No. 3.15 with the 'ors' is indeed plain error." Significantly, in both *Gonzalez* and *Herron*, the appellate court found that the evidence was "closely balanced." Indeed, *Herron* made clear that in Illinois, courts may invoke the plain-error doctrine to overlook a forfeited claim only where 1) "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence," or 2) "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." 215 Ill.2d at 178-79. (Russell did not invoke the second basis.) The Illinois Supreme Court has elsewhere explained that the plain error and harmless error doctrines are "basically the same," but that harmless error is applied "where the error has been properly preserved." *People v. Zeisler*, 125 Ill.2d 42, 531 N.E.2d 24 (1988). This raises further questions as to why the Russell court reached harmlessness after expressly finding the claim waived. One possibility is that when the court held that it was "plain error" to read the "ors" in this case, it used the word "plain" as synonymous with "clear" or

22

Whether the court properly applied state law is, of course, outside the scope of the present review. My concern here is only to ascertain the ground on which the court "actually relied" in disposing of Russell's claim. And although it appears the court *could have* resolved the claim based on waiver once it found that the evidence was not closely balanced, that interpretation is seemingly at odds with the court's statement that "the instruction as given constituted plain error," and its subsequent resolution of the claim based on harmlessness. Because I cannot say with confidence that *Russell* was clearly resolved on an "independent" state grounds, I conclude that it is not procedurally defaulted.

Having determined that Russell's claim fairly presented a constitutional issue, and that the appellate resolved the claim on the merits, I must now ascertain whether its adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Smiley v. Thurmer*, 542 F.3d 574, at

---

"obvious," and not as a term of art intended to convey that the doctrine of plain error applied. *See People v. Piatkowski*, 225. If the Illinois Appellate Court intended to use "plain" in this way, that would support the conclusion that it rested its decision on waiver, not on substantive harmlessness. That is not, however, the most obvious interpretation of the court's language.

580 (7th Cir. 2008) (citing 28 U.S.C. § 2254(d)). Unfortunately, Russell's petition and reply brief evidence a basic failure to appreciate this standard of review. In fact, although he cites § 2254 as the statutory authority for his petition, Russell acknowledges the AEDPA standard of review for the first time on page twenty-seven of his thirty-two page *reply* brief. Even then, Russell does not indicate which prong of § 2254 he believes entitles him to relief, or point to any perceived error in the Illinois Appellate Court's analysis. These omissions by Russell's counsel complicate my task, of course, since I hesitate to dispose of what could potentially be a meritorious claim without undertaking the appropriate analysis. Accordingly, I briefly address Russell's claim with reference to each prong of AEDPA.

A state court decision is "contrary to" federal law as established by the Supreme Court if it directly contradicts clearly established precedent, or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from" the Court's precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The parties are in agreement that *Boyde v. California*, 494 U.S. 370 (1990) and *Estelle v. McGuire*, 502 U.S. 62 (1991), set forth the relevant constitutional standards for determining whether ambiguous or erroneous jury instructions rise to the level of constitutional error. As noted above, under *Boyde*, "the proper inquiry...is

whether there is a reasonable likelihood that the jury has applied
the challenged instruction in a way that prevents the consideration
of constitutionally relevant evidence." 494 U.S. at 380.  In
*Estelle*, the Court quoted this language from *Boyde* and further
established that a federal court reviewing an erroneous instruction
may not grant habeas relief unless "the ailing instruction by
itself so infected the entire trial that the resulting conviction
violates due process."  502 U.S. 62, 72 (quoting *Cupp v. Naughten*,
414 U.S. 141, 147 (1973).  Although the Illinois Appellate Court
did not cite to these cases, its analysis is consistent with the
principles they set forth, and its reliance on *Herron* (which itself
quoted *Boyde*) further demonstrates that its reasoning was in accord
with the governing standards.  Moreover, the court's discussion of
harmlessness is in accordance with *Estelle's* requirement that the
erroneous jury instruction alone have "infected the entire trial"
with unfairness.  502 U.S. 62, 72.  I conclude that the *Russell*
court's analysis is not contrary to applicable Supreme Court
precedent.

"A state court's decision is 'an unreasonable application' of
federal law if the court 'identifies the correct governing legal
principle' from the Supreme Court's decisions but 'unreasonably
applies that principle to the facts of the prisoner's case." *Allen
v. Chandler*, 555 F.3d 596, 602 (7th Cir. 2009) (citing *Williams*, 529
U.S. at 413). "An 'unreasonable application' is one that is 'not

only erroneous, but objectively unreasonable,' which in turn means 'something like lying well outside the boundaries of permissible differences of opinion,'" *Allen*, 555 F.3d at 602 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) and *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003)). Russell's argument, construed generously, could be interpreted as asserting an unreasonable application of *Boyde* to the facts of his case. This argument, however, turns on the underlying issue of whether the evidence presented at trial was "closely balanced," for Russell acknowledges that the challenged instruction violates the constitutional principles underlying *Herron* only if the evidence is closely balanced.[8] Accordingly, I turn to whether the Illinois Appellate Court's conclusion that the evidence was not closely balanced is unreasonable.

The appellate court devoted roughly four-and-a-half pages to the evidence presented at Russell's trial, explaining that its discussion included "only testimony relevant to this appeal." The court summarized the testimony of Craig, Robinson, Washington, Tracy, Shivone, and Raashawn, who testified as eyewitnesses to the events surrounding Slack's death. In its analysis of Russell's claim that the evidence was insufficient to support his conviction (which preceded the portion of the opinion that addressed the

---

[8]Russell states that "the reading of IPI 3.15 with the 'ors' is reversible error *if the evidence is 'closely balanced,'*" Pet.'s Reply at 17, citing *Herron*. (Emphasis added)

26

alleged jury instruction error), the appellate court devoted another three pages to a discussion of the testimony of these witnesses. In concluding that the jury instruction error was harmless because the evidence was not closely balanced, the court held:

> In this case, although we find that the instruction as given constituted plain error, Russell has failed to establish that the error was prejudicial. As we have already discussed, there was sufficient evidence presented at trial to find Russell guilty. Therefore, we can not say that the evidence was closely balanced or that the outcome of this case would have been different had the instruction not included the "ors."

*Russell* at 28.

Russell assails this passage in his habeas petition, arguing that the court erroneously conflated the issue of sufficiency of the evidence with whether the evidence was "closely balanced." Russell cites *People v. Piatkowski*, 225 Ill.2d 551, 870 N.E.2d 403 (Ill. 2007), in which the Illinois Supreme Court observed, in a case that also challenged the use of the "ors" in IPI 3.15, that "[w]hether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge," *id*. at 411, and held that while the evidence against the defendant in that case was sufficient to sustain his conviction, it was not closely balanced. *Id*. at 568. The court concluded that the jury's verdict may have been different with a different instruction and ordered a new trial. *Id.* at 572.

Russell's *Piatkowski* argument does not entitle him to relief under § 2254.  Nothing in *Piatkowski* suggests that the *Russell* court violated any principle of constitutional law, or relied on an unreasonable determination of the facts, when it concluded that the evidence in *this* case was not closely balanced.  Although the *Piatkowski* court found that the evidence was closely balanced in *that* case, it took pains to clarify that "we do not mean to imply that a new trial is required in every case where this particular erroneous-identification instruction is given and the only evidence against defendant is identification testimony." 225 Ill.2d at 570.  The *Piatkowski* court went on to emphasize that whether the evidence is closely balanced depends on the "quantum and quality" of the evidence presented.  In particular, the court distinguished *People v. James*, 348 Ill.App.3d 498, 810 N.E.2d 96 (Ill. 2004), on the ground that in *James*, "three eyewitnesses identified the defendant, and each of those witnesses had known the defendant from the neighborhood."  In the present case, the appellate court found that in addition to the identification testimony of Gregory Craig (who had known Russell for a number of years and was with Russell during the events leading up to Slack's death), four witnesses heard Russell demand his gun after his van was hit by Raashawn's SUV and six witnesses testified that Russell's van chased the SUV.  Certain of these witnesses also testified to various other facts incriminating Russell.  Assuming the correctness of these factual

findings, I do not conclude that the appellate court's analysis in *Russell* violated any constitutional principle underlying *Piatkowski*.

Of course, Russell challenges the Illinois Appellate Court's factual findings with an attack on the credibility or reliability of two of the aforementioned witnesses (Craig and Shivone). State factual findings are presumed correct, however, unless the petitioner rebuts the presumption by clear and convincing evidence. *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); and *Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005)). Even if the testimony of Craig and Shivone are discounted, many of the factual findings on which the *Russell* court based its assessment of the closeness of the evidence remain unchallenged. Accordingly, I do not conclude that the *Russell* court relied on an unreasonable determination of the facts when it concluded that the evidence was not closely balanced.

For the foregoing reasons, Russell is not entitled to habeas relief based on his second claim.

C. Claim Three

In his third claim, Russell asserts that he was denied due process and a fair trial when evidence obtained through an illegal seizure was introduced to the jury. The Illinois Appellate Court

rejected this claim on the ground that the Riverdale police had probable cause to arrest Russell. In this court, Russell again asserts that his arrest was unconstitutional for lack of probable cause.

Respondent argues that Russell's claim is barred by *Stone v. Powell*, 428 U.S. 465 (1975), in which the Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494-95 (footnotes omitted). Russell replies that he did not have a full and fair opportunity to litigate his claim because the Illinois Appellate Court did not carefully and thoroughly analyze the facts of his case and apply the proper constitutional standard to those facts. Specifically, Russell claims that the appellate court "ignored key evidence" and argument that Craig's identification was insufficient to form a basis for probable cause.

The Illinois Appellate Court began its analysis of the propriety of Russell's arrest by noting that Russell did not move to quash his arrest or to suppress evidence on the ground that he was arrested without probable cause.[9] Accordingly, the court held

---

[9]Russell did move to suppress his identification on other grounds, but he did not raise the constitutionality of his arrest.

that Russell had waived this claim, but it elected to ignore the waiver and review Russell's claim in the interest of justice.

The court began by identifying the legal framework for determining whether probable cause exists: whether the "totality of the circumstances" would lead reasonable, prudent people to believe there was a reasonable probability that the defendant had committed an offense. Turning to the specifics of Russell's claim, the court held:

> Our review of the evidence reveals that Gregory Craig, Russell's friend and the passenger in Russell's van, told Satriano on July 20, 2000, that Russell was the driver of the van and that Russell shot and killed Aletra Slack. Furthermore, at trial, Craig testified that he was in the van with Russell when Raashawn backed his SUV into the van at which point Russell demanded his gun and chased the SUV. Our review of the record reveals that after the murder, the police interviewed Craig, an eyewitness, who provided the police with information about events leading up to and after the shooting. We find, based on the information known to the police at the time of their warrantless arrest of Russell, that they had sufficient information to believe that Russell committed Aletra's murder.

Russell argued before the appellate court that Craig's identification was insufficient as a matter of law to support probable cause because: 1) Craig was the initial suspect in Slack's murder, and he was held by the police for three days until he provided the statement that implicated Russell; 2) Craig had been intoxicated on the night of Slack's death; and 3) Craig had previously been convicted of battery and burglary. Russell claims that because the court did not acknowledge any of these facts, or

address Russell's argument, it did not "carefully and thoroughly analyze the facts." Thus, Russell argues, his claim is not barred by *Stone*.

Russell cites *Terry v. Martin*, 120 F.3d 661 (7th Cir. 1997), *Weber v. Murphy*, 15 F.3d 691 (7th Cir. 1994), and *Gamble v. State of Oklahoma*, 583 F.2d 1161 (10th Cir. 1978). Both cases from this circuit apply the standard set forth in *Pierson v. O'Leary*, 959 F.2d 1385 (7th Cir. 1991), in which the court analyzed what constitutes an "opportunity for full and fair litigation" under *Stone*:

> A habeas corpus petitioner has received an opportunity for full and fair litigation of his or her fourth amendment claim when (1) the petitioner has clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of the petitioner's fourth amendment rights and (2) the state court has carefully and thoroughly analyzed the facts and applied the proper constitutional case law to the facts.

*Id*. at 1391. Indeed, although Russell does not cite *Pierson*, this is the standard on which he rests his argument that his claim is not barred by *Stone*.

If *Pierson* were the Seventh Circuit's last word on the application of *Stone*, Russell's argument might have merit, for he is correct that the Illinois Appellate Court gave no apparent consideration to the facts Russell claims rendered Craig's statement to the police--which the court acknowledges was the sole basis for probable cause--inherently unreliable. The trouble with Russell's position is that since it decided *Pierson*, the Seventh

Circuit has noted that the standard it established in that case has "spawned many arguments," *Cabrera v. Hinsley*, 324 F.3d 527, 531 (7th Cir. 2003), and has revised the test in a way that sharply curtails a petitioner's ability to overcome the *Stone* bar based on even an egregiously erroneous analysis by a state court. For example, in *Hampton v. Wyant*, 296 F.3d 560 (7th Cir. 2002), the court held that:

> [W]hat a court has to do is look to the appropriate body of decisional law. Faced with a claim that the police lacked probable cause to make an arrest, a state court could not respond that in Illinois it is proper to arrest without probable cause. Failure to apply applicable law would show that the accused lacked a full opportunity to prevail on direct appeal. A court that has made up its mind not to enforce the fourth amendment rarely says so directly, though it may leave clues in its treatment of the merits. It is impossible to see how the problem could be identified without paying *some* attention to how the state court dealt with the merits. But as we said in *Turentine* [*v. Miller*, 80 F.3d 222, (7th Cir. 1996)] this must not be confused with a search for error. It takes an "egregious error" (80 F.3d 226) to imply that the state judges have closed their ears and minds to argument-and it is the latter circumstance, not the error itself, that would justify relief under *Stone*.

*Hampton*, 296 F.3d at 563-64 (emphasis in original).

The Seventh Circuit revisited this issue in *Cabrera v. Hinsley*, 324 F.3d 527 (7th Cir. 2003), where it reiterated its *Hampton* holding that "a blunder, no matter how obvious, matters only in conjunction with other circumstances that imply refusal by the state judiciary to take seriously its obligation to adjudicate claims under the fourth amendment." 324 F.3d at 531 (quoting *Hampton*, 296 F.3d at 564). The *Cabrera* petitioner had argued that the Illinois Supreme Court's affirmance of probable cause rested on

33

a finding of fact that was not supported by the evidence, and that its error demonstrated that the court was "careless of Cabrera's right to present his claim." 324 F.3d at 532. The Seventh Circuit rejected this argument, explaining that even an erroneous finding of fact "does not support a piercing of *Stone* to send a federal court sifting through the evidence to see whether the Illinois courts were, in its view, correct in determining that probable cause existed." *Id*.

In *Miranda v. Leibach*, 394 F.3d 984 (7th Cir. 2005), the Seventh Circuit discussed the *Pierson* standard as it has been refined in *Hampton* and *Cabrera*.[10] In *Miranda*, the petitioner argued that the police lacked probable cause to arrest him because their only basis for doing so was an incriminating statement made by a third party during that third party's own unlawful arrest. The Illinois Appellate Court rejected this argument based on its unexplained conclusion that the third was not under arrest at the time of his statement. On habeas, the petitioner argued that the court's unexplained conclusion showed it had failed to analyze the facts of the case carefully and thoroughly, so his claim was not barred by *Stone*.

_____

[10]The *Miranda* court's conclusion that the petitioner's Fourth Amendment claim was barred by *Stone* was an alternative basis for its decision. It first held that the claim had been procedurally defaulted. The court's *Stone* analysis is instructive regardless of the weight of the authority.

The *Miranda* court began by assuming that if the factual finding that the third party was not under unlawful arrest lacked *any* evidentiary support, the petitioner's claim might overcome the *Stone* bar, citing its previous indication in *Weber v. Murphy*, 15 F.3d 691, 694 (7th Cir. 1994) that when a state court's analysis turns on a factual determination that lacks the fair support of the record, it may not have carefully and thoroughly analyzed the facts. *Miranda*, 394 F.3d at 998. After closely reviewing the factual record, however, the *Miranda* court concluded that although the evidence was conflicting, there was some support for the state court's conclusion that the third party was not under arrest. Accordingly, it held that the court's finding was not so "gravely mistaken" that it suggested the court was "unwilling to engage in a good faith review of Miranda's Fourth Amendment claim." Id. at 1001. As a result, the claim was barred under *Stone*.

Still more recently, the Seventh Circuit rejected a habeas petitioner's argument that *Stone* did not apply because the Illinois state courts had "failed to consider" a factor relevant to his Fourth Amendment claim. *Watson v. Hulick*, 481 F.3d 537 at 541-42 (7th Cir. 2007). The court distilled its analysis into a few simple principles: first, that "a 'full and fair opportunity' guarantees only 'the right to present one's case,'" 481 F.3d 537 at 542 (quoting *Cabrera*, 324 F.3d at 531-32), and second, that "'absent a subversion of the hearing process,' federal courts will not examine

whether [state] courts 'got the decision right.'" 481 F.3d 537 at 542.

Turning back to Russell's claim, I conclude in light of these cases that Russell's claim is, indeed, barred by *Stone v. Powell*. Russell does not dispute that the Illinois Appellate Court identified and applied the correct constitutional standard: whether the "totality of the circumstances" would lead reasonable, prudent people--not legal technicians--to believe there was a reasonable probability that he had committed an offense.[11]  In addition, the appellate court exercised its discretion to review Russell's claim on the merits "in order to reach a just result," although it was not required to do so because Russell had waived the claim.  Both of these factors support applying the *Stone* bar under *Hampton*, which explains that state courts need only look to the "appropriate body of decisional law," and provides that so long as the alleged error does not "imply that the state judges have closed their ears and minds to argument," *Hampton*, 296 F.3d at 563-64, the petitioner cannot overcome *Stone* on the ground of the state court's deficient analysis of his claim.

Moreover, even if the Illinois Appellate Court had discounted the reliability of Craig's identification on the grounds Russell

---

[11]Although the Illinois Appellate Court cited only Illinois authority, at least one of the cases on which it relied--*People v. Tisler*, 103 Ill.2d 226 (Ill. 1984)--cited *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949), which Russell also cites for the applicable constitutional standard.

asserted (which, it bears noting, relied on state, not federal law), Russell's case still would not fall within the hypothetical scenario the Seventh Circuit contemplated in *Miranda* and *Weber*, in which *no* record support exists for the facts found to support probable cause. Russell does not dispute that at the time the police arrested him, they knew that Craig had known Russell for a number of years; that Craig and Russell had been together on the night of Slack's death; and that Craig claimed to have witnessed Russell's participation in events leading up to Slack's death. These record facts reasonably support the Illinois Appellate Court's determination that probable cause existed. Finally, even assuming the appellate court erroneously failed to consider facts or argument relevant to Russell's claim, I do not conclude that this deficiency amounted to "a subversion of the hearing process." *Watson*, 481 F.3d 537 at 542. Accordingly, his claim is barred by *Stone v. Powell*.

The cases Russell cites do not compel a contrary conclusion. In *Terry v. Martin*, 120 F.3d 661 (7th Cir. 1997), the petitioner argued that his claim was not barred by *Stone* "because the Illinois courts did not apply the proper constitutional case law." 120 F.3d 661 at 663. The Seventh Circuit rejected this argument, concluding that the Illinois courts had applied the appropriate constitutional cases. Although the Seventh Circuit observed that the Illinois courts had also analyzed the facts of Terry's case thoroughly, this

conclusion had no bearing on its determination that the petitioner's claim was barred by *Stone*. As noted above, Russell does not dispute that the Illinois Appellate Court identified the correct constitutional standards in his case, and *Terry* is neither controlling nor persuasive on the issue of whether the Illinois Appellate Court adequately analyzed the facts of Russell's case. Similarly, the Tenth Circuit's determination in *Gamble v. State of Oklahoma*, 583 F.2d 1161 (10th Cir. 1978), that the petitioner's claim was not barred by *Stone* rested on its conclusion that it was "manifestly evident that the state courts did not recognize or apply the controlling *Brown [v. Illinois*, 422 U.S. 590 (1975)] standards." 583 F.2d at 1165. Finally, *Weber v. Murphy*, 15 F.3d 691 (7th Cir. 1994), is inapposite for at least the reason discussed above: the record in his case is not devoid of *any* evidence to support probable cause.

For the foregoing reasons, Russell's third claim is barred by *Stone v. Powell* and does not entitle him to a federal writ of habeas corpus.

D. Claim Four

In this claim, Russell asserts that he was denied due process and a fair trial when evidence obtained from an overly suggestive lineup was introduced to the jury. Respondent contests this claim on the merits, arguing that the Illinois Appellate Court's disposition of this claim is consistent with federal law. In his

38

reply, Russell identifies, for the first time, the prong of AEDPA he believes entitles him to relief, asserting that the Illinois Appellate Court unreasonably applied federal law to the facts of his case. Russell's argument fails on several fronts.

First, as noted above, the "unreasonable application" prong of AEDPA requires an application of governing principles that is not merely erroneous, but is objectively unreasonable. *Allen v. Chandler*, 555 F.3d 596, 602 (7th Cir. 2009). To prevail on this prong of AEDPA, "'a habeas petitioner must show that the state court's decision unreasonably applied clearly established Supreme Court precedent by unreasonably extending a rule to a context where it should not have applied or by unreasonably refusing to extend a rule to a context where it should have applied.'" *Id.* (quoting *Virsnieks v. Smith*, 521 F.3d 707, 713 (7th Cir. 2008)). Russell does not claim, however, that the Illinois Appellate Court extended or failed to extend any rule to a context in which it did not apply. In fact, Russell does not point to any flaw in the appellate court's reasoning at all; he simply contests the correctness of its holding. This does not entitle him to relief under the "unreasonable application" test.

Moreover, although Russell cites several Supreme Court cases for the general principles that 1) due process protects defendants from unnecessarily suggestive confrontations, and 2) courts may suppress a pre-trial identification if the procedures employed by

the police were inherently suggestive and created a substantial likelihood of irreparable misidentification,[12] he relies on Seventh Circuit jurisprudence for his specific claim that the procedures used in *his* case were unreasonably suggestive.  Russell asserts that because he was physically distinct from the other lineup participants, the lineup was unconstitutional under *United States v. Jones*, 454 F.3d 642, 649 (7th Cir. 2006), *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003), and *United States v. Traeger*, 289 F.3d 461, 473-74 (7th Cir. 2002).  These cases, he argues, stand for the proposition that "procedures that have been orchestrated to yield the identification of one particular suspect," such as "a lineup in which the suspect is clearly distinguishable from the other persons," are considered unduly suggestive.  *Jones*, 454 F.3d at 649.  Even assuming this rule were firmly established in *Supreme Court* precedent (as it must be to support a challenge under § 2254), Russell's argument would nevertheless founder on the Illinois Appellate Court's factual determination that Russell was *not* clearly distinguishable from the remaining lineup participants. Of course, I must accord substantial deference to this factual finding, *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008), and Russell has not overcome the presumption of its correctness. Russell insists that disparities in height and weight set him apart

---

[12]Russell cites *Stovall v. Denno*, 388 U.S. 293 (1967) for the first of these principles and *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972) for the second.

from the other lineup participants, as did the fact that he was bald. The appellate court rejected these arguments, concluding based upon its review of the record (which included a photograph of the participants taken either just before or just after the lineup; the height and weight of all of the participants; the fact that the participants were seated during the lineup; and Russell's own testimony that at least two or three other participants were "about his size") that Russell was not so physically distinct form the other participants as to render the lineup unduly suggestive. Russell's reiteration on habeas that he "weighed nearly twenty-five percent more or less than any other participant" is insufficient to overcome the presumption that the appellate court's factual finding was correct.

Finally, Russell also reiterates, in a skeletal fashion, the argument previously rejected by both the trial and appellate courts that his lineup was unduly suggestive because the police spoke directly to him while he was being viewed by a witness, causing him to move. Neither state court made a specific factual finding as to whether Russell did or did not move while in view of any witness. The trial court, however, declined to resolve this factual issue, since it concluded that regardless of whether Russell moved, the lineup as a whole was not unduly suggestive, a conclusion that was upheld on appeal. This conclusion was not unreasonable in light of the state courts' factual findings.

For the foregoing reasons, Russell's fourth claim fails to support a federal writ of habeas corpus.

## E. Claim Five

In his fifth claim, Russell asserts that he was denied due process and a fair trial when the trial court gave a jury instruction on accountability when there was insufficient evidence to support a theory that he acted as an accomplice. Respondent argues that this claim is procedurally defaulted because Russell failed to raise it in the state proceedings and also argues that the claim fails on the merits.

Russell's argument in the Illinois Appeals Court began with a passing reference to the Constitution and to general due process principles. With respect to this claim, Russell cited the Fourteenth Amendment and *In re Winship*, 397 U.S. 358, 361-64 (1970) for the principle that a conviction must be based upon proof beyond reasonable doubt of every element of the crime charged. The bulk of Russell's argument, however, focused on state law. I need not dissect Russell's state court arguments to determine whether they fairly presented a constitutional claim, however because I conclude that the claim as Russell now frames it lacks a constitutional dimension.

In his habeas petition, Russell again opens with the general proposition that constitutional due process requires proof of every element of a crime before a conviction may stand. The "meat" of

his argument, however, is that the Illinois accountability statute, ILCS 5/2-2(c), requires proof of the defendant's specific intent to promote or facilitate a crime, and that because the evidence presented in his case was insufficient to show that he had that specific intent, the trial court erred in giving an accountability instruction. In his reply, although Russell again cites *In re Winship* to argue that he raised a due process claim in the state proceedings, his substantive argument is bare of any reference to Supreme Court or federal case law. He cites only two cases in the whole of his argument: *People v. Crowder*, 239 Ill.App.3d 1027, 60 N.E.2d 277 (Ill.App.Ct. 1993), and *People v. Taylor*, 186 Ill.2d 439, 712 N.E.2d 326 (Ill.1999). Russell relies on the first for the proposition that "*[i]n Illinois* guilt predicated on an accountability theory must be based on evidence that the defendant specifically intended to facilitate the underlying crime." Pet.'s Reply at 30 (citing *Crowder*, 239 Ill.App.3d at 1030)(emphasis added). By the very terms of Russell's argument under *Crowder*, the violation alleged is one of state law and may not be reversed on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Russell then cites the Illinois Supreme Court's decision in *Taylor* for the proposition that mere presence at the scene of a crime and participation in the escape is insufficient to convict a defendant based on a theory of accountability. *Taylor* itself cited only Illinois authority for this proposition, however, and Russell

fails to explain how violation of this principle, without more, amounts to the deprivation of due process.

Respondent is correct that the mere invocation of the phrases "due process" and "fair trial" does not suffice to raise a constitutional claim.[13] *Verdin v. O'Leary*, 972 F.2d 1467, 1475 (7th Cir. 1992) (bare allegations of an unfair trial and cursory references to "due process" insufficient to articulate federal constitutional claims). As discussed above, a jury instruction error rises to the level of a constitutional violation only where it "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973) and citing additional cases). Russell's barebones allegation of a due process violation and his reference to the general principles set forth in *In re Winship* fall short of articulating a constitutional claim based on the accountability instruction given in his case.

Moreover, it appears that the manner in which the Illinois Appellate Court resolved Russell's claim was consistent with governing constitutional principles. The court first held that the evidence presented at Russell's trial was sufficient to warrant the accountability instruction, then went on to hold that even if the

---

[13]Russell's argument that respondent merely "feels Russell did not say 'due process' enough times" is not well taken. The problem is not that Russell failed to recite this phrase; the problem is that he failed to give it any constitutionally significant content through argument or citation to authority.

trial court erred in giving the instruction, the error was harmless because sufficient evidence was presented to support Russell's conviction as a principal. Nothing in Russell's argument challenges the Illinois Appellate Court's conclusion of harmless error. As discussed previously, a harmless jury instruction error does not violate the Constitution, *see*, e.g., *Boyde v. California*, 494 U.S. 370, 380 (1990), and offers no basis for habeas relief under § 2254. *Fry v. Pliler*, 551 U.S. 112 (2007), *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

For the foregoing reasons, Russell's fifth claim does not entitle him to habeas corpus.

F. Claim Six

In his final claim, Russell asserts that the evidence was insufficient to support his conviction. Russell acknowledges that the Illinois Appellate Court correctly identified the governing constitutional principles as those articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979) but argues that it unreasonably applied these principles in his case. Russell asserts that no reasonable trier of fact could have found that the evidence presented at trial established the essential elements of the crime with which he was charged.

As noted previously, to obtain relief under the "unreasonable application" prong of AEDPA, a petitioner must demonstrate that the state courts "unreasonably applied clearly established Supreme

Court precedent by unreasonably extending a rule to a context where it should not have applied or by unreasonably refusing to extend a rule to a context where it should have applied." *Virsnieks v. Smith*, 521 F.3d 707, 713 (7th Cir. 2008)). This is not, however, the gravamen of Russell's claim. Again, Russell points to no flaw at all in the Illinois Appellate Court's reasoning.

In its analysis, the court summarized the state's evidence--and Russell's attacks on that evidence--as follows:

> Our review of the record indicates that evidence presented at trial established that Gregory Craig, a passenger in Russell's van, testified that he was seated in Russell's van when Raashawn's SUV backed into the van. Craig testified that Russell told him to give him his gun. Robinson, who was with Russell moments before the accident, testified that Russell showed her his gun earlier that evening and that she saw him place it in his glove compartment. Robinson also testified that after the accident Russell asked Craig for his gun and Craig testified that Russell reached into the glove compartment to get it. Washington also testified that after the accident, she heard Russell tell someone to give him his gun. Craig also testified that he was in Russell's van as Russell chased Raashawn's SUV. Although Craig jumped out of Russell's moving van and did not testify to shots being fired, Tracy testified that he was in Raashawn's SUV and heard approximately twelve gunshots being fired from Russell's van. Tracy testified that one of those gunshots struck Aletra Slack in the head. The record indicates that the car chase continued until Raashawn crashed his SUV into a tree on Wentworth Avenue. Shivone testified that once the SUV crashed she saw the van that was chasing them drive by and she identified Russell as the driver of the van.

Our review of the record indicates that four witness
— Craig, Robinson, Washington, and Raashawn — heard
Russell demand his gun after Russell backed his SUV into
his van. Six witnesses testified that the van chased
Raashawn's SUV: Craig, Robinson, Washington, Tracy,
Shivone, and Raashawn. Tracy, Shivone, and Raashawn
testified that as they were being chased in Raashawn's
SUV by the van, they were fired upon. Shivone testified
that when the SUV crashed into a tree at Wentworth, she
saw Russell driving the vehicle. Furthermore, Shivone
was able to identify Russell at the police-line up.
After reviewing the record and considering all of the
evidence, we hold that the evidence presented at trial
established that Russell was guilty of the crimes with
which he was charged.

Russell, however, argues that the State's case was
based solely on Shivone's identification of Russell at
the scene of the Wentworth accident. Russell argues that
Shivone's identification testimony is unreliable because
she was the only witness to from (sic) the Wentworth
accident to identify him; she did not testify to seeing
Russell with a gun; and she testified that she was
shaken, dazed, and vomiting after the accident. This
case is similar to Slayton, where the court noted that
"[t]he identification of defendant by a single witness is
sufficient to sustain a conviction despite testimony to
the contrary, provided the witness is credible and
observed defendant under circumstances that would permit
a positive identification to be made." Slayton, 363
Ill.App.3d at 31. In this case, Shivone testified no
less than two times that she was able to see the face of
the driver of the van. She identified Russell as the
offender at trial, as well as at the police lineup. It
was for the jury to determine whether Shivone was a
credible witness. See Cunningham, 212 Ill.2d at 279-80.
Accordingly, when viewed in the light most favorable to
the State, Shivone's testimony, coupled with the other
eyewitnesses' accounts, is sufficient to support a guilty
verdict. See Jackson, 443 U.S. at 319, 61 L.Ed. 2d at

573, 99 S.Ct. At 2789; <u>Collins</u>, 106 Ill.2d at 261; <u>Slayton</u>, 363 Ill.App.3d at 31.

*Russell* at 24-26. The factual findings in this discussion are, of course, presumed correct. *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003).

In his habeas petition, Russell ignores the majority of the appellate court's factual findings. His claim appears to rest entirely on the state's lack of forensic evidence or "direct" eyewitness testimony (by which he means that none of the witnesses claimed to have seen Russell fire the fatal shot), and on his argument that the witness testimony presented--particularly that of Shivone Langford, which he deems "the single most important piece of evidence presented" at his trial--was unreliable.

First, as the appellate court noted, direct evidence is not required to sustain a criminal conviction, provided that the circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt, a principle Russell does not dispute. *See*, e.g., *Clayton v. Gilmore*, 114 F.3d 1191, 1997 WL 267850 at *5 (7th Cir. 1997) (circumstantial evidence can be used to satisfy requirement of proving guilt beyond reasonable doubt)(*citing Holland v. United States*, 348 U.S. 121, 138 (1954)). Accordingly, the state's lack of physical evidence alone is not fatal to the appellate court's determination of sufficiency.

Second, the appellate court plainly considered Russell's argument regarding the reliability of the witness testimony. It first pointed out that notwithstanding the facts that Russell claimed undermined Shivone's reliability, at least some factors supported the conclusion that her testimony was indeed reliable. The court then declined Russell's invitation to second-guess the jury as to Shivone's credibility. Finally, the court concluded that when taken together, the testimony of all of the witnesses was sufficient to support the jury's guilty verdict under the *Jackson* standard. Although Russell reasserts the shortcomings he perceives in Shivone's testimony, his argument leaves the majority of the appellate court's analysis intact, as he does not dispute the testimony of the majority of the state's witnesses.[14] Moreover, Russell offers no basis for overturning the court's conclusion that Shivone's credibility was appropriately a question for the jury.

Based on the foregoing, I conclude that Russell has not carried his burden of proving that the Illinois Appellate Court's decision unreasonably applied clearly established

---

[14]Russell argues in conjunction with his Fourth Amendment claim that Craig's testimony identifying him also should not have been considered. Because I concluded that that claim was barred by *Stone v. Powell*, I did not reach the question of whether Craig's testimony was appropriately before the jury. Even if that testimony were also discarded, however, the testimony of four of the state's six witnesses would remain intact.

Supreme Court precedent when it held that the evidence was sufficient to support Russell's conviction.  Accordingly, he is not entitled to habeas relief on this claim.

III.

For the foregoing reasons, Russell's petition for a writ of habeas corpus is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated:  June 3, 2009